FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

99 MAR 29 AM II: 16

N.D. OF ALABAMA

SHERRI WILLIAMS, B.J. BAILEY,   )
BETTY FAYE HAGGERMAKER,          )
SHERRY TAYLOR-WILLIAMS,          )
ALICE JEAN COPE, and JANE DOE,   )
                                 )
        Plaintiffs,              )
                                 )
v.                               )     Civil Action No. 98-S-1938-NE
                                 )
BILL PRYOR, in his official      )
capacity as the Attorney         )
General of the State of          )
Alabama,                         )         **ENTERED**
                                 )
        Defendant.               )         MAR 29 1999

## MEMORANDUM OPINION

The Alabama Legislature enacted an "Anti-Obscenity Enforcement

Act" during the Regular Session of 1989.  The Act subsequently was

codified at Alabama Code §§ 13A-12-200.1 to -200.10 (1975) (1994

Replacement Volume).   Nine years later, during the 1998 Regular

Session, the Alabama Legislature amended various provisions of the

Act through passage of Alabama Act No. 98-467.[1]   Among other

changes wrought, section 6 of Act No. 98-467 extended Alabama Code

§ 13A-12-200.2[2] — which previously had applied only to the

---

[1] Act No. 98-467 was enacted on April 29, 1998, with an effective date of
July 1, 1998.

[2] Prior to amendment, Ala. Code § 13A-12-200.2 (1975) (1994 Replacement
Volume) read as follows:

§ 13A-12-200.2.  Distribution, possession with intent to distribute,
production, etc., of obscene material prohibited; penalties.

(1)  It shall be unlawful for any person to knowingly

"distribution" of "obscene material"[3] — so as to criminalize the
distribution of "any device designed or marketed as primarily

---

distribute, possess with intent to distribute, or offer or agree to
distribute any obscene material for any thing of pecuniary value.
Any person who violates this subsection shall be guilty of a
misdemeanor and, upon conviction, shall be punished by a fine of not
more than $10,000 and may also be imprisoned in the county jail or
sentenced to hard labor for the county for not more than one year.
   (2) It shall be unlawful for any person, being a wholesaler,
to knowingly distribute, possess with intent to distribute, or
offer or agree to distribute, for the purpose of resale or
commercial distribution at retail, any obscene material for any
thing of pecuniary value. Any person who violates this subsection
shall be guilty of a misdemeanor and, upon conviction, shall be
punished by a fine of not more than $20,000 and may also be
imprisoned in the county jail or sentenced to hard labor for the
county for not more than one year.
   (3) It shall be unlawful for any person to knowingly produce,
or offer or agree to produce, any obscene material for any thing of
pecuniary value. Any person who violates this subsection shall be
guilty of a Class C felony. (Acts 1989, No. 89-402, p. 791, § 4.)

[3] The terms "obscene," "material," and "distribute" were defined in Ala.
Code §§ 13A-12-200.1(1), (2), and (3), reading as follows:

   (1) OBSCENE. Such term means that:
      a.   The average person, applying contemporary community
standards, would find that the material, taken as a whole, appeals
to the prurient interest; and
      b. The material depicts or describes, in a patently offensive
way, sexual conduct, actual or simulated, normal or perverted; and
      c. A reasonable person would find that the material, taken as
a whole, lacks serious literary, artistic, political or scientific
value.

   (2) MATERIAL. Any book, magazine, newspaper, printed or written
matter, writing, description, picture, drawing, animation,
photograph, motion picture, film, video tape, pictorial
representation, depiction, image, electrical or electronic
reproduction, broadcast, transmission, telephone communication,
sound recording, article, device, equipment, matter, oral
communication, live performance, or dance.

   (3) DISTRIBUTE. To import, export, sell, rent, lend, transfer
possession of or title to, display, exhibit, show, present, provide,
broadcast, transmit, retransmit, communicate by telephone, play,
orally communicate or perform.

2

useful for the stimulation of human genital organs...."

> (a)(1) It shall be unlawful for any person to
> knowingly distribute, possess with intent to distribute,
> or offer or agree to distribute any obscene material <u>or</u>
> <u>any device designed or marketed as useful primarily for</u>
> <u>the stimulation of human genital organs</u> for any thing of
> pecuniary value. <u>Material not otherwise obscene may be</u>
> <u>obscene under this section if the distribution of the</u>
> <u>material, the offer to do so, or the possession with the</u>
> <u>intent to do so is a commercial exploitation of erotica</u>
> <u>for the sake of prurient appeal</u>. Any person who violates
> this subsection shall be guilty of a misdemeanor and,
> upon conviction, shall be punished by a fine of not more
> than <u>ten thousand dollars</u> <u>($10,000)</u> and may also be
> imprisoned in the county jail or sentenced to hard labor
> for the county for not more than one year. <u>A second or</u>
> <u>subsequent violation of this subdivision is a Class C</u>
> <u>felony if the second or subsequent violation occurs after</u>
> <u>a conviction has been obtained for a previous violation.</u>
> <u>Upon a second violation, a corporation or business entity</u>
> <u>shall be fined not less than ten thousand dollars</u>
> <u>($10,000) nor more than fifty thousand dollars ($50,000)</u>.

1998 Ala. Acts 98-467, § 6, now codified at Alabama Code § 13A-12-200.2(a)(1) (Supp. 1998) (emphasis added to language added by amendment).

For convenience, this court shall hereafter refer to the statutory prohibition pertaining to "any device designed or marketed as primarily useful for the stimulation of human genital organs" in an abbreviated form, by the use of the phrase "sexual devices," or sometimes "proscribed devices."

Six plaintiffs bring this action pursuant to 42 U.S.C. § 1983, challenging the constitutionality of Alabama Code § 13A-12-

3

200.2(a)(1), as thus amended.  These plaintiffs may be bifurcated
into discrete groups, each averring potential harm from enforcement
of the challenged statute:  (1) vendors of sexual devices (the
"vendor plaintiffs"); and (2) persons who use such devices (the
"user plaintiffs").

     The first group includes plaintiffs Sherri Williams and B. J.
Bailey.  Williams is the principal shareholder of "Pleasures," an
Alabama corporation that owns and operates two retail stores
located in Huntsville and Decatur, Alabama, respectively, both of
which display and sell sexual devices and novelties. Bailey is the
principal investor in "Saucy Lady, Incorporated," an Alabama
corporation selling sexual devices and novelties, including
vibrators, lubricants, and oils, through in-home "'Tupperware' —
style parties."  These vendor plaintiffs fear criminal prosecution
under the subject statute, and seek injunctive relief barring
enforcement of it.  They also seek to bring suit on behalf of their
customers, who allegedly are reluctant to come forward "because of
the sensitive and intimately personal nature of the reasons for
using the product[s]."  (Complaint, Doc. No. 1, ¶ 18.)

     The second group of plaintiffs includes Betty Faye
Haggermaker, Sherry Taylor-Williams,[4] Alice Jean Cope, and Jane

---

[4] The court offers as a point of clarification that plaintiff Sherry

4

Doe. Each of these persons avers that she personally uses sexual devices either for therapeutic purposes related to sexual dysfunction, or as an alternative to sexual intercourse. (*Id.*, ¶¶ 29-33.)

All plaintiffs seek to enjoin Bill Pryor, the Attorney General of the State of Alabama,[5] from enforcing Alabama Code § 13A-12-200.2(a)(1).[6] They contend implementation of that statute will infringe upon their fundamental right to privacy and personal autonomy secured by the United States Constitution. Plaintiffs further argue that the challenged legislation does not bear a reasonable relationship to a proper legislative purpose.

Plaintiffs initially sought a temporary restraining order, but formally withdrew that request on September 9, 1998, following an agreement among the parties stipulating that "the status quo would be maintained and the amendments not enforced with respect to

Taylor-Williams is an individual resident of Alabama, whereas plaintiff Sherri Williams is an individual resident of Florida.

[5] In their complaint, plaintiffs also named Timothy W. Morgan, the District Attorney of Madison County, Alabama, as a defendant. Morgan has since been dismissed, however, in accordance with a stipulation of dismissal filed by plaintiffs on December 3, 1998. (Document No. 32.)

[6] "Federal courts [may] enjoin state officials to conform their conduct to requirements of federal law." Milliken v. Bradley, 433 U.S. 267, 289, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). The doctrine of *Ex parte* Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 426, 52 L.Ed. 714 (1908), allows a federal suit for prospective injunctive relief against a state official, challenging the constitutionality of a state official's action in enforcing state law. *See* Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985).

5

plaintiffs' [sic], pending the Court's determination following a hearing on plaintiffs' claims for preliminary injunctive relief." (Plaintiffs' request for expedited scheduling conference, Doc. No. 27, at ¶ 2.)   No state adjudication has occurred, and none is pending.  The matter presently is before the court on plaintiffs' motion for permanent injunctive relief.[7]

### OUTLINE OF DISCUSSION

I.   STATEMENT OF UNDISPUTED FACTS
     A.   The Vendor Plaintiffs
          1.   Sherri Williams and "Pleasures"
          2.   B. J. Bailey and "Saucy Lady, Incorporated"
          3.   Other vendors of sexual devices
     B.   The User Plaintiffs
          1.   Betty Faye Haggermaker
          2.   Sherry Taylor-Williams
          3.   Alice Jean Cope
          4.   Jane Doe
     C.   Relevant Provisions of Alabama Law
     D.   Condoms, Virility Drugs, and Masturbation
     E.   Recognized Therapeutic Uses of the Proscribed Devices
          1.   Federal Food and Drug Administration regulations
          2.   Booksellers, magazine publishers, gift shops, and Internet websites
          3.   Alfred Jack Turner, Ph.D.
          4.   Pepper Schwartz, Ph.D.

II.  ANALYSIS OF THE PARTIES' CONTENTIONS
     A.   Standing to Sue
     B.   Framework of Analysis for Substantive Due Process Claims
     C.   Does the Alabama Act Infringe on a Fundamental Right?
          1.   Background:  fundamental rights generally
          2.   Plaintiffs' assertion of a fundamental right
          3.   The Attorney General's response
          4.   Decisions of other courts faced with this issue
          5.   Breadth of the fundamental right to privacy
     D.   Rational Basis Review
          1.   Conceivable state interests
          2.   Are the interests legitimate?
               a.   Banning public displays of obscene material
               b.   Banning "the commerce of sexual stimulation and auto-
                    eroticism, for its own sake, unrelated to marriage,

---

[7] By means of an order entered on December 9, 1998 (Doc. No. 31), this court advanced the hearing on plaintiffs' motion for declaratory judgment and preliminary injunctive relief to a final hearing on the merits.

procreation[,] or familial relationships"
    c.    Banning commerce of obscene material
3.    Is Alabama Code § 13A-12-200.2(a)(1) rationally related to these legitimate state interests?
    a.    Banning public displays of obscene material
    b.    Banning "the commerce of sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation[,] or familial relationships"
    c.    Banning commerce of obscene material
        (1)  What can be classified as "obscene"?
        (2)  What are the devices "designed or marketed as useful primarily for the stimulation of human genital organs"?
        (3)  Are these devices obscene?

III.  CONCLUSION

## I. STATEMENT OF UNDISPUTED FACTS

The stipulation of facts filed by the parties on December 3, 1998, is set forth in full immediately below.[8]

## A.    The Vendor Plaintiffs

### 1.    Sherri Williams and "Pleasures"

1.    Plaintiff Sherri Williams is a resident of Florida and the owner and operator of "Pleasures," an Alabama corporation doing business in Alabama. "Pleasures" has two retail stores in Alabama, one located in Huntsville and one in Decatur. Sexual aids and novelties are displayed and sold at these locations.

2.    The "Pleasures" store in Huntsville has been in operation since June, 1993. It is located on a main thoroughfare of Huntsville in a small shopping mall within a retail business district. It is adjacent to other retail stores which include an adult video store, a liquor store, a hair salon, a spa, an O'Charley's restaurant[,] and also a WalMart Super Center just 150 feet to the rear.

---

[8] This court added the descriptive headings set out in boldface type.

7

3. The "Pleasures" store in Decatur has been in operation since February, 1996. It is located on a main thoroughfare of Decatur in a small shopping mall within a retail business district. It is adjacent to other retail stores, which include a Texaco, a chiropractor's office, a pet grooming facility, a tanning salon, a printer, a specialty kite shop[,] and a women and children's linen clothing store.

4. Both stores have brick storefronts with large display windows which commonly display lingerie, massage oils, adult games, hosiery, instructional videos, bath powders, aromatherapy candles, romance novels, etc. They also have standard wood signage on the glass front doors stating, "If offended by explicit sexuality, Please do not enter, You must be 21 years of age."

5. The products in both stores are displayed openly in much the same way [that] products are displayed in a novelty store.

6. The product line in both stores is adult oriented and persons under the age of 21 are not permitted entry.

7. Both stores are strictly retail. There are no sexual performances or video shows. The only services offered are counseling on use of the product and the additional sale of cakes, chocolates, and similar foods and various types of coffee.

8. "Pleasures" does not purport to operate as or resemble an adult bookstore, although a limited number of adult oriented "soft porn" or "R" rated videos and magazines are sold.

9. The products sold at both stores include novelty products with an adult theme, and items that are marketed to facilitate sexual relations, such as condoms, lubricants, and vibrators. A complete inventory list of the product[s] available at "Pleasures" is attached.[9]

---

[9] Plaintiffs belatedly filed the inventory list (Doc. No. 40, Exhibit A)

8

Some of the products sold may, Ms. Williams believes, be covered by the statute, which Ms. Williams believes may subject her, and/or her agents, to arrest and prosecution.

10. "Pleasures" offers a large variety of romance orientated products marketed simply as "Adventures in Romance." The product line represents the intimate, private, and personal relations of the clientele. "Pleasures" promotes an extensive line of lingerie, exotic oils, lotions, and lubricants, gourmet chocolates, instructional video and reading materials, marital aids, vibrating and non-vibrating sexual aids.

11. There have been no arrests of Sherri Williams, or her agents, in connection with the operation of "Pleasures."

12. The "Pleasures" store in Huntsville has approximately 14,960 customers annually. In 1997, approximately 22,440 items were sold, generating gross revenue of approximately $448,837.00. Through July 1, 1998, approximately 10,060 items were sold, generating gross revenue of approximately $201,314.00.

13. The "Pleasures" store in Decatur has approximately 5,600 customers annually. In 1997, approximately 8,455 items were sold, generating gross revenue of approximately $169,093.00. Through July 1, 1998, approximately 5,170 items were sold, generating gross revenue of approximately $103,438.00.

14. Customer interest in the products is varied. Many use these products to avoid the possibility of sexually transmitted diseases; while others use the products to better stimulate intimate relationships with partners; there are those who use the products to achieve sexual satisfaction not otherwise available to them; and some use these products for temporary or long-term sexual satisfaction when a partner is not otherwise available. Many of "Pleasures'" customers have even been

---

on March 19, 1999.

9

        referred to the store by therapists treating them for
        sexual dysfunction or marital problems.

## 2. B. J. Bailey and "Saucy Lady, Incorporated"

        15. Plaintiff B.J. Bailey is a resident of the
        State of Alabama and the owner and operator of "Saucy
        Lady, Incorporated," an Alabama corporation doing
        business in Alabama. "Saucy Lady, Incorporated,"
        conducts in-house "Tupperware"-style parties at which
        sexual aids and novelties are displayed and sold.

        16. "Saucy Lady, Incorporated," has been conducting
        parties throughout Alabama since 1995, and prior to
        incorporation since 1993.

        17. "Saucy Lady" parties are conducted in the
        privacy of a host home and are marketed exclusively to
        adult women. Attendance is generated largely through
        word of mouth. No advertising is conducted.

        18. In 1997, approximately 770 "Saucy Lady" parties
        were conducted throughout the [S]tate of Alabama. Through
        July 1, 1998, approximately 380 parties were conducted.

        19. "Saucy Lady" parties were conducted in the
        following counties in 1997-1998: Lauderdale; Lawrence;
        Limestone; Madison; Jackson; Franklin; Morgan; Marshall;
        Walker; and Shelby.

        20. Attendance at "Saucy Lady" parties ranges from
        3 to 35. Total attendance in 1997 was approximately
        7,700. Total attendance in 1998 (through July 1st) was
        approximately 3,800.

        21. At "Saucy Lady" parties, sexual paraphernalia,
        aids and novelties are sold. A list of the product line
        is attached.[10] Some of these products may, Ms. Bailey
        believes, be covered by the statute, which Ms. Bailey
        believes may subject her[,] and/or her agents, to arrest

_____

        [10] Plaintiffs belatedly filed the product list (Doc. No. 40, Exhibit B) on
March 19, 1999.

                              10

and prosecution.

22. In 1997, approximately 10,500 products were sold, generating revenue of approximately $160,000.00. In 1998, through July 1st, approximately 5,250 products were sold, generating revenue of approximately $80,000.00.

23. There have never been any arrests in connection with "Saucy Lady" parties.

24. "Saucy Lady, Incorporated," does not advertise its business, which grows from referrals from parties. Ms. Bailey is invited into a host's home, where she shares "romance-enhancing" information for an hour with the guests who attend the party.

25. Ms. Bailey is self-taught, and makes no claim to be a counselor of any kind. If Ms. Bailey becomes aware of extreme cases of sexual dysfunction, she refers them to a medical doctor and/or psychotherapist. She also refers women who report abuse to the local women's shelter, Hope Place. Ms. Bailey describes her business as focused on ways to help couples make their marriage stronger through better communication, by understanding each other's bodies[,] and by considering how their partner views their intimate relationship.

26. "Saucy Lady" customers include married, single[,] and divorced adult women from 19 to 70 years of age (thus far), and of diverse religious, racial, and ethnic backgrounds, and varied professions and occupations. These women vary greatly in their level of sexual experience and knowledge. If called to testify, Ms. Bailey would testify that the majority of women who attend her parties have shared with her that they were either anorgasmic or had extreme difficulty reaching orgasm through sexual intercourse alone. Some of these customers have consulted a doctor or therapist about these issues. A great many customers have reported to Ms. Bailey that the products they purchased helped them to become orgasmic and greatly improved their marital and sexual relations.

11

27. If called to testify, Ms. Bailey would testify
that many women have also shared with her that they
wished to avoid sexual relations with others because of
the risk of sexually transmitted diseases, prior negative
relationships or other risks associated with developing
an intimate relationship.   Some women are unable to
establish a relationship with another person, but still
wish to be sexually active.   These women often purchase
sexual aids or devices so that they can achieve their
personal sexual goals in this respect within the privacy
of their homes without involving another person.

## 3.    Other vendors of sexual devices

28. Until the adoption of section 13A-12-200.12 of
the *Alabama Code*, the products sold by "Pleasures" and
"Saucy Lady, Incorporated," were available for sale
within in the State.   Sex boutiques specializing in
romance enhancing products and novelties operate in
virtually every major city in Alabama and cities
throughout the United States. Moreover, the products are
available through mail order catalogues and the Internet.

## B.   The User Plaintiffs

### 1.    Betty Faye Haggermaker

29. Plaintiff Betty Faye Haggermaker is a resident
of the State of Alabama and a user of the types of
devices which the new Alabama statute seeks to proscribe.
Ms. Haggermaker is a 43 year-old married woman who uses
the devices with her husband of twenty-five years, both
to enhance their intimate relationship and to assist her
in over-coming [sic] orgasmic difficulties.    Ms.
Haggermaker is a customer of "Saucy Lady, Incorporated."

30. During the second decade of Ms. Haggermaker's
marriage, including the time period after she had a
partial hysterectomy, it was very difficult for her to
achieve orgasm.   She has now used for approximately the
last four years[,] and continues to use[,] marital aids
to improve her intimate relationship with her husband and
to achieve orgasm.

12

## 2.    Sherry Taylor-Williams

31.   Plaintiff Sherry Taylor-Williams is a resident
of Alabama and a user of the types of devices which the
new Alabama statute seeks to proscribe.   Ms. Taylor-
Williams is a 48 year-old woman who has been divorced and
is now single.   Ms. Taylor-Williams first began using
sexual devices on the advice of her medical doctor after
experiencing five years of marital intimate relations
without being able to achieve orgasm.   Without such
devices, Ms. Taylor-Williams is anorgasmic.   Ms. Taylor-
Williams is a customer of "Saucy Lady, Incorporated."

## 3.    Alice Jean Cope

32.   Plaintiff Alice Jean Cope is a resident of
Alabama and a user of the types of devices which the new
Alabama statute seeks to proscribe.   Ms. Cope is a 30
year-old married woman who uses the devices in her
intimate relations with her husband.   The marital aids
have been used as a door to open communication by Mrs.
Cope and her husband.   Before beginning use of such
sexual devices approximately one year ago, Ms. Cope was
anorgasmic for approximately the last ten years, even
though she was sexually active during that time period.
Ms. Cope is a customer of "Saucy Lady, Incorporated."

## 4.    Jane Doe

33.   Plaintiff Jane Doe is a resident of Alabama and
a user of the types of devices which the new Alabama
statute seeks to proscribe.   Ms. Doe is a 50 year-old
woman who is now single, but has previously been married
and divorced.   Ms. Doe began using sexual devices as a
means to combat post-partum depression and to help her
marital relationship.   Her use of such devices was
approved of and encouraged by her therapist.   Using
marital aids to reach orgasm improved Ms. Doe's marital
relationship and helped her to overcome depression.   Ms.
Doe currently uses the devices to avoid the possibility
of contracting sexually transmitted diseases.   Ms. Doe is
a customer of "Saucy Lady, Incorporated."

13

**C.    Relevant Provisions of Alabama Law**

34.    Pursuant to section 13A-12-200.2 of the *Alabama
Code*, it is unlawful to sell or otherwise distribute
obscene material. This has been the law in Alabama since
at least 1975.    In 1998, this provision of Alabama's
criminal code was amended to prohibit the sale or
distribution of any device designed or marketed primarily
for the stimulation of human genital organs ("sexual
aids," "sexual devices" or "marital aids"). The law went
into effect on July 1, 1998. Enforcement of the ban will
make it a crime to sell or distribute any device designed
or marketed as primarily useful for the stimulation of
human genital organs for any thing of pecuniary value.
The only way to obtain marital aids will be to purchase
or otherwise obtain them in another state and bring the
product back across state lines.    Alternatively, a
visiting friend or other person can bring them across
state lines and provide them to Alabama residents,
provided a sale is not involved.

**D.    Condoms, Virility Drugs, and Masturbation**

35.    The text of the statute does not define sexual
devices as obscene per se[,] or purport to regulate them
on the grounds that they may be obscene as that term is
defined in the statute. The statute simply declares that
it is unlawful to sell, distribute[,] or produce any
devices designed or marketed as primarily useful for the
stimulation of human genital organs for any thing of
pecuniary value.  The legislative basis or rationale for
the enactment of the prohibition against the sale of
sexual devices does not appear in the statute or in the
statement of legislative findings.[11]

36.    Ribbed and tickler condoms are manufactured in
Alabama and sold throughout the [S]tate as well as
nationally.

---

[11] The parties' stipulation notwithstanding, the court notes that the
Alabama Legislature included its basis and rationale for Act No. 98-467 in
section one of that Act. *See* Part II.D.1 *infra*.

14

37. Virility drugs, such as Viagra, are also available in Alabama.

38. The laws of the State of Alabama do not per se prosecute masturbation or other stimulation of the genitalia—even when performed with a sexual aid. It is only the sale of such devices that is proscribed. Note: This conduct may be unlawful if performed in conjunction with another illegal act, such as public lewdness, or molestation.

E.   **Recognized Therapeutic Uses of the Proscribed Devices**

39. The plaintiff "sellers" of the products in this case have customers with a wide variety of therapeutic needs. A number of purchases are by anorgasmic women for which the use of a vibrator or similar device is the standard treatment recommended by therapists. Such a vibrator may or may not be penis shaped and may or may not be used for vaginal insertion. Because of the sensitive and intimately personal nature of the reasons for using the products, most users of the products are understandably reluctant to come forward and challenge this law.

40. Women who are anorgasmic have difficulty achieving orgasm through sexual intercourse, masturbation[,] or other stimulation of the genitalia. The inability to achieve orgasm through sexual intercourse is a recognized and treatable medical condition. In the opinion of some medical and psychological professionals, failure to treat the condition may not only jeopardize the women's physical and physiological health, but may also destroy a marriage or relationship. For this reason, many married and unmarried couples seek out therapy or advice on how to treat this condition.

41. There are at least three reasons for use of a vibrator by anorgasmic women. First, some women may be less physiologically responsive than others. The vibrator is helpful for these women in the same manner as are the vibrators commonly used by physical therapists in

15

the treatment of people with cerebral palsy. In treating
cerebral palsy, the vibration has a specific effect on
the sensory and motor enervation of the muscle.   A
vibrator is used in sex therapy to cause vibration to go
through the pubic bone to the sensory endings called
muscle spindles within the pelvic musculature.   This
helps lower the physiological threshold for initiating
the spinal reflex.

    42.   The second reason for using a vibrator in dildo
form is to lower a patient's inhibitions and produce
intense stimulation that is difficult or impossible to
duplicate manually. This is especially helpful to women
who have built up a history of nonorgasmic sexual
experiences, which causes what is called orgasmic
inhibition.

    43.   Another reason for use of a vibrator in dildo
form, or a dildo alone, is for women who have relaxed
pelvic muscles which cause the orgasmic response to be
less intense than usual.   These women are prescribed
Kegel's exercise, with a dildo or dildo-type vibrator
inserted to provide resistance.   This exercise is
essential   for   women   suffering   urinary   stress
incontinence.   Many women suffer varying degrees of
incontinence at some point in their lives. The condition
is often caused by  the stretching of the pelvic
ligaments during childbirth, which causes the bladder to
prolapse.  Kegel's exercise, in which the circumvaginal
muscles are contracted and strengthened, is universally
acknowledged as the most effective way of avoiding
urinary stress incontinence, short of surgery.

## 1.   Federal Food and Drug Administration regulations

    44.   The   Food   and   Drug   Administration   has
promulgated the following regulations concerning powered
vaginal muscle stimulators and genital vibrators:

    §   884.[5940].      Powered   vaginal   muscle
    stimulator for therapeutic use.

        (a)   Identification.  A  powered  vaginal

16

muscle stimulator is an electrically powered
device designed to stimulate directly the
muscles of the vagina with pulsating
electrical current. This device is intended
and labeled for therapeutic use in increasing
muscular tone and strength in the treatment of
sexual dysfunction. This generic type of
device does not include devices used to treat
urinary incontinence.

(b) Classification. Class III (premarket
approval).

[....]

§ 884.5960. Genital vibrator for therapeutic
use.

(a) Identification. A genital vibrator
for therapeutic use is an electrically
operated device intended and labeled for
therapeutic use in the treatment of sexual
dysfunction or as an adjunct to Kegel's
exercise (tightening of the muscles of the
pelvic floor to increase muscle tone).

(b) Classification. Class II
(performance standards).

21 C.F.R. §§ 884.[5940] & 884.5960 (1984)

45. Various studies estimate that 20% of all
sexually active women have used a vibrator at some point
during their lives. Therapists sometimes direct patients
to adult stores to find suitable vibrators for therapy
purposes. If vibrators and related products, such as
oils and lubricant, were not readily available to the
public, anorgasmic women who want to obtain such products
would have to leave the [S]tate to do so or obtain them
by other means.

46. Some of the plaintiff "users" of the products
in this case are indeed anorgasmic and have purchased

17

vibrators to treat their condition. Many customers of
the plaintiff "sellers" in this case use sexual aids for
these purposes as well. Some of these individuals have
acted on the recommendation or approval of a therapist or
medical doctor, while others may have acted on the
recommendation of a husband, lover, friend, or popular
literature freely available in the community.

47. A separate category of purchasers of the
vibrators and other types of sexual devices covered by
the challenged statutory provision are individuals for
whom sexual intercourse may not be an option for a number
of reasons, including a medical condition or physical
handicap. Fear of contracting or spreading AIDS or
another sexually transmitted disease is compelling
grounds to avoid sexual intercourse, the availability of
condoms notwithstanding. There are many individuals who
would prefer to play it safe rather than risk their life
with a one-night-stand. Many of the plaintiff "sellers'"
customers fall into this category.

48. Sexual intercourse may not be an option for
other reasons as well. An individual may be unable or
simply unwilling to find a spouse or take on a serious or
casual lover. This may be the result of an individual's
physical appearance, personality, philosophy, or even the
person's age, particularly if it is advanced. Thus, in
addition to the women who use vibrators as a therapeutic
device, a number of the individual plaintiffs in this
case simply use vibrators and other devices as an
alternative to sexual intercourse.

49. This decision is a matter of preference or may
be the only viable way of obtaining sexual gratification
because of the unavailability of a spouse or lover. Many
of the plaintiff "sellers'" customers fall into this
category.

50. One of the "user" plaintiffs in this case uses
a vibrator or dildo-type device as an alternative to
sexual intercourse for one or more of the reasons set out
in the preceding paragraph.

18

**2. Booksellers, magazine publishers, gift shops, and Internet websites**

51. Barnes and Noble bookstore is located on University Drive in Huntsville, Alabama. Waldenbooks bookstore and Spencer Gifts shop are both located in Madison Square Mall in Huntsville. The Wal-Mart department store and Whispers, an adult novelty shop, are also located on University Drive. Except for Whispers, which restricts admittance to persons over 21 years of age, all of these stores are open to the general public.

52. Barnes and Noble sells a number of books which describe the use of vibrators/sexual aids to assist women in achieving orgasm and to help generally in sexual relationships. The following books are available at Barnes and Noble:

Becoming Orgasmic: A Sexual and Personal Growth Program for Women, Julia R. Heiman, Ph.D., and Joseph Lopiccolo, Ph.D., 1988, Prentice Hall Press[;]

The Complete Guide to Women's Health, 3rd Revised Edition, Bruce D. Shepard, M.D., F.A.C.O.G. and Carroll A. Shepard, R.N.[,] Ph.D., 1997, First Plume Printing[;]

Healthy Sex, Dr. Miriam Stoppard, 1998, DK Publishing Book[;]

The Kinsey Institute New Report on Sex: What You Must Know To Be Sexually Literate, June M. Reinisch, Ph.D.[,] with Ruth Beasley[,] M.L.S., 1990, St. Martin's Press[;]

The New Good Vibrations Guide to Sex, Cathy Winks and Anne Semans, 1997, Cleis Press Inc.[;]

Our Bodies, Ourselves for the New Century, 1998, Boston Women's Health Book Collective, 1998, Simon & Schuster[;]

19

Sex For One: The Joy of Selfloving, Betty Dodson,
Ph.D., 1996, Three Rivers Plus[;]

Sex Over 40, Saul H. Rosenthal, M.D., 1987,
Tarcher/Putnam[;]

Sexual Pleasure: Reaching New Heights of Sexual
Arousal & Intimacy, Barbara Kessling, Ph.D., 1993,
Hunter House, Inc.[;]

A Woman's Guide to Overcoming Sexual Fear & Pain,
Aurelie Jones Goodwin, Ed.D.[,]    and Marc E.
Agronin, M.D., 1997, New Harbinger Publications,
Inc.

Excerpts from the above titles are attached to the
affidavit of Amy Louise Herring as Exhibit "A", submitted
in support of Plaintiffs' Motion for a Temporary
Restraining Order and Preliminary Injunction.    Each of
these books describe and recommend the use of vibrators
as a sexual aid.

        53.    Waldenbooks also has a variety of titles which
discuss vibrators and their use in achieving orgasm and
enhancing sexual relationships.    The following books are
available at Waldenbooks:

Changing Positions: Women Speak Out On Sex And
Desire, Joanne Marrow, Ph.D., 1997, Adams Media
Corporation[;]

The Guide To Getting It On!: A New and Mostly
Wonderful Book About Sex, Goofy Foot, 1996, The
Goofy Foot Press[.]

Attached to the affidavit of Amy Herring as Exhibit "B"
are excerpts from those books.    Those books describe and
recommend the use of vibrators as a sexual aid.

        54.    Spencer Gifts offers for sale a number of
vibrators from a variety of available products.    Copies
of portions of the exterior packaging of three of these
items are included as Exhibit "C" in the affidavit of Ms.

20

Herring. The packaging of each of those items indicates that the items are intended to be used in sexual activities.

55. Two of the books available in Huntsville's bookstores, entitled <u>Sex Over Forty</u> and <u>Becoming Orgasmic</u>, described a commonly sold body massager and how it could be used to stimulate the human genitalia. A device meeting this description is located in the personal appliance section of Wal-Mart on University Drive. A copy of a portion of the exterior packaging of this product is attached to the affidavit of Ms. Herring as Exhibit "D". Although nothing on the package suggests the use of the product for such stimulation, the instructions provided in <u>Sex Over Forty</u> and <u>Becoming Orgasmic</u> clearly indicate that this product may be used successfully for the stimulation of the human genital organs.

56. Numerous magazines available in Huntsville contain advertisements for sexual aids available by mail and/or articles about the use of sexual aids to achieve orgasm. The following magazines are sold locally:

> <u>Complete Woman</u>, June/ July 1998 (Obtained from B.J. Bailey on July 9, 1998)[;]

> <u>Cosmopolitan</u>, July 1998 (purchased at Barnes & Noble on July 9, 1998)[;]

> <u>McCall's</u>, April 1998 (purchased at Barnes & Noble on July 9, 1998)[;]

> <u>Redbook</u>, July 1998 (purchased at Barnes & Noble on July 9, 1998)[;]

> <u>Scientific American Presents Women's Health</u>, Quarterly, Display until August 31, 1998 (purchased at Barnes & Noble on July 9, 1998)[;]

> <u>Sex Life</u>, #4 (purchased at Barnes & Noble on July 9, 1998)[.]

21

Copies of ads and/or articles found therein are included
as Exhibit "E" in the affidavit of Ms. Herring.

57.  The Internet contains numerous web sites which
featured the sale of sexual aids.  The following sites
are available:

"Action Girl Toys," http://www.girltoys.com[;]

"Acts of Love: Toys & Video,"
http://www.barelake.com/ cat2.html[;]

"Condoms, etc.," http://www.condomsetc.com[;]

"Good Vibrations - Toys,"
http://secure.goodvibes.com/cgi-bin/menu...
=PJFWPXSPZNFRSNCM&sub=toys&docs=index.html[;]

"Kamma Sutra,"
 http://www.pleasureplay.com/shop.html[;]

"Secret Toys,"
http://www.secrettoys.com/sextoys/menu.html[;]

"TOYBOX erotica,"
 http://www.toyboxerotica.com/tbstlc.htm[.]

Excerpts from the sites are attached as Exhibit "F" in
Ms. Herrings's affidavit.

**3.  Alfred Jack Turner, Ph.D.**

58.  Dr.  Alfred  Jack  Turner  is  a  clinical
psychologist in private practice in Huntsville, Alabama
and an expert in the fields of clinical psychology and
human sexuality.  In the past, he has testified in that
capacity.  Dr. Turner is an expert for purposes of FRE
702 in the field of clinical psychology and the treatment
of sexual disorders.  The bases of his opinion and
testimony comport with FRE 703.  Dr. Turner has been in
private practice since 1978.  Before that, he was the
Associate Director of the Huntsville-Madison County
Mental Health Center from 1970 until 1978.  Dr. Turner

22

was a faculty member at Auburn University from 1964 until 1970, first as an Assistant Professor of Psychology (1964-1967) and later as an Associate Professor of Psychology (1967-1970); serving also as a member of the University of Alabama in Huntsville.

59.  Dr. Turner was a consultant for the National Aeronautics and Space Administration ("NASA") in Huntsville from 1963 to 1975. He served as a member of the Alabama State Board of Examiners in Psychology from 1966 to 1972 and as a member of the Professional Advisory Board of the State (Alabama) Mental Health Association from 1967 to 1970. He was a consultant to the Alabama Mental Health Association (1963-1970), the OEO Programs in Lee and Macon Counties, Alabama (1966-1969), the Tuskegee Mental Health Clinic (1964-1969), the Veteran's Administration Hospital, Tuskegee, Alabama (1964-1969; also Coordinator of Group Therapy from March, 1966), and the Jackson County, Morgan County[,] and Tri-County Mental Health Clinics (1962-1964).

60.  Dr. Turner received his Ph.D. in Psychology from Florida State University in 1962. He served an Internship in Clinical Psychology at the University of Louisville during 1961-1962. He received the Bachelor of Science Degree in Physical Education from Auburn University (1954). He also pursued post-graduate studies in psychology at Emory University (1956-1957) and Auburn University (1957-1958).

61.  Dr. Turner holds professional memberships in the American Psychological Association, the Southeastern Psychological Association, the Alabama Psychological Association (President 1967-1968, Chairman, Committee for Training and Salary Standards for Psychologists in Alabama and Committee on Insurance), the American Association of University Professors, Phi Delta Kappa, Phi Chi, and the Association for the Advancement of the Behavioral Therapist. Dr. Turner's *vita* is attached hereto as an additional reference and also lists honors received and describes his dissertation and professional publications.

23

62. If called to testify, Dr. Turner would testify
that in his practice in clinical psychology, he
principally counsels patients who have experienced sexual
dysfunction or other sexual problems. Many of his female
patients have difficulty in achieving orgasm and, in some
cases, have never achieved orgasm. Dr. Turner regularly
recommends the use of sexual/marital aids such as
vibrators to his patients to assist them in overcoming
sexual dysfunction and other sexual problems. Reports
from his female patients have indicated that sexual aids
have helped them in achieving orgasm, sometimes after
many years of frustration and difficulty in their sexual
relationships.

63. If called to testify, Dr. Turner would testify
that he also sometimes counsels older persons or disabled
persons who are having difficulties with sexual
expression. The use of sexual aids such as vibrators is
also extremely helpful in these situations, especially
when sexual intercourse is not possible due to physical
limitations or lack of a partner.

64. If called to testify, Dr. Turner would testify
that other situations in which he has recommended the use
of sexual aids to aid in overcoming sexual difficulties
have included persons who are not able to have a sexual
partner due to fear of sexually transmitted diseases,
emotional attachment[,] or other perceived dangers of
sexual relationships, both real and imagined. He has
counseled some patients who were unable to locate
appropriate sex partners due to lack of physical
attractiveness or obesity. Sexual aids have provided an
appropriate outlet for sexual expression for these
patients as well.

65. It is Dr. Turner's professional opinion[,]
based on his years of experience in sexual therapy and
counseling, [that the] expression of sexuality, including
the successful experience of orgasm, are important
aspects of a person's overall mental health. His
professional opinion is that the sexual experience[,]
culminating in sexual climax or orgasm[,] builds self-
esteem and confidence, relieves stress[,] and has been

24

clinically proven to generate and release hormones which aid in the achievement of an appropriate mental balance and positive outlook on life situations in general. In his practice, he has frequently seen sexual aids help in the re-vitalization of potentially failing marital relations as well.

**4. Pepper Schwartz, Ph.D.**

66. Dr. Pepper Schwartz is a Professor of Sociology at the University of Washington Department of Sociology in Seattle, Washington, where she has done research and taught classes since 1972. She is a nationally renowned expert in the field of human sexuality and has also testified on the subject on numerous occasions. Dr. Schwartz is an expert for purposes of FRE 702 in the field of human sexuality. The bases of her opinion comports with FRE 703.

67. Dr. Schwartz's teaching has included courses on the contemporary family, the history of the family, gender and the family, gender and sexuality, the social organization of human sexuality, qualitative methodology[,] and other topics. At this university, Dr. Schwartz has also served on the executive, recruitment, admissions, and development committees of her department[,] and took a leave of absence to be a Special Assistant to the Provost for two years.

68. Dr. Schwartz received her Ph.D. from Yale University in 1974. She received a M.Phil. from that University in 1970, a M.A. from Washington University (in St. Louis) in 1968[,] and a B.A. from Washington University in 1967.

69. Dr. Schwartz was elected President of the Society for the Scientific Study of Sex, an international association of sex researchers, in 1992-93[,] after having served as President of the Western region of that organization in 1989-91. Among other national offices and services[] Dr. Schwartz has performed, she was elected to the Committee of Publications for the American Sociological Association 1995-98, appointed to the

25

American Medical Association review committee on Human Papilloma Virus Consensus Group in 1997[,] and the Yale Council Committee on the Social Sciences 1989-1993.

70. Dr. Schwartz is on the editorial board of a number of sociological and sexological publications[,] including the <u>Journal of the International Network on Personal Relations</u>, <u>Sexual Health</u>[] (senior editor), and the <u>Journal of Personal Relationships</u>. She has served as a reviewer for many other journals[,] including the <u>American Sociological Review</u>, the <u>Journal of Marriage and the Family</u>, the <u>Journal of Family Issues</u>, etc. She has also served on several review committees for the National Institute of Health.

71. Dr. Schwartz has been asked to give expert testimony on a number of important issues in her field and has served on national commissions. She was asked to give testimony in *Baehr v. Department of Health*, 1st Circuit Court of Hawaii, on the issue of gay marriage and marriage in the United States, and on sexuality in the military in Federal Court in New York City in the 2nd Circuit on the comparisons of heterosexual and homosexual practices. She has also given testimony to the United States Commission on AIDS. Dr. Schwartz served on the National Committee on Sexual Education for Planned Parenthood, the National Committee on Sexuality and the Media for S.E.I.C.U.S.[] (sex education, information council of the United States)[,] and for the National Commission on Adolescent Sexual Health. In 1984, Dr. Schwartz served on President Ronald Reagan's Advisory Roundtable on the Family.

72. Dr. Schwartz is the author of eleven books, most of a scholarly nature, among them <u>The Gender of Sexuality</u> (with Virginia Rutter) Pine Forge, 1998, <u>Peer Marriage</u>, Free Press, 1994, <u>Gender and Intimate Relationships</u> (with Barbara Risman and others) and <u>American Couples</u> (Wm. Morrow, 1983). She also writes for a general audience and writes nationally syndicated columns for American Baby Magazine on relationships and sexuality and Glamour Magazine (with Janet Lever) on Sex and Health. She has also written <u>The Great Sex Weekend</u>

26

(with Janet Lever; Putnam, 1998) which, among other
information, discusses the use of vibrators in sexual
enhancement. The newest popular books Dr. Schwartz has
written will be published next year, What I Learned about
Sex: Wisdom from America's Sex Educators, Counselors, and
Researchers (with Debra Hafner; Putnam, 1998) and 201
Questions for Parents to ask Children/ 201 Questions for
Children to ask Parents, Avon, 1999. Dr. Schwartz has
also published over 40 academic articles. More specific
information is included in her vita.

73. If called to testify, Dr. Schwartz would
testify that based on her review of the literature, her
interviews with hundreds of couples about their sex
lives, and her receipt of thousands of questionnaires and
letters from both men and women, she has concluded that
vibrators are a commonly accepted form of sexual
pleasure, release and therapy in the United States, most
usually used in couple relationships, but also used by
women and men alone.

74. If called to testify, Dr. Schwartz would
testify that her research and experience indicates that
some of the earliest discussions of vibrators and
dilators (often popularly called dildos) appears in the
therapeutic literature in the early work of William
Masters and Virginia Johnson in which they used both
devices to measure female sexual functioning. The work
they did would have been impossible to accomplish without
these devices and they helped establish base line data on
orgasmic capacity and dysfunction. Later work by
Masters, Johnson[,] and Kolodny helped establish that
vibrators and dilators were useful for helping establish
orgasmic capacity in anorgasmic women and also for re-
establishing capacity in gerontological populations.
They also did some work in helping women who had little
or no sexual feeling establish sexual feeling.

75. If called to testify, Dr. Schwartz would
testify that her research and experience indicates that
the field of modern sex therapy was essentially
established with the work of Masters, Johnson, and
Kolodny, although sexual therapy per se has been

27

practiced for hundreds of years and there is advice on how to be sexually functional in the most ancient of tracts. This is because, throughout the ages, people have realized that sexual functioning is an important part of human mental health -- not just for the purposes of reproduction, but also for promoting health, happiness, and relationship bonding.

76. If called to testify, Dr. Schwartz would testify that her research and experience also indicates that modern sexual therapy now believes that masturbation is an important adjunct to sexual functioning[,] and that masturbation is a healthy rehearsal to establish knowledge about one's body and the ability to give and receive pleasure. While it might seem that everyone could accomplish masturbation manually, in fact, some women do not masturbate competently, this is sometimes because of misinformation, and other times because there may be problems with blood flow into the vaginal area.

77. If called to testify, Dr. Schwartz would testify that her research and experience indicates that vibrators produce an intense stimulation that creates more blood flow, more quickly for some women[,] and thus is recommended by therapists as a way for creating enough sexual arousal for women who are having trouble increasing arousal enough to have an orgasm, or even to enjoy sexual intercourse. This is therapy for couples who are having sexual problems in their marriage, but also for women without partners who want to be able to experience sexual arousal and satisfaction. This also includes older women who may be widowed and would like to stay sexually active[,] even if they do not have a partner[,] and the disabled[,] who may never have a partner[,] or who, because of their disability, did not have the usual gradual sexual socialization and haven't learned how to make their body work for them and need assistance.

78. If called to testify, Dr. Schwartz would testify that her research and experience indicates that sex therapy has grown because so many people now value a high level of sexual functioning. Still, there are very

28

few places that doctors and psychologists can send their
patients to buy sexual devices. There are some mail
order catalogues[,] but doctors do not always know about
them[,] and individuals seeking this information may not
know about them either. In Dr. Schwartz's professional
opinion, small stores specializing in these devices are
absolutely necessary so that individuals can find the
vibrators and dilators that will help them be functional.
Furthermore, there are different size dilators and
different power vibrators[,] and it helps to be able to
look at them and find what is required. In circumstances
of severe dilation problems, for example, the physician
might start with very little intromission (entry with a
small finger, for example) and then, upon increasing the
elasticity of the vagina, use dilators of increasing
size.

79. Dr. Schwartz's research and experience also
indicates that[,] while the most problematic of sexual
problems may be relatively rare (having to dilate an
almost closed vaginal canal), there are numerous other
reasons for using a vibrator. These include: (1)
learning how to have an orgasm; (2) satisfying one's
desires before one is ready for a partner; (3) use by the
pathologically shy; (4) use by people with grave physical
and mental afflictions, etc.; (5) use after divorce; (6)
use in old age; or (7) use when one's partner is
unavailable. One prominent study relied upon by Dr.
Schwartz stipulates that approximately 20% of American
women at least occasionally use a vibrator. The National
Sexual Health Study by Julia Heiman (University of
Washington) and Joseph Catania (UCLA) done in 1997
indicated about 10% of sexually active adults use
vibrators in their regular sex life.

80. Dr. Schwartz's research and experience
indicates that almost every book on sexual therapy
supports the use of vibrators and dilators as an
important way to teach sexual functioning. Anecdotal
information from case studies of women in these books
confirms the utility of these sex devices. The Harvard
Women's Medical book talks about using dilators for
Kegel's exercises (strengthening the pelvic muscles to

29

make orgasm more likely or more intense or to help reverse stress incontinence—a common problem in post-menopausal women). An article by Clive Davis, et al., in the Journal of Sex Research in 1996, "Characteristics of Vibrator Use Among Women," shows that in a sample of women who have bought vibrators at one store, that these women use them in partnered relationships, but most commonly alone. Women tended to rate orgasms as more intense with vibrators than in intercourse (see also Lonnie Barbach, For Yourself)[,] but that is seen as an adjunct to partner relationships, not a replacement.

81. Dr. Schwartz's research and experience also indicates that several articles ("Help with Sexual Difficulties", "Drug Therapy Bulletin", "The relationship between mode of female masturbation and achievement of orgasm in coitus", Archives of Sexual Behavior, June 1983, and others to be produced), establish that vibrators helped anorgasmic women, especially disabled women, reach orgasmic potential. Even articles that say vibrators are less effective than previously thought, find vibrators helping produce orgasmic capacity at 47% of the treatment group. ("The semantics of success: do masturbation exercises lead to partner orgasm?" J.C. Wakefield, Journal of Sexual and Marital Therapy, Spring 1987.)

82. In the professional opinion of Dr. Schwartz, vibrators and dilators are of medical and psychological benefit to women and their partners, an adjunct to marital and sexual therapy and an absolute necessity in some kinds of therapeutic approaches for sexual dysfunction.

(Stipulation of facts, Doc. No. 33.)

30

## II. ANALYSIS OF THE PARTIES' CONTENTIONS

### A.    Standing to Sue

The federal concept of "standing" addresses the issue of
whether a particular person is the proper party to mount a
constitutional challenge to governmental action.  *See generally*,
Charles Allen Wright, *Law of Federal Courts* § 13 (5th ed. 1994);
Erwin Chemerinsky, *Federal Jurisdiction* 53 (2d ed. 1994).   "In
essence the question of standing is whether the litigant is
entitled to have the court decide the merits of the dispute or of
particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct.
2197, 2205, 45 L.Ed.2d 343 (1975).    The Supreme Court has
articulated the standing requirement as part of the "case or
controversy" requirement of Article III, Section 2 of the United
States Constitution. *See Lujan v. Defenders of Wildlife*, 504 U.S.
555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).    The
doctrine of standing mandates that a party seeking to invoke a
federal court's jurisdiction demonstrate three things:    (1) an
"injury in fact"; (2) a causal relationship between the injury and
the challenged conduct; and (3) a likelihood that the injury will
be redressed by a favorable decision.   *See Northeastern Florida
Contractor v. Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297,

31

2302, 124 L.Ed.2d 586 (1993).

The Attorney General challenges the vendor plaintiffs' ability to assert a challenge to Alabama Act No. 98-467 on behalf of their customers: that is, of unnamed users of the proscribed devices. Clarifying this position at oral argument, the Assistant Attorney General representing defendant said: "[w]e think the sellers can have standing as sellers of the products but not on behalf of the users, ... given the fact that users are here" (emphasis supplied).

As an initial matter, this court finds that the vendor plaintiffs independently satisfy standing requirements. *See Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976). Furthermore, this court agrees with the Attorney General's implicit concession that the user plaintiffs have standing to assert a due process challenge. *Cf. Carey v. Population Services International*, 431 U.S. 678, 683-84, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977). As a consequence, it is not necessary to decide the standing of the vendor plaintiffs to act as advocates for the rights of unnamed users of the proscribed devices.[12] *See*

---

[12] Generally, a plaintiff must assert his, her, or its own legal rights and interests. The Supreme Court has recognized exceptions to this general rule, however, including one in which third parties have not and are not likely to assert their rights and interests which are at stake. The vendor plaintiffs in the instant case presumably rely upon this exception, and likely could avail themselves of this exception in the absence of the user plaintiffs. "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third

32

*id.* at 682, 97 S.Ct. at 2014.    The Article III "case or controversy" requirement has been satisfied for the challenges to the legislation presented in this action.

**B.    Framework of Analysis for Substantive Due Process Claims**

Plaintiffs claim enforcement of Alabama Code § 13A-12-200.2(a)(1)[13] would impose an undue burden on their "fundamental rights of privacy and personal autonomy guaranteed by the First, Fourth, Fifth, Ninth[,] and Fourteenth Amendments of the United States Constitution." (Plaintiffs' corrected memorandum, Doc. No. 24, at 2.) Plaintiffs thus assert that their right of privacy and personal autonomy constitutes a "liberty interest" protected by the Due Process Clause of the Fourteenth Amendment. Such claims fall under the rubric and correlative analytical framework of substantive due process claims.    *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, ___, 117 S.Ct. 2258, 2267-68, 138 L.Ed.2d 772 (1997).

---

parties who seek access to their market or function." *Craig*, 429 U.S. at 195, 97 S.Ct. at 456.

[13] The text of section 13A-12-200.2(a)(1) is set out on p. 3 *supra*. Subsections (a)(2) and (a)(3) of the same statute also were amended by section six of Act No. 98-467.    Subsection 200.2(a)(2) applies the prohibition articulated in (a)(1) to wholesalers.    Subsection 200.2(a)(3) now makes it "unlawful for any person to knowingly produce, or offer or agree to produce" such material or devices.    (Emphasis supplied.)    Although these other subsections contain prohibitions similar to the ones contained in section 13A-12-200.2(a)(1), and likely would be subject to a similar analysis, only subsection (a)(1) is attacked in the instant case.

33

The standard of scrutiny a legislative act faces when challenged on such grounds depends upon whether the statute burdens a "fundamental right." If legislation interferes with the exercise of a fundamental right, then that legislation is subject to strict judicial scrutiny. The ensuing inquiry asks whether the challenged governmental action is justified by a compelling state interest, and whether the statute at issue is narrowly tailored to achieve that compelling state interest through the least restrictive means possible. *See, e.g., Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973) ("Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' ... and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake.") (citations omitted).

If legislation does not burden a fundamental right, however, then the act faces only minimal scrutiny: that is, a "rational basis" standard. When reviewing legislation under a rational basis test, courts ensure only that a legitimate governmental interest supports the legislation, and, that the resulting law bears a rational relation to that interest. *See Glucksberg*, 117 S.Ct. at 2271; *Reno v. Flores*, 507 U.S. 292, 302-05, 113 S.Ct. 1439, 1447-

34

49, 123 L.Ed.2d 1 (1993).

Thus, determining whether a particular statute interferes with the exercise of a fundamental right is a critical inquiry in the analysis of substantive due process claims.

## C. Does the Alabama Act Infringe on a Fundamental Right?

Plaintiffs do not seek recognition of a fundamental right. Rather, they seek extension of the "right to privacy" which the Supreme Court has recognized as fundamental in certain contexts.

Plaintiffs frame the issue in this case as whether the right to privacy "is broad enough to encompass an individual's decision to engage in private sexual activity not proscribed by law." (Plaintiffs' corrected memorandum, at 14 (emphasis in original).)

The Attorney General, on the other hand, contends this case presents the following question: "whether there is a constitutional right to obtain dildos, vibrators, and other marital aids 'designed or marketed as useful primarily for the stimulation of human genital organs.'" (Brief of Alabama Attorney General, Doc. No. 35, at 4.)

In the opinion of this court, however, the issue at this stage of analysis is neither as broad as plaintiffs suggest, nor as narrow as the Attorney General defines it. Instead, this court must decide whether the concept of a constitutionally protected

35

"right to privacy" protects an individual's liberty to use devices "designed or marketed as useful primarily for the stimulation of human genital organs" when engaging in lawful, private, sexual activity.[14]

## 1. Background: fundamental rights generally

The Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment protects individuals from state governmental interference with specific liberty interests, not simply from physical restraint. In so doing, the Court speaks in terms of "substantive due process" and "fundamental rights." The Court also consistently expresses or manifests its reluctance to expand these notions and, therefore, the protection of the Due Process Clause:

> [W]e "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S., at 125, 112 S.Ct., at 1068. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," *ibid*, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court, *Moore*, 431 U.S., at 502, 97 S.Ct., at 1937 (plurality

---

[14] For a complete discussion of how this court frames the issue presented by plaintiffs' proposed extension of the fundamental right to privacy, see Part II.C.5, *infra*.

36

opinion).

*Glucksberg*, 117 S.Ct. at 2267-68.

These concerns have prompted the Court to maintain focus on its proper role when reviewing legislative enactments. Accordingly, the Court adheres to an analytical method with two principal guidelines: (1) "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, ... and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," *id.* at 2268 (citations and internal quotation marks omitted); and (2) substantive due process claims require "a careful description of the asserted fundamental liberty interest. ...", *id.* (citations and internal quotation marks omitted). In accordance with these amorphous guidelines, the Supreme Court looks to the history, legal traditions, and practices of this Nation as "guideposts for responsible decisionmaking, ... that direct and restrain [the Court's] exposition of the Due Process Clause." *Id.*

Recently, in *Washington v. Glucksberg*, 521 U.S. 702, ___, 117 S.Ct. 2258, 2267-68, 138 L.Ed.2d 772 (1997), the Court catalogued the opinions in which it had invalidated state laws because they

37

infringed on an individual's fundamental rights.

> In a long line of cases, we have held that, in addition
> to the specific freedoms protected by the Bill of Rights,
> the "liberty" specially protected by the Due Process
> Clause includes the rights to marry, *Loving v. Virginia*,
> 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to
> have children, *Skinner v. Oklahoma ex rel. Williamson*,
> 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to
> direct the education and upbringing of one's children,
> *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed.
> 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510,
> 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy,
> *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14
> L.Ed.2d 510 (1965); to use contraception, *ibid*;
> *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31
> L.Ed.2d 349 (1972); to bodily integrity, *Rochin v.
> California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183
> (1952), and to abortion, [*Planned Parenthood v. Casey*,
> 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)].
> We have also assumed, and strongly suggested, that the
> Due Process Clause protects the traditional right to
> refuse unwanted lifesaving medical treatment. *Cruzan [v.
> Director, Missouri Dept. of Health*, 497 U.S. 261, 278-
> 279, 110 S.Ct. 2841, 2851-2852, 111 L.Ed.2d 224 (1990)].

(Emphasis supplied.)   This exhaustive list comprises only eight,

specific liberty interests or fundamental rights.[15]

## 2.  Plaintiffs' assertion of a fundamental right

As previously noted, plaintiffs seek extension of the

recognized right to privacy, so that it covers individuals who

desire to engage in lawful, private, sexual conduct that section

13A-12-200.2(a)(1) unduly burdens.   Plaintiffs seek protection

---

[15] The Court did not add to this total in *Glucksberg*, *see* 117 S.Ct. at
2271, nor has it done so since.

38

behind that line of cases guarding "the personal intimacies of the home, the family, marriage, motherhood, procreation, child rearing." *Paris Adult Theatre I v. Slaton*, 431 U.S. 49, 65-66, 93 S.Ct. 2628, 2639-40, 37 L.Ed.2d 446 (1973) (citing *Eisenstadt v. Baird*, 405 U.S. 438, 453-54, 92 S.Ct. 1029, 1038-1039, 31 L.Ed.2d 349 (1972); *id.* at 460, 463-65, 92 S.Ct. at 1042, 1043-044 (White, J., concurring); *Stanley v. Georgia*, 394 U.S. 557, 568, 89 S.Ct. 1243, 1249, 22 L.Ed.2d 542 (1969); *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).)

Initially, plaintiffs divide the fundamental right jurisprudence into cases providing protection for "spatial" interests,[16] as distinguished from those according protection to

---

[16] Plaintiffs cite as an example *Stanley v. Georgia*, 394 U.S. 557, 559, 89 S.Ct. 1243, 1245, 22 L.Ed.2d 542 (1969), in which the Supreme Court held that a person's "mere private possession of obscene matter [in the confines of his or her home] cannot constitutionally be made a crime." For a discussion of *Stanley*,

39

"decisional" interests.[17] (Plaintiffs' corrected memorandum, at 15.) Plaintiffs then steer their argument onto the side of the dichotomy protecting "decisional" interests: "[This case] is more appropriately analyzed as involving encroachment upon the ultimate personal autonomy of individuals to make independent decisions about intimate matters for themselves." (Id.)

Plaintiffs also attempt to define the admittedly evasive contours of the right to privacy by dividing the relevant case law into three classes:

> (1) the right of marital privacy which extends to the physical and emotional intimacies between husbands and wives, see, e.g., Loving v. Virginia, supra; Griswold v. Connecticut, supra; (2) the right of family/ home privacy which encompasses not only decisions concerning raising children but also choices concerning family living arrangements, see, e.g., Moore v. City of East Cleveland, 431 U.S. 494 (1977); Wisconsin v. Yoder, 406 U.S. 205 (1972); Pierce v. Society of Sisters, supra; cf. Stanley v. Georgia, supra ...; and (3) the right of individual privacy which encompasses decisions concerning the integrity and autonomy of one's body, see, e.g., Carey v. Population Services International, supra; Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52 (1976); Roe v. Wade, supra; Skinner v. Oklahoma, supra.

(Plaintiffs' corrected memorandum, at 15-16.) Plaintiffs claim the "central teaching" of the cases cited for the respective

---

see note 30 infra.

[17] Plaintiffs cite Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973).

40

classifications is that "the right of privacy is broad enough to encompass matters of sexual intimacy." (*Id.* at 16.) Plaintiffs then conclude, by also invoking the holdings of those cases addressing abortion and contraception,[18] that the decision whether to engage in lawful, private, sexual activity garners the utmost constitutional protection.

The basic premise undergirding this argument is that protection for decisions concerning abortion and the use of contraceptives presupposes protection for the decision to engage in sexual activity in the first instance. Or, as plaintiffs phrase it: "That the Constitution provides the freedom to make the second decision necessarily means that the right to make the first one is protected." (*Id.*) Indeed, one could factually assert that the "decision whether to bear or beget a child," *Eisenstadt,* 405 U.S. at 453, 92 S.Ct. at 1038 (emphasis supplied), necessarily presupposes the right of two consenting, heterosexual partners to engage in the act of sexual intercourse.

### 3.   The Attorney General's response

The Attorney General answers plaintiffs primarily by attempting to distinguish this controversy from those cases in

---

[18] *See, e.g., Carey,* 431 U.S. 678, 97 S.Ct. 2010.

41

which the Supreme Court has recognized a protected liberty interest

under substantive due process analysis. For example, he first

directs this court's attention to what the challenged Alabama

statute actually prohibits and, more importantly, what it does not

prohibit. In essence, section 13A-12-200.2(a)(1) bans the sale of

sexual devices; it does not ban the possession or use of them.

This is a significant distinction from *Griswold*, where the Court

declared that, even though the Connecticut statute at issue there[19]

sought to regulate conduct within the State's domain, it did so "by

means which sweep unnecessarily broadly and thereby invade the area

of protected freedoms." 381 U.S. at 485, 85 S.Ct. at 1682

(emphasis supplied). The Court recognized the right to marital

privacy,[20] and then identified the impermissibly "broad sweep" of

---

[19] In *Griswold*, the Court considered the constitutionality of a Connecticut statute that barred the use or sale of "any drug, medicinal article or instrument for the purpose of preventing conception." 381 U.S. at 482, 85 S.Ct. at 1680.

[20] The *Griswold* Court held that:

[T]he right of privacy which presses for recognition here is a legitimate one.

The present case ... concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. And it concerns a law which, in forbidding the use of contraceptives rather than regulating their manufacture or sale, seeks to achieve its goals by means having a maximum destructive impact upon that relationship. Such a law cannot stand in light of the familiar principle, so often applied by this Court, that a "governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." ...

42

the law at issue: "[I]n forbidding the <u>use</u> of contraceptives <u>rather than</u> regulating their <u>manufacture or sale</u>, [the law] seeks to achieve its goals by means having the maximum destructive impact upon [the marital] relationship."[21] *Id.*, 85 S.Ct. at 1682 (emphasis supplied). The Attorney General carries this distinction to the next level,[22] thereby rendering moot this stated concern of the *Griswold* Court: "Would we allow the police to search the sacred precincts of marital bedrooms ...?" *Id.*, 85 S.Ct. at 1682.

---

381 U.S. at 485, 85 S.Ct. at 1682.

[21] In a subsequent decision, *Carey v. Population Services International*, 431 U.S. 678, 687, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977), the Supreme Court placed this focus of the *Griswold* Court in a different light, one more translucent:

> *Griswold* did state that by "forbidding the use of contraceptives rather than regulating their manufacture or sale," the Connecticut statute there had "a maximum destructive impact" on privacy rights. 381 U.S., at 485, 85 S.Ct., at 1682. This intrusion into "the sacred precincts of marital bedrooms" made that statute particularly "repulsive." *Id.*, at 485-486, 85 S.Ct., at 1682. But subsequent decisions have made clear that the constitutional protection of individual autonomy in matters of childbearing is not dependent on that element. *Eisenstadt v. Baird*, holding that the protection is not limited to married couples, characterized the protected right as the "decision whether to bear or beget a child." 405 U.S., at 453, 92 S.Ct., at 1038 (emphasis added). Similarly, *Roe v. Wade*, held that the Constitution protects "a woman's decision whether or not to terminate her pregnancy." 410 U.S., at 153, 93 S.Ct., at 727 (emphasis added). *See also Whalen v. Roe, supra,* 429 U.S., at 599-600, 97 S.Ct., at 876-877, and n.26. These decisions put *Griswold* in proper perspective. *Griswold* may no longer be read as holding only that a State may not prohibit a married couple's use of contraceptives. Read in light of its progeny, the teaching of *Griswold* is that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State.

[22] "Prohibiting sales of sexual devices does not require the State to intrude into the bedrooms of its citizens to investigate suspected violations as would a prohibition on their use." (Brief of Alabama Attorney General, at 7.)

The Attorney General offers a second distinction from the cases relied upon by plaintiffs. He argues that application of those cases to the instant controversy requires an unprecedented and unwarranted leap in logic. He contends the liberty interests recognized in those cases are limited to "marriage, procreation, contraception and abortion." (Brief of Alabama Attorney General, at 8.) The Attorney General quotes the discussion of *Griswold* in another such case, *Carey v. Population Services International*, 431 U.S. 678, 687, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977): "Read in light of its progeny, the teaching of *Griswold* is that the Constitution protects individual decisions <u>in matters of childbearing</u> from unjustified intrusion by the State." (Brief of Alabama Attorney General, at 8 (emphasis in original).)

Bolstering his argument that no fundamental right protection is warranted in this case, the Attorney General invokes the *Glucksberg* Court's description of fundamental rights: "Plaintiffs cannot be possibly suggesting that the use, let alone the purchase, of sexual devices for the purposes of achieving orgasms is 'so deeply rooted in our history and traditions, or so fundamental to our concept of ordered liberty,' ... that it is protected by the Constitution." (*Id.* (citation omitted).) The Attorney General

44

also exposes any theory that the decision to use these devices
deserves protection, because the decision implicates an
individual's personal autonomy, or because the devices are used
behind closed doors, to the light of *Glucksberg*: "That many of the
rights and liberties protected by the Due Process Clause sound in
personal autonomy does not warrant the sweeping conclusion that any
and all important, intimate, and personal decisions are so
protected." (*Id.* at 9) (quoting *Glucksberg*, 117 S.Ct. at 2271).

   The Attorney General offers these distinctions in support of
his effort to narrow the issue before the court: "[T]his case is
not about the right to control one's own reproductive organs and
make decisions regarding whether or not to have children and raise
a family. This case is about the 'right' to purchase a product to
use in pursuit of having an orgasm." (Brief of Alabama Attorney
General, at 7.)

   Ultimately, the Attorney General contends "[t]his case
presents the question whether there is a constitutional right to
obtain dildos, vibrators, and other marital aids 'designed or
marketed as useful primarily for the stimulation of human genital
organs.'" (Brief of Alabama Attorney General, at 4.) He asserts
that no fundamental right to acquire or sell such sexual devices

45

exists.  The Attorney General, therefore, concludes that this case should not be subjected to "strict scrutiny."

### 4.  Decisions of other courts faced with this issue

In addition to Alabama, seven states have enacted laws banning the sale, distribution, or "promotion" of sexual devices.[23]  The statutes in several of these states have been challenged on numerous grounds.  State courts in Colorado,[24] Kansas,[25] and Texas[26] have addressed claims that the respective statutes violated the fundamental right to privacy.

The Colorado Supreme Court and the Kansas Supreme Court each sustained the challenge, holding that the sweep of the respective statute was excessively broad and unduly burdensome to the fundamental right to privacy.  Each court relied heavily on the fact that the proscribed devices are used as a means of treatment for certain physical and psychological disorders: that is, there are "legitimate medical [and] therapeutic use[s] of such devices."  *Seven Thirty-Five East Colfax, Inc.*, 697 P.2d 348, 370 (Colo.

---

[23] These seven states are Colorado, see Colo. Rev. Stat. § 18-7-101, 102, Georgia, see Ga. Code Ann. § 16-12-80, Kansas, see Kan. St. Ann. § 21-4301, Louisiana, see La. Rev. Stat. Ann. § 14:1206.1, Mississippi, see Miss. Code Ann. § 97-29-105, Texas, see Tex. Penal Code Ann. § 43.21, 43.23, and Virginia, see Va. Code Ann. § 18.2-373.

[24] See Seven Thirty-Five East Colfax, Inc., 697 P.2d 348 (Colo. 1985).

[25] See State v. Hughes, 792 P.2d 1023 (Kan. 1990).

[26] See, e.g., Regaldo v. State of Texas, 872 S.W.2d 7 (Tex. Crim. App. 1994); Yorko v. State of Texas, 690 S.W.2d 260 (Tex. Crim. App. 1985).

46

1985).

Texas courts, on the other hand, rejected similar challenges. In *Yorko v. State of Texas*, 690 S.W.2d 260 (Tex. Crim. App. 1985), the court drew a distinction between contraceptives, which are protected, and obscene material, which is not. Focusing on the uses of sexual devices such as those at issue here, the *Yorko* court found the devices were more like obscene material than condoms and, therefore, were not protected. The court in *Regaldo v. State of Texas*, 872 S.W.2d 7 (Tex. Crim. App. 1994), flatly rejected the plaintiff's challenge. The court cited a footnote from *Carey*, where the Supreme Court said it had never held that a fundamental right to sexual privacy exists under the Constitution.[27] The *Regaldo* court also cited state court precedent rejecting this fundamental right argument, and concluded "[t]here is no fundamental right to use obscene devices; therefore, restricting the promotion of such devices does not infringe on any recognized fundamental right." *Id.* at 9.

Aside from the state courts addressing challenges similar to

---

[27] The cited *Carey* footnote, number 17, reads in pertinent part as follows: "We observe that the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating such behavior among adults." 431 U.S. at 695 n.17, 97 S.Ct. at 2021 n.17. *See Regaldo*, 872 S.W.2d at 9.

47

the assault mounted upon the Alabama Act in this case, the former

Fifth Circuit and the Supreme Court have seen challenges to

legislation that is similar to the Alabama statute at issue here.

The Fifth Circuit upheld the Texas statute[28] in *Red Bluff Drive-In,*

*Inc. v. Vance*, 648 F.2d 1020 (5th Cir. June 1981).[29] The court

defined plaintiffs' numerous challenges as follows:

> Plaintiffs attack the challenged statutes from several
> angles. They maintain that some provisions are
> unconstitutionally vague or overbroad or both. They
> complain that certain provisions threaten those charged
> under the statute with denials of procedural due process
> and that other provisions infringe upon fundamental
> rights of expression and personal autonomy. They assert
> that the statute, by outlawing the sale or possession in
> quantity of sexually stimulative materials and devices,
> denies equal protection of the laws to handicapped
> persons dependent on these items for sexual
> gratification.

648 F.2d at 1025-26. Rejecting these challenges, the court focused

primarily on the First Amendment claim and turned to the Supreme

Court's obscenity jurisprudence. The court's only other mention of

the fundamental right issue came in its brief discussion of the

equal protection claim: "With nothing more than the naked legal

conclusions on the record, we have no evidentiary basis to sustain

---

[28] For the text of the Texas statute, see *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1025 n.1 (5th Cir. 1981).

[29] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

48

the plaintiffs' proposed extension of the constitutional guarantee
of personal autonomy." 648 F.2d at 1028 (citing *Roe v. Wade*, 410
U.S. 113, 152-53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973)). The
Supreme Court denied plaintiff's petition for writ of certiorari.
*See Theatres West, Inc. v. Holmes*, 455 U.S. 913, 102 S.Ct. 1264, 71
L.Ed.2d 453 (1982).

The Supreme Court also dismissed an appeal from the Supreme
Court of Georgia in *Sewell v. Georgia*, 435 U.S. 982, 98 S.Ct. 1635,
56 L.Ed.2d 76 (1978). The appeal challenged the Georgia Supreme
Court's affirmance of appellant's conviction for selling material
and devices prohibited under that State's obscenity statute. The
constitutional challenges raised by the appellant in *Sewell* were
summarized by Justice Brennan in his dissent from the Court's
dismissal of the appeal as follows:

> First, he argues that an obscenity statute which defines
> scienter in a manner which authorizes obscenity
> convictions on mere "constructive" knowledge
> impermissibly chills the dissemination of materials
> protected under the First and Fourteenth Amendments. ...
> Second, he argues that there is no rational basis for §
> 26-2101(c) and, in addition, that it is
> unconstitutionally vague. ... Third, appellant contends
> that "Hot and Sultry" is not obscene as a matter of law.
> ... And, finally, appellant challenges the warrantless
> mass seizure of the sexual devices on First, Fourth, and
> Fourteenth Amendment grounds. ...

435 U.S. 982, 984, 98 S.Ct. 1635, 1636 (Brennan, J., with whom

49

Marshall, J. joins, dissenting) (internal citations omitted). The
appeal was dismissed nevertheless, over the dissents of Justices
Brennan, Marshall, and Stewart, "for want of a substantial federal
question." *Id.* at 982, 98 S.Ct. at 1635.

This court finds the decisions discussed above informative,
but neither binding nor particularly persuasive, because each case
can be distinguished by differences in the statute at issue, or in
the challenges to the statute which the plaintiffs pursued (or the
respective courts chose to address).

### 5. Breadth of the fundamental right to privacy

As a preliminary matter, this court now will confront the
primary distinction underlying the different manners in which the
parties frame the issue raised by this case.

Each party makes much ado about the distinction between the
sale, distribution, or marketing of sexual devices, and the use or
simple possession of such devices. The court finds that the
arguments to this end are specious, at least in so far as they are
intended to bear upon the fundamental right determination. In
fact, answering whether such a distinction is meaningful with
regard to a particular prohibition begs the question of what
protection the proscribed material or conduct deserves.[30]

---

[30] In *Stanley v. Georgia*, 394 U.S. 557, 559, 89 S.Ct. 1243, 1245, 22

50

Nevertheless, to resolve the issues raised by plaintiffs' assertion

L.Ed.2d 542 (1969), the Supreme Court held that "mere private possession of obscene matter cannot constitutionally be made a crime." The Court distinguished its earlier decision in *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957), because *Roth* and its progeny did not involve prosecution for private possession of obscene material. The *Stanley* Court concluded that the First and Fourteenth Amendments prohibit making mere possession of obscene material a crime. *Stanley*, 394 U.S. at 568, 89 S.Ct. at 1249-50.

The Supreme Court soon would limit the holding of *Stanley*, however, in *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). There, the Court refused to extend the right to possess obscene material to the right to distribute obscene material. The Court reiterated this holding in *United States v. Reidel*, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), a case the Court decided on the same day it handed down its opinion in *Thirty-Seven Photographs*. The *Reidel* Court opined that the right to possess obscene material expressed in *Stanley* "does not require that we fashion or recognize a constitutional right ... to distribute or sell obscene material." *Id.* at 356, 91 S.Ct. at 1412. The Supreme Court again determined that the right to possess obscene material in the privacy of one's home does not "give rise to a correlative right to have someone sell or give it to others" in *United States v. 12,200 Ft. Reels of Super 8MM. Film*, 413 U.S. 123, 128, 93 S.Ct. 2665, 2669, 37 L.Ed.2d 500 (1973), and *United States v. Orito*, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973).

The distinction in treatment of the possession *versus* the sale of <u>obscene material</u> (which is unprotected) stands in contrast to the treatment of such distinction where the statute burdens <u>liberties protected by the fundamental right to privacy</u>. The opinions in two cases elucidate the fact that any significance of the distinction between prohibitions of commercial use versus private use depends on the protection the Constitution affords the targeted material or conduct. In *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446 (1973), the Court alluded to this fact: "If obscene material unprotected by the First Amendment in itself carried with it a 'penumbra' of constitutionally protected privacy, this Court would not have found it necessary to decide *Stanley* on the narrow basis of the 'privacy of the home,' which was hardly more than a reaffirmation that 'a man's home is his castle.'" The Court solidified the validity of this distinction in *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), holding:

> Restrictions on the distribution of contraceptives clearly burden the freedom to make [protected childbearing] decisions. ... The same test must be applied to state regulations that burden an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely. This is so ... because such access is essential to exercise of the constitutionally protected right of decision in matters of childbearing ....

51

of a "fundamental right," this court must focus on the <u>use</u> of the proscribed devices, rather than their <u>distribution</u> because, if the use of such devices is a fundamental liberty interest as plaintiffs contend, then the legislature's ban on distribution compels strict judicial scrutiny.

The Supreme Court has clearly said that it has not yet decided whether lawful, private, sexual conduct is sheltered from state interference by the Constitution. For example, in *Carey* the Court noted that it "has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating (private consensual sexual) behavior among adults, ... and we do not purport to answer that question now." 431 U.S. at 689 n.5, 97 S.Ct. at 2018 n.5; *see also Postscript Enterprises, Inc. v. Whaley*, 658 F.2d 1249, 1254 n.6 (8th Cir. 1981). *But see Carey*, 431 U.S. at 718 n.2, 97 S.Ct. at 2033 n.2 (Rehnquist, J., dissenting) ("While we have not ruled on every conceivable regulation affecting such conduct the facial constitutional validity of criminal statutes prohibiting certain consensual acts has been 'definitively' established.") (citing *Doe v. Commonwealth's Attorney*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), *summarily aff'g* 403 F. Supp. 1199 (E.D. Va. 1975)).

52

Consequently, as plaintiffs conceded at oral argument, they must seek an <u>extension</u> of the line of cases establishing that fundamental decisions inherent in an individual's personal autonomy are protected by the Due Process Clause of the Fourteenth Amendment, because no case has recognized that the Due Process Clause protects their asserted liberty interest. *See Vance*, 648 F.2d at 1028.

To be sure, several opinions discuss principles which support plaintiffs' desired extension of the fundamental right to privacy. *See, e.g., Carey*, 431 U.S. at 685, 97 S.Ct. at 2016; *Eisenstadt v. Baird*, 405 U.S. at 453, 92 S.Ct. at 1038; *Prince v. Massachusetts*, 321 U.S. at 166, 64 S.Ct. at 442. Nevertheless, these opinions generally have been narrowly construed or discussed by the Court, for example, as protecting only major life decisions such as decisions related to childbearing and child rearing. *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 834, 112 S.Ct. 2791, 2797, 120 L.Ed.2d 674 (1992). Moreover, the Court's narrow characterization of these cases is exemplified in *Casey*: "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth

53

Amendment." *Id.* at 851, 112 S.Ct. at 2807. More recently in
*Glucksberg*, the Court cautioned: "That many of the rights and
liberties protected by the Due Process Clause sound in personal
autonomy does not warrant the sweeping conclusion that any and all
important, intimate, and personal decisions are so protected." 117
S.Ct. at 2271.

Perhaps of greater note, the Court has intimated that such
protection is not available under the Due Process Clause. For
example, in *Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S.Ct. 2841,
2844, 92 L.Ed.2d 140 (1986), the Court discounted the argument for
extending the right of privacy to encompass <u>all</u> private sexual
conduct[31]:

> [A]ny claim that these [fundamental right to privacy]
> cases ... stand for the proposition that <u>any kind</u> of
> private sexual conduct between consenting adults is
> constitutionally insulated from state proscription is
> unsupportable. Indeed, the Court's opinion in *Carey*
> twice asserted that the privacy right, which the *Griswold*
> line of cases found to be one of the protections provided
> by the Due Process Clause, did not reach so far. ...

(Citation omitted) (emphasis supplied.) As the *Bowers* Court noted,

the Court had addressed such a proposed extension in *Carey*:

> [W]e do not hold that state regulation must meet this

---

[31] This court acknowledges that *Bowers* is distinguishable from the instant
case because the underlying sexual conduct at issue in *Bowers*, homosexual sodomy,
was illegal, and had been so historically.

54

> [strict scrutiny] standard "whenever it implicates sexual
> freedom," ... or "affect(s) adult sexual relations," ...
> but only when it "burden(s) an individual's right to
> decide to prevent conception or terminate pregnancy by
> substantially limiting access to the means of
> effectuating that decision."

431 U.S. at 689 n.5, 97 S.Ct. at 2018 n.5. Even more directly,

then Justice (and now Chief Justice) Rehnquist took issue with the

characterization of the majority in *Carey* that this issue remained

somewhat of an open question:

> I cannot, however, let pass without comment, the
> statement that "the Court has not definitively answered
> the difficult question whether and to what extent the
> Constitution prohibits state statutes regulating (private
> consensual sexual) behavior among adults." ... While we
> have not ruled on every conceivable regulation affecting
> such conduct the facial constitutional validity of
> criminal statutes prohibiting certain consensual acts has
> been "definitively" established. ... [³²]

431 U.S. at 718 n.2, 97 S.Ct. at 2033 n.2 (Rehnquist, J.,

dissenting) (citations omitted). *See also Postscript Enterprises,*

*Inc.,* 658 F.2d at 1254 n.6 ("We assume, without having to decide,

that the City of St. Louis may, through a properly drawn ordinance,

restrict the sale of items which enable, aid, or encourage private

consensual sexual behavior among adults.")

Absent authority directly on point, this court now turns to

---

³² Justice Rehnquist cited to a case summarily affirming the conviction of
an individual for violating a state sodomy law.

55

those factors the Supreme Court has sketched for recognition of a liberty interest as fundamental.

The Supreme Court's most recent foray into the swampy fields of substantive due process came in *Glucksberg*. As discussed above, the Court stressed that it relies upon the following factors for firm footing in this soft area of constitutional law: (1) whether the asserted liberty interest is "objectively, deeply rooted in this Nation's history and tradition, ... and [is] implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed"; and (2) "a careful description of the asserted fundamental liberty interest." 117 S.Ct. at 2267-68 (citations and internal quotation marks omitted).

Considering the second factor first, the asserted liberty interest that this court must address is dictated by the facts of the case before it. This court has no authority to pronounce broad rules of constitutional law when an Article III "case or controversy" does not demand it. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 394 (1985) (stating that one of the "cardinal rules governing ... federal courts [is] never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be

56

applied ...") (citations and internal quotation marks omitted); *see also Flast v. Cohen*, 392 U.S. 83, 96-97, 88 S.Ct. 1942, 1950-51, 20 L.Ed.2d 947 (1968); *see generally Ashwander v. TVA*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). As stated in the introduction to Part C of this opinion, *supra*, the issue presented by plaintiffs' challenge is whether the Due Process Clause of the Fourteenth Amendment (and the concomitant fundamental right to privacy) protects an individual's liberty interest in using devices "designed or marketed as useful primarily for the stimulation of human genital organs" when engaging in lawful, private, sexual activity.

Is this liberty interest "deeply rooted" in the history and traditions of the Nation? Is this liberty interest "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed?" *Glucksberg*, 117 S.Ct. at 2267-68. This court holds it is not.

Although the actual proscription of this liberty interest does not have historical roots as deeply embedded in the value-laden soil of English speaking peoples as, say, the proscription of sodomy, nothing presented to this court in brief or during oral argument suggests that use of sexual devices has monumental or

57

abiding approval.[33] The Supreme Court simply has placed the bar too high to allow recognition of an individual's use of devices "designed or marketed as useful primarily for the stimulation of human genital organs" as a fundamental liberty interest.

Plaintiffs' most persuasive argument stems from the therapeutic and medical use these devices have for individuals afflicted with some form of sexual dysfunction. The argument presupposes the existence of a fundamental right to engage in lawful, private, sexual activity. This premise inheres in the fact that secondary decisions, which flow from the original decision to engage in sexual intercourse, are protected as fundamental liberty interests: for example, the right to procreate, *see Skinner v.*

---

[33] Certain submissions to the court, and certain facts that were stipulated, establish that some level of popularity in the use of sexual devices has evolved over the past twenty years. For example, several publications and websites discuss or suggest the use of these devices in aid of achieving orgasm. The parties also have stipulated that these devices possess some therapeutic value (or at least that plaintiffs and certain experts in human sexuality believe they do).

Evidence of recent popularity notwithstanding, the most persuasive evidence supporting an argument that use of these devices can satisfy the *Glucksberg* standards is the fact that the federal Food and Drug Administration promulgated regulations concerning some of the more common sexual devices, establishing standards for their therapeutic use.

The FDA first established such regulations in 1980. *See* 45 Fed. Reg. 12684-12720 (1980); *see also Postscript Enterprises, Inc. v. Whaley,* 658 F.2d 1249, 1254 n.6 (8th Cir. 1981).

The twenty years of regulation proves to be the most persuasive evidence before the court, largely because it is the most longstanding. In fact, aside from references to two publications, it is the only stipulation or evidentiary submission dating from an earlier decade.' The court also notes that neither of the vendor plaintiffs has operated her relevant business (at least in Alabama) for more than six years.

58

*Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); the

right to use contraceptives, *see*, *e.g.*, *Eisenstadt v. Baird*, 405

U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); and the right to

choose to have an abortion, *see Planned Parenthood v. Casey*, 505

U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Thus, plaintiffs

draw the conclusion that people who have a physiological or

psychological need to use sexual devices in order to perform

sexually should be accorded similar protection for this liberty

interest as they and others are accorded for the liberty interest

in lawful, sexual intercourse.

The appeal of this argument notwithstanding, based on the

Supreme Court's focus on history and tradition, the Supreme Court's

express reluctance to extend the protection of the Due Process

Clause, its narrow readings of cases recognizing liberty interests

as fundamental, and its statements that it has not yet decided a

case squarely on point, this court refuses to extend the

fundamental right of privacy to protect plaintiffs' interest in

using devices "designed or marketed as useful primarily for the

stimulation of human genital organs" when engaging in lawful,

private, sexual activity, and thereby impose a strict scrutiny

frame of analysis when reviewing the Alabama statute at issue.

59

**D.   Rational Basis Review**

Although Alabama Code § 13A-12-200.2(a)(1) has escaped strict
scrutiny, it still must survive review under the rational basis
test. *See, e.g., Glucksberg*, 117 S.Ct. at 2271. The Supreme Court
sketched the contours of analysis for claims alleging state
violation of the Due Process Clause of the Fourteenth Amendment in
*Nebbia v. People of State of New York,* 291 U.S. 502, 525, 54 S.Ct.
505, 510-11, 78 L.Ed. 940 (1934):

> [T]he   Fourteenth   [Amendment   does]   not   prohibit
> governmental regulation for the public welfare. [It]
> merely condition[s] the exertion of the admitted power,
> by securing that the end shall be accomplished by methods
> consistent with due process. And the guaranty of due
> process, as has often been held, demands only that the
> law shall not be unreasonable, arbitrary, or capricious,
> and that the means selected shall have a real and
> substantial relation to the object sought to be attained.

The derivative inquiry for rational basis review asks whether a
<u>legitimate</u> governmental interest supports the state's legislation,
<u>and</u>, whether the resulting law bears a <u>rational relation</u> to that
interest. *See Glucksberg*, 117 S.Ct. at 2271; *Reno v. Flores*, 507
U.S. 292, 302-05, 113 S.Ct. 1439, 1447-49, 123 L.Ed.2d 1 (1993).
For such a relationship to exist, the nexus between the state
interest and the law at issue must be reasonable, and thus not
arbitrary, capricious, or irrational. *See Village of Euclid v.*

60

*Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *see also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985) (stating, in Equal Protection analysis, that a law must not be "arbitrary or irrational"); *Western and Southern Life Insurance Company v. State Board of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981) (analyzing two questions in the rational basis review under the Equal Protection Clause: "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?"); *Frontiero v. Richardson*, 411 U.S. 677, 683, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1973) ("Under 'traditional' equal protection analysis, a legislative classification must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate governmental interest."); *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (stating that statutes "must be reasonable, not arbitrary").

The Supreme Court also has prescribed the application of certain principles which assures a deferential review. Such principles include presuming the validity of challenged

61

legislation, *see Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637,
2642, 125 L.Ed.2d 257 (1993); not requiring that the legislature
"actually articulate ... a purpose or rationale" supporting the
legislation, *id.* at 320, 113 S.Ct. at 2642 (quoting *Nordlinger v.*
*Hahn*, 505 U.S. 1, 15, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992)),
but instead placing the burden on the challenger "to negative every
conceivable basis which might support [the legislation]," *Heller*,
509 U.S. at 320, 113 S.Ct. at 2642 (quoting *Lehnhausen v. Lake*
*Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35
L.Ed.2d 351 (1973)); accepting a legislature's generalizations, *see*
*Heller* 509 U.S. at 321, 113 S.Ct. at 2643. Ultimately, however,
"the reasonableness of each regulation depends upon the relevant
facts." *Nebbia*, 291 U.S. at 525, 54 S.Ct. at 511.

### 1. Conceivable state interests

Although the existence of a single purpose behind any
legislation probably is rare, courts must review statutes based
upon the interest the state presumably acted upon, or may have
acted upon. Thus, as a threshold matter, a reviewing court must
identify what interests conceivably could have motivated the
state's action. The Alabama Legislature aided the court in this
respect, however, by stating a purpose for Act No. 98-467 in

62

Section 1:

**Section 1.** The Legislature of Alabama finds and declares:

(1) That in order to protect children from exposure
to obscenity, prevent assaults on the sensibilities of
unwilling adults by the purveyor[s] of obscene material,
and suppress the proliferation of "adult-only video
stores," "adult bookstores," "adult movie houses," and
"adult-only entertainment," the sale and dissemination of
obscene material should be regulated without impinging on
the First Amendment rights of free speech by erecting
barriers to the open display of erotic and lascivious
material.

1998 Ala. Acts 98-467.   These findings and declarations clearly

suggest that the purpose behind this act was to prohibit "open

display[s]" of things "obscene," specifically those displays

accessible to "children" and "unwilling adults."[34]

In addition, upon consideration of the pleadings, motions,

briefs, oral arguments of counsel, and independent judicial

research, the court finds that the state's interest in passing the

Act also could have been:   (1) the belief that "[t]he commerce of

sexual stimulation and auto-eroticism, for its own sake, unrelated

to marriage, procreation or familial relationships is an evil, an

---

[34] The only other reading of this statutory language would add a second
purpose targeting the types of businesses listed in the statute for general
prohibition. Such a purpose may create the type of invidious discrimination that
would run afoul of the Equal Protection Clause of the Fourteenth Amendment.
Nevertheless, no party has even hinted at that motive or the argument it
certainly would engender. The proper reading of this language reveals a purpose
concerned with public displays, particularly those that would expose children "to
obscenity," or would "assualt[] ... the sensibilities of unwilling adults."

63

obscenity ... detrimental to the health and morality of the state"[35]

(Brief of Alabama Attorney General, at 21); or (2) the desire to

ban commerce in all "obscene" material.

## 2.   Are the interests legitimate?[36]

### a.   Banning public displays of obscene material

Alabama's interest in preventing "open display" of "obscene

material" is, in the abstract, a means to suppress demonstrable,

public "immorality" or, stated differently, to effect a sense of

---

[35] The court possibly could articulate other interests related to this one:
for example, banning sexual devices in an effort to condemn just "auto-
eroticism," or to condemn what the legislature may deem "deviant" sexual conduct.
Any difference in such state interests is inapposite to this court's analysis,
however, as it is neither conceivable nor argued that the State targeted sexual
activity related to "marriage, procreation or familial relationships." (Brief
of Alabama Attorney General, at 21.)

[36] In the sections of their corrected memorandum (Doc. No. 24) and reply
memorandum (Doc. No. 38) addressing rational basis review, plaintiffs focus on
the fact that the targeted activity was, and remains, lawful. According to
plaintiffs, the State can have no legitimate interest in discouraging lawful
conduct, or targeting it with legislation. The Attorney General responds with
citations to Supreme Court cases, arguing that "[a] statute is not invalid under
the Constitution because it might have gone farther than it did, or because it
may not succeed in bringing about the result that it tends to produce." Roschen
v. Ward, 279 U.S. 337, 339, 49 S.Ct. 336, 336, 73 L.Ed. 722 (1929). To the
extent that the Attorney General's response answers plaintiffs' argument, this
court concurs.

That concurrence notwithstanding, this court believes the Attorney General
misses the point of plaintiffs' argument and, more importantly, that plaintiffs
miss the point of rational basis review. Plaintiffs' argument, that the State
has no legitimate interest in discouraging conduct because it is legal, is an
argument properly advanced for the fundamental right inquiry, because both
address the protection particular conduct, i.e., a liberty interest, deserves or
derives from the law. The conduct must be protected from state interference by
the Constitution (and in this case the Due Process Clause of the Fourteenth
Amendment), for this court to strike that law because it targets plaintiffs'
conduct or liberty interest. Thus, plaintiffs' argument begs the question of
whether the conduct is protected by the Due Process Clause: a question this
court answered in the negative. See Part II.C supra.

64

public morality.[37]  Statutes aimed at effecting a sense of public

morality address legitimate state objectives.  "The traditional

police power of the States is defined as the authority to provide

for the public health, safety, and morals, and [the Supreme Court

has] upheld such a basis for legislation."  *Barnes v. Glen Theatre,*

*Inc.,* 501 U.S. 560, 569, 111 S.Ct. 2456, 2462, 115 L.Ed.2d 504

(1991) (emphasis supplied).  Thus, the basic premise of the State's

action is permissible.

    This state interest can be reduced from the abstract interest

in morality to a slightly more specific level:   targeting

obscenity.   Furthermore, "morality" often is the goal  invoked

(properly) by state legislatures to support obscenity laws, public

indecency laws, and similar legislation.  *See id.,* 111 S.Ct. at

2462; *Bowers v. Hardwick,* 478 U.S. 186, 196, 106 S.Ct. 2841, 2846,

92 L.Ed.2d 140 (1986) ("The law ... is constantly based on notions

of morality, and if all laws representing essentially moral choices

are to be invalidated under the Due Process Clause, the courts will

be  very  busy  indeed.").    In  fact,  the  Supreme  Court  has

acknowledged other state interests that may be related to statutes

addressing public morality:  (1) "the interest of the public in the

---

[37] The court notes that the statute in issue is found in Title 13A, Chapter
12 of the 1975 Code of Alabama, and Chapter 12 is entitled "Offenses Against
Public Health and Morals."

65

quality of life and the total community environment"; (2) "the tone
of commerce in the great city centers"; and (3) "possibly, the
public safety itself." *Paris Adult Theatre I*, 413 U.S. at 57-58,
93 S.Ct. at 2635.

The State of Alabama's interest in shielding children and
"unwilling adults" from "immoral," obscene displays is a
legitimate, constitutionally sound interest. *See Paris Adult
Theatre I*, 413 U.S. at 57-58, 93 S.Ct. at 2635 ("[The Supreme Court
has] often pointedly recognized the high importance of the state
interest in regulating the exposure of obscene materials to
juveniles and unconsenting adults ....") (collecting cases)
(citations omitted).

> **b. Banning "the commerce of sexual stimulation and
> auto-eroticism, for its own sake, unrelated to
> marriage, procreation[,] or familial relationships"**

Similar to the state interest first identified, Alabama's
interest in banning "the commerce of sexual stimulation and auto-
eroticism, for its own sake" is an interest tied to social
morality. Implicit in a legislative ban on the commerce of devices
used for "sexual stimulation and auto-eroticism" is disapproval of
this type of activity. The reverse may also be true: that is,
allowing the sale of these devices, which inherently implicates the

66

state's regulatory channels, is an implicit condonation of this
activity.   Furthermore, implicit state condonation of certain
conduct, which is created by the absence of state proscription, is
likely to give some semblance of approval by the general public.
Without question, social approval or disapproval, or the appearance
of either, will affect the mores of a particular society.   Thus,
Alabama's interest in public morality is directly connected to what
is sold with the State's tacit approval.  Accordingly, this court
finds that Alabama has a legitimate interest in prohibiting the
commerce of sexual devices.  *See Vance*, 648 F.2d at 1035; *cf.
United States v. Reidel*, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d
813 (1971) (distinguishing the protected right to possess obscene
material from the right to distribute or sell it).

### c.  Banning commerce of obscene material

The reasons identified above for finding those two state
objectives legitimate apply with equal force to Alabama's interest
in banning the commerce of obscene material.  The former Fifth
Circuit found a legitimate state interest when reviewing a Texas
statute similar to the Alabama act in question:   "The Texas
Legislature has attempted in the challenged statute to regulate a
matter of concern to the people of Texas[:]    commercial
transactions in obscene materials.  The State has a legitimate

67

interest in promulgating such regulations."   *Vance*, 648 F.2d at
1035.[38]

### 3.   Is Alabama Code § 13A-12-200.2(a)(1) rationally related to these legitimate state interests?

The statutory provision at issue makes it "unlawful for any
person to knowingly distribute, possess with intent to distribute,
or offer or agree to distribute any obscene material or any device
designed or marketed as useful primarily for the stimulation of
human genital organs for any thing of pecuniary value."   Ala. Code
§ 13A-12-200(a)(1).   This section further provides that "[m]aterial
not otherwise obscene may be obscene under this section if the
distribution of the material, the offer to do so, or the possession
with the intent to do so is a commercial exploitation of erotica
for the sake of prurient appeal."   *Id.*  The first violation of this
section constitutes a misdemeanor punishable by a fine of not more
than $10,000 and imprisonment for not more than one year; a
subsequent violation is elevated to the status of a "Class C
felony."

The court now must determine whether this statutory provision
bears a reasonable, rational relation to one of the legitimate

---

[38] One difference that distinguishes the Texas statute (and the challenge
to it) from the Alabama Act is that the Texas statute defined sexual devices as
obscene *per se*.   *See Vance*, 648 F.2d at 1027.

68

state interests discussed above.

### a. Banning public displays of obscene material

The Legislature stated in the findings and declarations section of Alabama Act No. 98-467 that its purpose, essentially, was to protect "children" and "unwilling adults" from exposure to "open display[s]" of "obscene material." As observed above, however, it is not likely that a legislative body will have a single purpose as the lone, collective motivation for any one act. The purpose the Alabama Legislature expressly included in the Act probably was the lowest common denominator, as it were. Stated differently, the social evils the Legislature expressly identified were those that all legislators, or at least a majority of them, could agree to target and, hence, were evils that fostered the legislation to some degree. Indeed, this court found the expressed objective, as such, to be constitutionally sound.[39]

While this interest may have been one purpose motivating the entire Act, it is too discrete to support the challenged prohibition. If this interest were the State's sole interest, then Alabama Code § 13A-12-200.2(a)(1) is not rationally related thereto. The proscription, in such instance, would be absolutely arbitrary. Innumerable measures far short of an absolute ban on

---

[39] See Part II.D.2.a supra.

69

the distribution of sexual devices would accomplish the State's goals. In fact, the "'Tupperware'-style parties" through which plaintiff B.J. Bailey operates her entire business do not even remotely offend this state interest. In addition, the other vendor plaintiff, Sherri Williams, easily could adapt the outward appearance of her stores to accommodate such a state objective. *Cf. Turner v. Safley*, 482 U.S. 78, 91, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987) (stating that if a petitioning prisoner "can point to an alternative that fully accommodates [his] rights at *de minimis* cost to [the] valid [state interests in issue], a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard").

Accordingly, this court finds that the Alabama Legislature's express interest is not rationally related to the provision at issue. *Cf. Romer v. Evans*, 517 U.S. 620, 635, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855 (1996) (holding amendment to state constitution failed rational basis review under the Equal Protection Clause because "[t]he breadth of the Amendment [was] so far removed from the[] particular justifications ..."); *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262 (finding that one of the asserted penological interests of the state "[did] not satisfy the

70

reasonable relationship standard, but rather constitute[d] an
exaggerated response to [its] ... concerns"); *City of Cleburne*, 473
U.S. at 448, 105 S.Ct. at 3258 (holding zoning ordinance
unconstitutional where the Court found no "rational basis for
believing that the [home subject to the ordinance] would pose any
special threat to the city's legitimate interests").

> **b.  Banning "the commerce of sexual stimulation and
> auto-eroticism, for its own sake, unrelated to
> marriage, procreation[,] or familial relationships"**

The Attorney General asserted in his brief that one
conceivable interest of the State was banning "the commerce of
sexual stimulation and auto-eroticism, for its own sake, unrelated
to marriage, procreation[,] or familial relationships." (Brief of
Alabama Attorney General, at 21.) This court found that targeting
this alleged evil is a legitimate state objective.  Is the
prohibition of distribution of sexual devices rationally related to
this interest?  This court holds it is not.

First, the statutory provision does not ban actual "commerce
of sexual stimulation and auto-eroticism."  Rather, the statute
bans commerce of devices that may be used to these ends.  A statute
prohibiting prostitution would ban "commerce of sexual
stimulation."  Thus, prohibition of sexual devices does not bear a
rational relation to the proposed state interest, when that

71

interest is given a literal construction.

The statute fails the rational relation standard even when
this interest is considered as an interest in discouraging the
conduct identified in the proposed state objective: that is,
"sexual stimulation and auto-eroticism, for its own sake, unrelated
to marriage, procreation[,] or familial relationships." Banning
commerce of sexual devices is not rationally related to this end,
because such a ban inevitably interferes with sexual stimulation
and auto-eroticism which is related to marriage, procreation, and
familial relationships.

The use of these devices by married couples as an aid to
marital relations, including sexual relations, is established by
the parties' stipulations.[40] First, customers of the vendor
plaintiffs include married individuals who use the devices, often
upon the suggestion of a therapist, as treatment for sexual
dysfunction or other marital problems. (Stipulation, ¶¶ 14, 25,
26.) Second, several of the user plaintiffs use, or have used
these devices while married, to enable them to achieve a more

---

[40] Any argument derived from the fact that the stipulations or the expert
opinions also indicate the proscribed devices are used by individuals who are not
married, merely bolsters this court's conclusion that the users and uses of these
devices cannot be so distinguished: that is, that any proscription of these
devices inherently interferes with both the conduct the State sought to interfere
with or discourage ("sexual stimulation and auto-eroticism, for its own sake"),
and that which it did not ("sexual stimulation and auto-eroticism ... unrelated
to marriage, procreation or familial relationships").

72

satisfactory relation with their respective marital partners, and thereby enhance their marital relationships. (*See id.*, ¶¶ 29-33.) Such use, in fact, has improved the marital relationships of some plaintiffs. (*See id.*, ¶ 33.) Third, two undisputed experts in the field of human sexuality opine that sexual devices are effective, if not vital, in the treatment of married couples' difficulties, whether sexual or other, general difficulties. (*See id.*, ¶¶ 65, 73, 77, 82.). The experts opine that such devices help, or actually enable many married couples to engage in sexual relations. (*See id.*) Not surprisingly, they also state that the devices are used or prescribed commonly in sexual or marital counseling. In fact, in the opinion of Dr. Pepper Schwartz, certain sexual devices are "of medical and psychological benefit to women and their partners, an adjunct to marital and sexual therapy, and an absolute necessity in some kinds of therapeutic approaches for sexual dysfunction." (*Id.*, ¶ 82.)   Dr. Alfred Jack Turner offers a perspective acquired through years as a therapist and counselor, when he claims "he has frequently seen sexual aids help in the revitalization of potentially failing marital relations." (*Id.*, ¶ 65.)

The Food and Drug Administration concurs with plaintiffs'

73

experts to the extent that these devices are useful in treating sexual dysfunction. (See stipulation, ¶ 44 (citing 21 C.F.R. §§ 884.5490, .5960 (1984)).) Other courts have recognized the therapeutic value of sexual devices, see People v. Seven Thirty-Five East Colfax, Inc., 697 P.2d 348, 370 (Colo. 1985); State v. Hughes, 792 P.2d 1023, 1031-32 (Kan. 1990), as have some state legislatures, see Ga. Code Ann. § 16-12-80(e)(2); Miss. Code Ann. § 97-29-107(b). In addition, this court finds it of some note that a common name for the proscribed devices, and a name which the Attorney General recognizes as such in brief, is "marital aids." (Brief of Alabama Attorney General, at 1.)

The court finds that the information above establishes that the sexual devices in issue are used by married individuals to aid their marital relationships, and to facilitate or enable sexual performance with their respective spouses. It follows that a ban on the commerce of these devices interferes with "sexual stimulation and auto-eroticism" which is related "to marriage, procreation[,] or familial relationships." This effect is one the State specifically sought to avoid,[41] but one that was unavoidable with an absolute legislative ban on the commerce of sexual devices.

---

[41] See note 35 and accompanying text, supra.

74

The challenged legislation, therefore, bears no rational relation to this state interest.

### c. Banning commerce of obscene material

Alabama has a legitimate interest in banning commerce of obscene material generally, without confining the legislation to public displays. *See Paris Adult Theatre I*, 413 U.S. at 57, 93 S.Ct. at 2635 ("[W]e hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby."). The statutory provision at issue in this case is a ban on distribution of sexual devices. These devices "express" nothing. Consequently, this case, contrary to most cases in which courts review obscenity laws, does not involve a First Amendment challenge. Thus, the court must address whether banning the sale of these "non-expressive" devices is rationally related to the Alabama's interest in banning obscene material generally.

### (1) What can be classified as "obscene"?

Obscenity traditionally has been identified by an appeal to an interest in sex which is "over and beyond those that would be characterized as normal." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 394 (1985). The

75

Supreme Court has quoted the following Model Penal Code definition
of obscenity with approval: "material whose predominate appeal is
to a shameful or morbid interest in nudity, sex, or excretion."
*Id.*, 105 S.Ct. at 2799 (internal quotation marks omitted).  The
term and concept of "prurience" often is invoked to identify
obscenity, and "prurience may be constitutionally defined for the
purposes of identifying obscenity as that which appeals to a
shameful or morbid interest in sex ..."  *Id.* at 497, 504, 105 S.Ct.
at 2798, 2802 (citing *Roth v. United States*, 354 U.S. 476, 77 S.Ct.
1304, 1 L.Ed.2d 1498 (1957)).

In *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37
L.Ed.2d 419 (1973), the Supreme Court established a three-pronged
inquiry to guide courts in identifying obscenity.  *Miller* involved
a First Amendment challenge by an individual convicted under a
California obscenity statute for mailing advertisements of
allegedly obscene, "adult material."  The Court began its analysis
by reiterating the general principle that "obscene material is
unprotected by the First Amendment. ..."  413 U.S. at 23, 93 S.Ct.
at 2614 (citations omitted).  Thus, the issue the Court addressed
in *Miller* was: what material is obscene? The Court first narrowed
its inquiry, holding that the permissible scope of state statutes

76

designed to regulate obscene materials is confined to "works which depict or describe sexual conduct." *Id.* at 24, 93 S.Ct. at 2614-15. Ultimately, the Supreme Court held that:

> The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.*, 93 S.Ct. at 2615 (citations and internal quotation marks omitted).

Section 13A-12-200.1(17) of the Alabama Code adopts the *Miller* standards to define what material depicting or describing sexual conduct is obscene.[42] Neither this definition nor the challenged provision expressly includes or identifies sexual devices as obscene.[43]

---

[42] Section 13A-12-200.1(17) reads:

(17) OBSCENE. The term means that:
    a.   The average person, applying contemporary community standards, would find that the material, taken as a whole, appeals to the prurient interest; and
    b. The material depicts or describes, in a patently offensive way, sexual conduct, actual or simulated, normal or perverted; and
    c. A reasonable person would find that the material, taken as a whole, lacks serious literary, artistic, political or scientific value.

[43] In fact, one word in section 13A-12-200.2(a)(1) — the disjunctive "or" — impliedly <u>excludes</u> sexual devices from the material identified as obscene:

77

**(2)  What are the devices "designed or marketed as useful primarily for the stimulation of human genital organs"?**

The sexual devices that section 13A-12-200.2(a)(1) prohibit include devices which depict human genitals.  Those devices generally are designed for use as such organs and are used in sexual acts.  They include penis-shaped dildos and artificial vaginas.  Many sexual devices do <u>not</u> represent human genitals, however, and some bear absolutely no resemblance to such organs. Other common sexual devices noted in the record include:  vibrators and other stimulators, which may or may not be in the form of a penis, and may or may not be designed for insertion into the vagina; penis extenders; penis enlargement pumps; genital rings; anal beads; and inflatable dolls.

---

"It shall be unlawful for any person to knowingly distribute ... any obscene material <u>or</u> any device designed or marketed as useful primarily for the stimulation of human genital organs ...."  (Emphasis supplied.)  The intended distinction perhaps could be that the devices do not classify as "material" (which would negate any concern over the following language).  Nevertheless, the statute then provides that "material not otherwise obscene may be obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of prurient appeal."  Ala. Code § 13A-12-200.2(a)(1).  The court finds this language inapposite to its analysis for three reasons.  First, a proper construction of the statute considers this language as applicable only to the aforementioned "material," which the statute itself distinguishes from devices.  Second, this language still is confined to the traditional notions of obscenity, *i.e.*, the concept of prurience.  This provision seeks to establish certain "erotica" as obscene.  "Erotica" is defined as "literature or art intended to arouse sexual desire."  Webster's II: New Riverside University Dictionary 441 (3d ed. 1994).  The devices in issue are neither literature nor art; they are, by definition, "designed or marketed as useful primarily for the stimulation of human genital organs."

78

### (3) Are these devices obscene?[44]

The court will first consider the three basic guidelines set forth in *Miller*. The court questions the applicability of the *Miller* analysis outside the First Amendment context,[45] however, and accordingly modifies these guidelines slightly, so they may provide guidance in the analysis of "non-expressive" devices. Thus, the court now considers: (1) whether the average person, applying contemporary community standards, would find that the proscribed devices appeal to the prurient interest; (2) whether the proscribed devices, standing alone, are patently offensive; and (3) whether the proscribed devices, taken as a whole, lack serious artistic, political, or scientific value.

Prurient interests should not be equated with normal, healthy interests in sex. *Brockett*, 472 at 498, 105 S.Ct. at 2799. As

---

[44] It is within this court's province to determine as a matter of law whether the devices at issue in this constitutional challenge are obscene, or may reasonably be found obscene. *See Penthouse International, Ltd. v. McAuliffe*, 702 F.2d 925, 928 (11th Cir. 1983); *see also Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974).

[45] The former Fifth Circuit in *Reeves v. McConn*, 638 F.2d 762, 764 (5th Cir. March 1981), limited the *Miller* analysis to printed material: "With regard to printed obscenity, the constitutional limits of state or federal regulations were set out in *Miller*." (Emphasis supplied.) Furthermore, the Supreme Court in *Miller* held that the permissible scope of state statutes designed to regulate obscene materials is confined to "works which depict or describe sexual conduct." 413 U.S. at 24, 93 S.Ct. at 2614-15. The Court noted this limitation recently in Reno v. American Civil Liberties Union, 521 U.S. 844, ___, 117 S.Ct. 2329, 2345, 138 L.Ed.2d 874: "[T]he *Miller* definition is limited to 'sexual conduct' ..."

79

stated above, prurience indicates a "shameful or morbid interest in nudity, sex, or excretion." *Id.*, 105 S.Ct. at 2799. In this community, do particular sexual devices appeal to such a shameful or morbid interest? Although the popular literature available at numerous retail outlets throughout Huntsville and northeastern Alabama generally suggest not,[46] the Alabama legislature apparently believes so.[47] Many, and perhaps a majority of sexual devices, most notably vibrators and other stimulators, appear innocuous and have no appeal to prurient interests, nor are they patently offensive. The court finds, however, that certain devices (including some vibrators) which are designed as representations of human genitals may have such prurient appeal. As such, these devices are likely to be patently offensive. The device that best fits this description is a penis-shaped dildo. Nevertheless, these dildos and most other devices which may be found to have prurient appeal and to be patently offensive, also have therapeutic, medical value.[48] Thus, these devices are not obscene under the guidelines

---

[46] As stated above, this part of the obscenity analysis considers the standards of the local community: that is, the judicial district in which this court sits, the Northern District of Alabama. *See* Hamling v. United States, 418 U.S. 87, 105-06, 94 S.Ct. 2887, 2901-02, 41 L.Ed.2d 590 (1974).

[47] This presumption assumes that banning commerce of obscenity was in fact the state's interest in passing the Act. The court notes, however, that the statute does not define sexual devices as obscene *per se*. Nevertheless, there are limits on what a legislature may deem offensive. *See id.* at 114, 94 S.Ct. at 2905.

[48] *See* Part II.D.3.b *supra*. While the expert opinions, the attestations

80

set forth in *Miller*.

Even if neither *Miller* nor the adapted guidelines are applicable, the statute as well as traditional obscenity jurisprudence focuses on the concept of "prurience."[49] *See Brockett*, 472 U.S. at 497, 504, 105 S.Ct. at 2798, 2802 (citing *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). In this community, only the certain few types of sexual devices noted above may reasonably be found to appeal to shameful or morbid interests in sex, nudity, or excretion.[50]

---

of plaintiffs, and the literature available in local retail outlets provide evidence of community standards for what appeals to "prurient interests" and what is "patently offensive," the regulations of the FDA conclusively establish the scientific and medical value of certain devices on a national level. Of course, the expert opinions and popular literature offer a national perspective for this inquiry, and the two previous inquiries as well. The court's determination regarding scientific and medical value is not limited to a local community standard, rather the court analyzes the material at issue from the perspective of a reasonable person. *See* Pope v. Illinois, 481 U.S. 497, 500-01, 107 S.Ct. 1918, 1920-21, 95 L.Ed.2d 439 (1987).

[49] In fact, the Alabama Legislature seeks to broaden the statutory definition of obscenity which adopted the *Miller* standards, by including in section 13A-12-200.2(a)(1) that: "material not otherwise obscene may be obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of prurient appeal." Even this proposed extension focuses on prurience. For a discussion of this language, see note 43, *supra*.

[50] If this court were to consider the devices as "erotica," perhaps some devices which are found to have no therapeutic value could be deemed obscene under this statute. For example, the sale of anal beads and devices used for sado-masochistic purposes may constitute "commercial exploitation of erotica solely for the sake of prurient appeal." *See* Mishkin v. New York, 303 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); Ward v. Illinois, 431 U.S. 767, 92 S.Ct. 2085, 52 L.Ed.2d 738 (1977) (reaffirming *Mishkin* after the *Miller* standards for obscenity were announced). Such a construction of the statute, however, would be plainly inconsistent with the statutory language.

81

Indeed, certain devices may be found obscene and, therefore, in furtherance of the state's interest in prohibiting the commerce of obscenity. However, the rub lies in the fact that a majority, or at least a significant minority, of the proscribed devices, as a matter of law, are not obscene under any established definition of obscenity. This fact notwithstanding, anyone who engages in the distribution of sexual devices faces, upon first conviction, a fine of up to $10,000 and imprisonment for up to one year. *See* Ala. Code § 13A-12-200.2(a)(1). Thus, the vendor plaintiffs face the spectre of a substantial fine and incarceration if they decide to continue their businesses. Moreover, users of these devices will be denied therapy for, among other things, sexual dysfunction. These widespread deleterious effects notwithstanding, the Alabama Legislature banned the distribution of all sexual devices in an effort to prohibit the few which may be found obscene.

Therefore, the court finds that the prohibition in issue is an exaggerated response to the State's concerns, and an overly broad means of regulating or prohibiting commerce of obscenity. *Cf.* *Romer v. Evans*, 517 U.S. 620, 635, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855 (1996) (holding amendment to state constitution failed rational basis review under the Equal Protection Clause because

82

"[t]he breadth of the Amendment [was] so far removed from the[]
particular justifications ..."); *Turner*, 482 U.S. at 91, 107 S.Ct.
at 2262 (finding that one of the asserted penological interests of
the State "[did] not satisfy the reasonable relationship standard,
but rather constitute[d] an exaggerated response to [its] ...
concerns"); *City of Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3258
(holding zoning ordinance unconstitutional where the Court found no
rational basis for believing that the [home subject to the
ordinance] would pose any special threat to the city's legitimate
interests").

Accordingly, this court finds that the prohibition on the
distribution of sexual devices, found in Alabama Code § 13A-12-
200.2(a)(1), bears no reasonable, rational relation to a legitimate
state interest and is, therefore, in violation of the Due Process
Clause of the Fourteenth Amendment to the United States
Constitution.[51]

---

[51] This court has no authority to offer a "saving construction" to a state
statute: that is, construe the statute in a manner that would obviate any
constitutional infirmity. Rather, this court determines whether the statute in
issue exceeds the bounds of the Constitution. *See* United States v. Thirty-Seven
Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1405, 28 L.Ed.2d 822 (1971)
("[Federal courts] lack jurisdiction authoritatively to construe state
legislation."); Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31
L.Ed.2d 408 (1972) (in absence of decision by state court limiting scope of
statute, federal court lacked authority to narrowly construe statute and avoid
facial constitutional challenge); *Dimmitt v. City of Clearwater*, 985 F.2d 1565,
1572 (11th Cir. 1993) ("[A]s a federal court, we must be particularly reluctant
to rewrite the terms of a state statute.")

83

## III. CONCLUSION

For the reasons stated above, this court finds that plaintiffs' motion for permanent injunctive relief is due to be granted. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this  *29th* day of March, 1999.

_____

United States District Judge

84