UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

*FILED*

*02 OCT 10 AM 10: 47*

*U.S. DISTRICT COURT*
*N.D. OF ALABAMA*

SHERRI WILLIAMS; B.J. BAILEY; *et al.*,  )
                                      )

     Plaintiffs,                )
                                      )

vs.                                   )     Civil Action No. CV-98-S-1938-NE
                                      )

BILL PRYOR, in his official capacity as )
the Attorney General of the State of    )
Alabama,                             )
                                      )

     Defendant.               )

**ENTERED**

OCT 10 2002

## MEMORANDUM OPINION

This case is before the court on remand from the Eleventh Circuit Court of Appeals for further consideration of plaintiffs' as-applied constitutional challenge to an Alabama statute prohibiting the distribution of "any device designed or marketed as useful primarily for the stimulation of human genital organs." Alabama Code § 13A-12-200.2(a)(1) (1975) (Supp. 2001). *See Williams v. Pryor*, 240 F.3d 944, 955-56 (11th Cir. 2001), *rev'g Williams v. Pryor*, 41 F. Supp. 2d 1257 (N.D. Ala. 1999). For convenience, the prohibited appliances will be referred to in this opinion as "sexual devices."[1] Plaintiffs are either vendors or users of such sexual devices. Defendant is William H. Pryor, Jr., the Attorney General for the State of Alabama.

"Vendor" plaintiffs B.J. Bailey and Sherri Williams, and "user" plaintiffs Alice Jean Cope, Jane Doe, Deborah L. Cooper, Benny G. Cooper, Dan Bailey, Jane Poe, and Jane Roe, have moved for summary judgment, and seek a declaration that Alabama Code § 13A-12-200.2(a)(1) is unconstitutional. Defendant also has filed a motion for summary judgment. He argues that plaintiffs

---

[1] *See Williams v. Pryor*, 240 F.3d 944, 947 n.1 (11th Cir. 2001) ("We adopt the district court's usage of the shorthand term "sexual device" in place of the cumbersome phrase 'device designed or marketed as useful primarily for the stimulation of the human genital organs.'"); *see also Williams v. Pryor*, 41 F. Supp. 2d 1257, 1259-60 (N.D. Ala. 1999).



lack standing to assert a constitutional challenge and, further, that plaintiffs seek recognition of a right not protected by the Constitution.

When confronted with cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 335-36 (1998) (footnote omitted); *see also, e.g., Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986). Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

## I. SUMMARY OF DECISION

When a state statute is alleged to burden a fundamental constitutional right, the district court's review of the challenged provision must be strict and exacting. Plaintiffs have submitted a great deal of unrefuted evidence to demonstrate that the Alabama statute at issue contravenes the "user" plaintiffs' fundamental constitutional right to privacy. That evidence has convinced this court that there exists a substantial history, legal tradition, and contemporary practice of deliberate state non-interference in the private, consensual, sexual relationships of married persons and unmarried adults. The ultimate result is that plaintiffs have shown that the fundamental right of privacy, long-recognized by the Supreme Court as inherent among our constitutional protections, incorporates a right to sexual privacy. Plaintiffs also have shown that this Nation's history, tradition, and contemporary treatment of sexual devices themselves evidences that this right of sexual privacy, even in its narrowest form, protects plaintiffs' use of sexual devices like those targeted by Alabama Code § 13A-12-200.2(a)(1). Accordingly, plaintiffs assert that the challenged statute impermissibly infringes their right to sexual privacy, insofar as the statute burdens the user plaintiffs' right to employ sexual devices within their private, adult, consensual, sexual relationships.

The constitutional guarantees that accompany plaintiffs' fundamental right to privacy will not permit the State of Alabama to prohibit plaintiffs from purchasing sexual devices for use within the confines of their private, adult, consensual, sexual relationships, unless the State can demonstrate that it has a compelling interest to do so, and, that the challenged statutory provision is narrowly tailored to accomplish that objective. Given plaintiffs' overwhelming evidence that the State of Alabama cannot make that showing, the Attorney General's failure to attempt an argument to the contrary, and this court's conclusion that Alabama has not narrowly constructed Alabama Code §

13A-12-200.2(a)(1) to accomplish its objectives, plaintiffs' motion for summary judgment is due to be granted and defendant's denied.

## II. PROCEDURAL HISTORY

The original plaintiffs in this action — Sherri Williams, B.J. Bailey, Betty Faye Haggermaker, Sherry Taylor-Williams, Alice Jean Cope, and Jane Doe — filed their complaint on July 29, 1998, following the Alabama Legislature's enactment of amendments to the "Alabama Anti-Obscenity Enforcement Act" on April 29, 1998. *See* Act No. 98-467, 1998 Acts of Alabama (subsequently codified as Alabama Code §§ 13A-12-200.1 through 13A-12-200.12 (1975) (Supp. 2001)). Those amendments became effective on July 1, 1998, and made it unlawful to sell or otherwise distribute "any device designed or marketed as useful primarily for the stimulation of human genital organs . . . ." Alabama Code § 13A-12-200.2(a)(1). The original plaintiffs were users or vendors of such sexual devices and, pursuant to 42 U.S.C. § 1983, sought injunctive relief from this court, arguing that § 13A-12-200.2 — facially and as-applied — burdened and violated their right to privacy and personal autonomy under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution.

Plaintiffs initially sought a temporary restraining order to preclude defendant from enforcing the amendments to the State's obscenity statute. The parties subsequently stipulated that "the status quo would be maintained and the amendments not enforced with respect to plaintiffs[], pending the Court's determination following a hearing on plaintiffs' claims for preliminary injunctive relief."[2] In an order entered on December 9, 1998, however, this court advanced plaintiffs' motion for a preliminary injunction to a final hearing on the merits of their application for declaratory and

---

[2] Plaintiffs' Request for Expedited Scheduling Conference (doc. no. 27) ¶ 2. (All references herein to "doc. no. __" are to the numbers assigned pleadings stamped by the Clerk as "filed.")

permanent injunctive relief. This court thus solely considered plaintiffs' motion for permanent

injunctive relief, and granted that motion on March 29, 1999, thereby enjoining the Attorney General

from enforcing Alabama Code § 13A-12-200.2(a)(1). *See Williams v. Pryor*, 41 F. Supp. 2d 1257,

1293 (N.D. Ala. 1999). The Attorney General appealed and the Eleventh Circuit reversed,

remanding the action for further consideration of plaintiffs' as-applied constitutional challenges to

the statute. *See Williams v. Pryor*, 240 F.3d 944, 955-56 (11th Cir. 2001). These as-applied

challenges are the subject of this court's consideration, *infra*, at Part V.

Following remand, plaintiffs amended their complaint to add five plaintiffs — Deborah L.

Cooper, Benny G. Cooper, Dan Bailey, Jane Poe, and Jane Roe — who appear in this action as users

of sexual devices proscribed by the challenged statutory provision.

All plaintiffs again request that this court declare Alabama Code § 13A-12-200.2(a)(1) to

be unconstitutional, as it is applied to these plaintiffs, and to the extent that it restricts the sale and

purchase of sexual devices. Plaintiffs seek permanent injunctive relief barring the Attorney General

from enforcing the statute. As grounds for this demand, plaintiffs argue that, by prohibiting the

distribution and sale of sexual devices designed to stimulate orgasm, the State of Alabama has

> intruded into the most intimate of places — the bedrooms of its citizens — and the
> lawful sexual conduct that occurs therein. While the statute's reach does not directly
> proscribe the sexual conduct in question, it places — without justification — a
> substantial and undue burden on the ability of the plaintiffs to obtain devices
> regulated by the statute. By restricting sales of these devices to plaintiffs, Alabama
> has acted in violation of the fundamental rights of privacy and personal autonomy
> that protect an individual's lawful sexual practices guaranteed by the First, Fourth,
> Fifth, Ninth, and Fourteenth Amendments of the United States Constitution.[3]

Plaintiffs also claim that similar constitutional violations have occurred because the State of

Alabama has, "[b]y prohibiting the distribution and sale of sexual devices and aids designed to

---

[3] Amended Complaint (doc. no. 55) ¶ 43, at 13-14.

stimulate orgasm, . . . intruded upon the lawful treatment decisions of its citizens to alleviate a common medical condition treatable by use of many of the devices covered by the statute."[4]

The day after filing their amended complaint, plaintiffs filed a motion for summary judgment, which was denied without prejudice, in order to permit the parties to reopen the discovery process.

The Attorney General subsequently moved to dismiss plaintiff Sherry Taylor-Williams from the action for failure to prosecute her individual claims. ("User" plaintiff Sherry Taylor-Williams is not related to "vendor" plaintiff Sherri Williams.) The evidence presented to this court demonstrated that Ms. Taylor-Williams had moved from her previous residence without contacting her attorneys, or leaving information regarding her new address. Neither plaintiffs' counsel nor defendant could locate Ms. Taylor-Williams, despite numerous attempts to do so. Consequently, the court granted the Attorney General's motion, and dismissed the claims of Ms. Taylor-Williams. Meanwhile, plaintiff Betty Faye Haggermaker and the Attorney General stipulated to the dismissal of Ms. Haggermaker's claims, due to her declining health and unwillingness to proceed. The court accordingly entered an order dismissing Ms. Haggermaker from the action on February 27, 2002.

The remaining plaintiffs renewed their motion for summary judgment on April 12, 2002, asserting that Alabama Code § 13A-12-200.2(a)(1) violates their constitutional right to privacy. The Attorney General filed his own motion for summary judgment on April 15, 2002, arguing that plaintiffs lack standing to bring their constitutional challenge, and cannot claim that the fundamental right to privacy protects the right to distribute or purchase sexual devices.

---

[4] *Id.* ¶ 44, at 14.

## III. STATEMENT OF FACTS

Many of the same issues and parties previously considered by this court in the memorandum opinion entered on March 29, 1999 now reappear before the court on the parties' cross-motions for summary judgment. *See Williams v. Pryor*, 41 F. Supp. 2d 1257 (N.D. Ala. 1999). For that reason, the court adopts the statement of facts from its prior opinion where relevant, and briefly reviews those facts here. With the addition of new parties, the dismissal of former parties, and the passage of more than three years, however, this court also undertakes a consideration of the facts and circumstances as they presently stand.

The Alabama Legislature originally enacted an "Anti-Obscenity Enforcement Act" in 1989. *See* Act No. 89-402, 1989 Acts of Alabama, at 791 *et seq.* (subsequently codified at Alabama Code §§ 13A-12-200.1 through 13A-12-200.10 (1975) (1994 Replacement Vol.)). Nine years later, the Alabama Legislature broadened the scope of that act — which previously had governed solely the distribution of "obscene material"[5] — through enactment of Act No. 98-467 during the 1998 regular

---

[5] The terms "obscene," "material," and "distribute" were defined by the original legislation as follows:

(1) OBSCENE. Such term means that:
    a. The average person, applying contemporary community standards, would find that the material, taken as a whole, appeals to the prurient interest; and
    b. The material depicts or describes, in a patently offensive way, sexual conduct, actual or simulated, normal or perverted; and
    c. A reasonable person would find that the material, taken as a whole, lacks serious literary, artistic, political or scientific value.

(2) MATERIAL. Any book, magazine, newspaper, printed or written matter, writing, description, picture, drawing, animation, photograph, motion picture, film, video tape, pictorial representation, depiction, image, electrical or electronic reproduction, broadcast, transmission, telephone communication, sound recording, article, device, equipment, matter, oral communication, live performance, or dance.

(3) DISTRIBUTE. To import, export, sell, rent, lend, transfer possession of or title to, display, exhibit, show, present, provide, broadcast, transmit, retransmit, communicate by telephone, play, orally communicate or perform.

Ala. Code §§ 13A-12-200.1 (1975) (1994 Replacement Vol.).

session. *See* Act No. 98-467, 1998 Acts of Alabama (subsequently codified as Alabama Code §§ 13A-12-200.1 through 13A-12-200.12 (1975) (Supp. 2001)).  The 1998 amendments inserted a proviso that criminalized the distribution of "any device designed or marketed as useful primarily for the stimulation of human genital organs . . . ."  The amended provision reads, in pertinent part, as follows:

> It shall be unlawful for any person to knowingly distribute, possess with intent to distribute, or offer or agree to distribute any obscene material *or any device designed or marketed as useful primarily for the stimulation of human genital organs* for any thing of pecuniary value. *Material not otherwise obscene may be obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica for the sake of prurient appeal.* Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than *ten thousand dollars ($10,000)* and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than one year. *A second or subsequent violation of this subdivision is a Class C felony if the second or subsequent violation occurs after a conviction has been obtained for a previous violation. Upon a second violation, a corporation or business entity shall be fined not less than ten thousand dollars ($10,000) nor more than fifty thousand dollars ($50,000).*

Alabama Code § 13A-12-200.2(a)(1) (Supp. 2001) (emphasis added to 1998 amendments).[6]  The

---

[6] The remaining sub-sections of § 13A-12-200.2(a) read as follows:

> (2) It shall be unlawful for any person, being a wholesaler, to knowingly distribute, possess with intent to distribute, or offer or agree to distribute, for the purpose of resale or commercial distribution at retail, any obscene material or any device designed or marketed as useful primarily for the stimulation of human genital organs for any thing of pecuniary value. Material not otherwise obscene may be obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than twenty thousand dollars ($20,000) and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than one year. A second or subsequent violation of this subdivision is a Class C felony if the second or subsequent violation occurs after a conviction has been obtained for a previous violation. Upon a second violation, a corporation or business entity shall be fined not less than ten thousand dollars ($10,000) nor more than fifty thousand dollars ($50,000).
>
> (3) It shall be unlawful for any person to knowingly produce, or offer or agree to produce, any obscene material or any device designed or marketed as useful primarily for the stimulation of human genital organs for any thing of pecuniary value. Material not otherwise obscene may be

statute does not state, as in the form of examples, which sexual devices are prohibited from distribution.

## A.   The Vendor Plaintiffs

"Vendor" plaintiff Sherri Williams is a Florida resident who owns and operates "Pleasures," an Alabama corporation.  The company has two retail outlets in Alabama that sell sexual aids and novelties:  one located in Huntsville, and another in Decatur.  The Huntsville Pleasures store has been operating since June of 1993, and it is located in a small shopping mall near other retail establishments, including an adult video store, a liquor store, a hair salon, a health spa, an O'Charley's restaurant, and a Wal-Mart Super Center.[7]  As of December 3, 1998, the date of the parties' stipulation of facts, the Huntsville store had approximately 14,960 customers annually and, during calendar year 1997, sold approximately 22,440 items, generating gross revenues of approximately $448,837.  In 1998, through July 1, the Huntsville store sold approximately 10,060 items and generated gross revenues of approximately $201,314.[8]

The Decatur Pleasures store has been operating since February of 1996, and it also is situated in a small shopping mall in a retail business district, close to other retail establishments, including a Texaco gasoline station, a chiropractor's office, a pet grooming facility, a tanning salon, a printer,

---

obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of prurient appeal.  Any person who violates this subsection shall be guilty of a Class C felony.

(4) If a person is held under this section in the county jail, one-half of any fines collected and due to be deposited to the State General Fund for violations of this section shall be paid by the Comptroller to the general fund of the county where the person is held for the operation of the county jail.

Ala. Code § 13A-12-200.2(a)(2) – (a)(4) (Supp. 2001).

[7] Stipulation of Facts (doc. no. 33) ¶ 2.

[8] *Id.* ¶ 12.

a specialty kite shop, and a clothing store catering to women and children.[9]  During calendar year

1997, the Decatur Pleasures store had approximately 5,600 customers and sold approximately 8,455

items, generating gross revenues of approximately $169,093.  In 1998, through July 1, that store sold

approximately 5,170 items and generated gross revenues of approximately $103,438.[10]

The parties have stipulated that the Pleasures stores do not purport to operate as, or resemble,

"adult" bookstores, although a limited number of adult-oriented, "soft porn" or "R"-rated videos and

magazines are sold.[11]  Both stores have signage on the front doors stating: "If offended by explicit

sexuality, Please do not enter, You must be 21 years of age."[12]  Both stores also have brick

storefronts with large display windows that feature lingerie, massage oils, adult games, hosiery,

instructional videos, bath powders, aromatherapy candles, romance novels, and similar products.[13]

Both stores are strictly retail operations, and do not offer sexual performances or video shows.[14]  The

products sold at both stores include novelties with an adult theme, and items that are marketed to

facilitate sexual relations, such as condoms, lubricants, and vibrators.[15]  More specifically, Pleasures

promotes an extensive line of lingerie, exotic oils, lotions, lubricants, instructional videos, reading

materials, and vibrating and non-vibrating sexual aids, which include vibrators, vibrating and non-

vibrating dildos, penis extensions, penis enlargement devices, anal beads, penis rings, creams to

prolong erection, artificial vaginas, and inflatable dolls.[16]  Each store offers counseling on the use

---

[9] *Id.* ¶ 3.

[10] *Id.* ¶ 13.

[11] *Id.* ¶ 8.

[12] *Id.*

[13] Stipulation of Facts (doc. no. 33) ¶ 4.

[14] *Id.* ¶ 7.

[15] *Id.* ¶ 9.

[16] *Id.* ¶ 10; *see also* Supplementation/Correction of Stipulation of Facts (doc. no. 40), Ex. A (Inventory of Pleasures' Huntsville location).

of these products, and also sells cakes, gourmet chocolates, and various types of coffee.[17]

Although neither Sherri Williams nor her agents have been arrested in connection with the operation of Pleasures, Ms. Williams challenges the constitutionality of the statute — on her own behalf and also on behalf of her customers — because she fears arrest and prosecution under Alabama Code § 13A-12-200.2(a)(1) unless she discontinues the sale of sexual devices.[18]

Similarly, vendor plaintiff B.J. Bailey is an Alabama resident who owns and operates "Saucy Lady, Inc.," an Alabama corporation that "conducts in-house 'Tupperware'-style parties at which sexual aids and novelties are displayed and sold."[19] (Plaintiff Dan Bailey, newly added to this action, is B.J. Bailey's husband, and owns 49% of the stock in Saucy Lady, Inc., although Mr. Bailey presents himself in this action as a "user" plaintiff.[20]) Saucy Lady, Inc. has been organizing and conducting such parties throughout Alabama since 1993, although the company was not incorporated until 1995.[21] Sexual paraphernalia, devices, and novelties are sold at the parties, including lubricants, massage oils, books and instruction manuals, adult games, lingerie, vibrating and non-vibrating dildos, products to strengthen or tighten the vagina, products to prolong erection, and anal beads.[22] Mrs. Bailey asserts that at least some of these items may be covered by the statute, thereby subjecting her and her agents to arrest and prosecution.[23] During 1997, approximately 10,500 such products were sold at Saucy Lady parties, generating revenue of approximately $160,000. Through July 1, 1998, the parties were responsible for the sale of approximately 5,250

---

[17] Stipulation of Facts (doc. no. 33) ¶ 7.

[18] Amended Complaint (doc. no. 55), ¶ 6.

[19] *Id.* ¶ 7.

[20] Declaration of B.J. Bailey (doc. no. 14), ¶ 2.

[21] Stipulation of Facts (doc. no. 33) ¶ 16.

[22] Supplementation/Correction of Stipulation of Facts (doc. no. 40), Ex. B (Saucy Lady, Inc. order form).

[23] Stipulation of Facts (doc. no. 33) ¶ 21.

products, generating revenues of approximately $80,000.[24]

Saucy Lady parties are conducted in the privacy of a host home and are marketed exclusively to adult women. The company does not advertise, and instead relies on word-of-mouth to generate attendance.[25] In 1997, approximately 770 Saucy Lady parties were conducted throughout Alabama (in Franklin, Jackson, Lauderdale, Lawrence, Limestone, Madison, Marshall, Morgan, Shelby, and, Walker counties), while approximately 380 parties had been hosted in 1998, as of July 1.[26]

Generally, between three and thirty-five women attend each Saucy Lady party. Total attendance in 1997 was approximately 7,700, while total attendance through July 1, 1998 was approximately 3,800.[27] Saucy Lady customers typically are adult women (married, single, and divorced) from nineteen to seventy years of age, and are of diverse religious, racial, and ethnic backgrounds.[28] The customers also belong to a variety of professions and occupations, and differ extensively in their level of sexual experience and knowledge. Mrs. Bailey asserts that the majority of women who attend her parties have told her that they previously were either anorgasmic,[29] or had experienced extreme difficulty reaching orgasm through sexual intercourse alone. Some of these customers have consulted a physician or therapist about such issues. A significant number of customers allegedly have reported that products purchased at the Saucy Lady parties helped them to become orgasmic, and greatly improved their sexual and marital relations.[30]

Mrs. Bailey further contends that numerous Saucy Lady customers attend the parties and

---

[24] *Id.* ¶ 22.

[25] *Id.* ¶ 17.

[26] *Id.* ¶ 18-19.

[27] *Id.* ¶ 20.

[28] *Id.* ¶ 26.

[29] Anorgasmy is defined as "failure to experience orgasm in coitus." *Dorland's Illustrated Medical Dictionary* 88 (28th ed. 1994).

[30] Stipulation of Facts (doc. no. 33) ¶ 26.

purchase sexual devices because they prefer to avoid sexual relations with others, due to prior negative relationships, or the risk of sexually transmitted diseases, or other risks associated with developing an intimate relationship.  Other attendees state that they are unable to establish a relationship with another person, but still desire to be sexually active.  These women often purchase sexual devices in order to pursue personal sexual goals within the privacy of their homes without involving another person as a sexual partner.[31]

As with plaintiff Sherri Williams, there have never been any arrests or threats of prosecution in connection with Saucy Lady parties.[32]

## B.     The User Plaintiffs

"User" plaintiff Alice Jean Cope is an Alabama resident, a customer of Saucy Lady, Inc., and a user of the sexual devices that Alabama Code § 13A-12-200.2(a)(1) seeks to prohibit.  Mrs. Cope is a thirty-year-old married woman who uses sexual devices during intimate relations with her husband.  Before beginning to use such devices, Mrs. Cope was anorgasmic for approximately ten years, despite being sexually active during that time period.[33]  Like the other user plaintiffs in this action, Mrs. Cope has not been arrested or threatened with prosecution for her purchase of sexual devices.

User plaintiff Jane Doe is an Alabama resident, a customer of Saucy Lady, Inc., and a user of sexual devices that the 1998 amendments seek to proscribe.  Ms. Doe is a fifty-year-old woman who now is single, but who previously has been married and divorced.  Ms. Doe began using sexual devices on the advice of her therapist, as a means to combat post-partum depression and to improve

---

[31] *Id.* ¶ 27.

[32] *Id.* ¶ 23.

[33] Amended Complaint (doc. no. 55) ¶ 10.

-13-

her marital relationship.  Ms. Doe currently uses the devices to avoid sexually transmitted diseases, while remaining sexually active.[34]

User plaintiff Deborah L. Cooper is thirty-three years old, and an Alabama resident.  She is married to user plaintiff Benny G. Cooper.  The Coopers began using sexual devices in order to repair their deteriorating sexual relationship and marriage.  To that end, Mrs. Cooper attended an "adult toy" party at a friend's home, at which she purchased a sexual device that she "subsequently introduced into her marriage."[35]  Both Mr. and Mrs. Cooper attribute the use of sexual devices to "restoring . . . trust, dialogue, and understanding in their marriage."[36]

User plaintiff Dan Bailey also is an Alabama resident, and is married to vendor plaintiff B.J. Bailey.  Mr. Bailey, who is sixty-one, and fourteen years older than his wife, has suffered in recent years from a respiratory condition and problems with arousal.  Mr. Bailey asserts that the use of sexual devices has improved his sexual relationship with his wife.[37]

User plaintiff Jane Poe is a twenty-four year-old Alabama resident who has been married for two years.  Ms. Poe contends that her inability to achieve orgasm caused problems in her marriage.  After seeking advice from friends and other women facing similar marital problems, Ms. Poe attended an "adult toys" party, and subsequently introduced sexual devices purchased at the party into her marriage.  As a result, Ms. Poe avers that she and her husband enjoy a tension-free sexual relationship, and are happier as a couple, "both in and out of the bedroom."[38]

Finally, user plaintiff Jane Roe is a thirty-eight year-old Alabama resident who suffers from

---

[34] *Id.* ¶ 11.

[35] *Id.* ¶ 12.

[36] *Id.*

[37] *Id.* ¶ 14.

[38] *Id.* ¶ 15.

a chronic disability that makes it extremely painful to engage in sexual intercourse.  Ms. Roe has

lived with this condition since she was twenty-four, and claims that sex has become increasingly less

enjoyable since that time.  Ms. Roe asserts, however, that she was invited to an "adult toys" party,

at which she was able to discuss her condition with other women in a "private, supportive

environment."[39]  Ms. Roe purchased sexual devices at this party that allow her to experience sexual

pleasure without pain or discomfort.  This plaintiff states that, while she hopes to marry or have a

consistent sexual partner in the future, any sexual relationship will require her partner to use such

a sexual device to enable her to experience sexual pleasure without pain.

All plaintiffs challenge the constitutionality of Alabama Code § 13A-12-200.2(a)(1), as it

is applied to them, arguing that

> Alabama has unduly burdened the rights of plaintiffs to be free from unwarranted
> governmental intrusions into their private practices — practices which have not been
> made unlawful in Alabama.  Neither masturbation nor stimulation of the genitalia by
> a sexual device is a crime in Alabama.  Indeed, many of the devices covered by the
> statute are the recommended treatment choice by therapists treating sexual
> dysfunction.  The constitutional right of privacy established in a long line of United
> States Supreme Court decisions forbid[s] this type of intrusion into an individual's
> lawful sexual practices and intimate medical affairs.[40]

Plaintiffs emphasize that purchasers of sexual devices have "a wide variety of therapeutic needs,"[41]

and that such devices also are purchased by persons seeking to avoid sexually transmitted diseases,

or who are unable or unwilling to marry, or to enter into a sexual relationship with another person.[42]

The Attorney General has stipulated to all of these facts.  Even so, he responds in his motion

for summary judgment that this court does not possess subject matter jurisdiction, as both the user

---

[39] Amended Complaint (doc. no. 55) ¶ 16.

[40] *Id.* ¶ 22.

[41] *Id.* ¶¶ 23, 30.

[42] *See id.* ¶¶ 32-33.

-15-

and vendor plaintiffs allegedly are without standing to pursue their claims.  Attorney General Pryor

also argues that the constitutional right to privacy relied on by plaintiffs cannot be expanded to

include a fundamental right of plaintiffs to sell or purchase sexual devices.  These arguments are

considered in greater detail below.

## IV. STANDING

In order to determine whether a "specific person is the proper party to bring a matter to the

court for adjudication," a plaintiff must demonstrate each of the elements of the tripartite standard

that the Supreme Court has characterized as an "irreducible constitutional minimum."  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 531 (1992).

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally
> protected interest which is (a) concrete and particularized and (b) actual or imminent,
> not conjectural or hypothetical.  Second, there must be a causal connection between
> the injury and the conduct complained of — the injury has to be fairly traceable to
> the challenged action of the defendant, and not the result of the independent action
> of some third party not before the court.  Third, it must be likely, as opposed to
> merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61, 112 S. Ct. at 2136 (citations, internal quotation marks, and bracketed alterations

omitted).  Only the first of these three elements is disputed by the Attorney General:  he contends

that none of the plaintiffs can demonstrate that she or he has experienced an "injury in fact."

This court briefly considered plaintiffs' standing to bring this action in the memorandum

opinion entered on March 29, 1999:

> The Attorney General challenges the vendor plaintiffs' ability to assert a challenge
> to Alabama Act No. 98-467 on behalf of their customers:  that is, of unnamed users
> of the proscribed devices.  Clarifying this position at oral argument, the Assistant
> Attorney General representing defendant said:  "[w]e think the sellers can have
> standing as sellers of the products but not on behalf of the users, . . . *given the fact*
> *that users are here*" (emphasis supplied).
>
> As an initial matter, this court finds that the vendor plaintiffs independently

satisfy standing requirements. *See Craig v. Boren*, 429 U.S. 190, 194, 97 S. Ct. 451, 455, 50 L. Ed. 2d 397 (1976). Furthermore, this court agrees with the Attorney General's implicit concession that the user plaintiffs have standing to assert a due process challenge. *Cf. Carey v. Population Services International*, 431 U.S. 678, 683-84, 97 S. Ct. 2010, 2015, 52 L. Ed. 2d 675 (1977). As a consequence, it is not necessary to decide the standing of the vendor plaintiffs to act as advocates for the rights of unnamed users of the proscribed devices. *See id.* at 682, 97 S. Ct. at 2014. The Article III "case or controversy" requirement has been satisfied for the challenges to the legislation presented in this action.

*Williams*, 41 F. Supp. 2d at 1273-74. The Eleventh Circuit did not consider plaintiffs' standing on appeal of that decision. *See Williams*, 240 F.3d at 944. The Attorney General argues in his present motion for summary judgment, however, that because "the complexion of this litigation has . . . changed since 1999," issues regarding plaintiffs' standing to sue require further consideration.[43] This court agrees.

## A.    Standing of the User Plaintiffs

Attorney General Pryor contends that, "[b]ecause any vendor who sells a sexual device to the user plaintiffs has a statutory affirmative defense that shields them from a successful prosecution, there is no real legal impediment to the plaintiffs purchasing sexual devices in Alabama."[44] Specifically, he refers to Alabama Code § 13A-12-200.4, which provides that "[i]t shall be an affirmative defense to a charge of violating Sections 13A-12-200.2 and 13A-12-200.3 that the act charged was done for a bona fide medical, scientific, educational, legislative, judicial, or law enforcement purpose." Alabama Code § 13A-12-200.4 (1975) (1994 Replacement Vol.). This affirmative defense provision was part of the original obscenity legislation enacted in 1989, and was not affected by the state legislature's 1998 amendments. The section of Alabama's obscenity law challenged by all plaintiffs, § 13A-12-200.2(a)(1), is specifically included in this affirmative defense

---

[43] Defendant's Memorandum of Law (doc. no. 78), at 3.

[44] *Id.* at 4.

provision.   Consequently, the Attorney General argues, "the affirmative defense undeniably applies."[45]   The affirmative defense provision embodied in § 13A-12-200.4, according to the Attorney General, would protect sales by vendors to these user plaintiffs because the vendors "would come within the 'safe harbor' set forth [in] section 13A-12-200.4 such that they could never be successfully prosecuted for an alleged violation of section 13A-12-200.2."[46] The Attorney General's reliance on the affirmative defense provision stems from the fact that, "[i]n the depositions and declarations filed in this case, it is made plain that each of the user plaintiffs have a bona fide [medical or psychological] need for sexual devices such that a vendor could sell to them without incurring criminal liability."[47]

Attorney General Pryor thus asserts that plaintiffs have failed to demonstrate that they have been or will be prosecuted, or threatened with arrest or prosecution, for purchasing sexual devices of the type governed by Alabama Code § 13A-12-200.2.[48]   The affirmative defense of § 13A-12-200.4 leads the Attorney General to contend that the user plaintiffs cannot demonstrate that an Article III case or controversy exists, because the user plaintiffs cannot produce evidence that they have suffered, or will suffer, an injury by the challenged statute.[49]  *See Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136.  He argues that "plaintiffs have shown nothing more than an imaginary or speculative

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at 4-5.  The Attorney General concedes that user plaintiffs who claim psychological need for these devices cannot rely specifically on the language of the affirmative defense provision, which refers only to a defense for "bona fide medical, scientific, educational, legislative, judicial, or law enforcement" purposes. Ala. Code § 13A-12-200.4. The Attorney General goes to great lengths to demonstrate that psychology is a scientific field of study, but does not offer any evidence that this affirmative defense was intended to, or does, govern psychological needs of the kind exhibited by some of the user plaintiffs. *See* Memorandum of Law (doc. no. 78), at 4-5 & n.2.

[48] Defendant's Supplemental Brief (doc. no. 92), at 1.

[49] *Id.* at 2.

fear of prosecution to support their assertion of standing."[50]  Finally, the Attorney General contends that, because the challenged statutory provision targets solely distributors, the user plaintiffs "could not be prosecuted at all for their mere use and possession of sexual devices."[51]

The Supreme Court has held that, for a plaintiff to contest the constitutionality of a criminal statute, "'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309, 60 L. Ed. 2d 895 (1979) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S. Ct. 1209, 1216, 39 L. Ed. 2d 505 (1974)).  Further, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"  *Babbitt*, 442 U.S. at 298, 99 S. Ct. at 2309 (quoting *Doe v. Bolton*, 410 U.S. 179, 188, 93 S. Ct. 739, 745, 35 L. Ed. 2d 201 (1979)).  On the other hand, it also has been said that, when a plaintiff fails to claim that he or she has "'ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,'" that plaintiff lacks standing to challenge the offending statute.  *Babbitt*, 442 U.S. at 298-99, 99 S. Ct. at 2309 (quoting *Younger v. Harris*, 401 U.S. 37, 42, 91 S. Ct. 746, 749, 27 L. Ed. 2d 669 (1971)).

The gravamen of the standing inquiry concerning the user plaintiffs, then, would seem to be solely whether these plaintiffs can show that they have "ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible" for violation of Alabama

---

[50] *Id.* at 4.

[51] *Id.*

Code § 13A-12-200.2(a)(1).  *Id.*  Given that this statutory provision targets solely distributors of sexual devices, the immediate impulse is to answer this question in the negative.

In response, the user plaintiffs direct this court's attention to a body of Supreme Court precedent that, they claim, permits them to maintain their constitutional challenge. *See Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976); *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d. 201 (1973).  According to plaintiffs, the "common denominator in all these cases is that the statute at issue sought to choke off or constrict the supply of information, services, or products by imposing criminal sanctions on those who provide them."[52]

For example, in *Roe v. Wade*, plaintiff Jane Roe was unable to obtain an abortion in Texas due to a state statute that made it illegal for physicians to perform an abortion unless the mother's life was endangered.  The court immediately acknowledged Ms. Roe's standing to challenge the constitutionality of the statute, although she was not a provider of such services and thus not targeted by the statute's language:  "[T]here can be little dispute that [Ms. Roe] presented a case or controversy and that, wholly apart from the class aspects, she, *as a pregnant single woman thwarted by the Texas criminal abortion laws, had standing to challenge those statutes.*"  410 U.S. at 124, 93 S. Ct. at 712 (emphasis supplied).

Similarly, in *Doe v. Bolton*, decided the same day as *Roe*, the Supreme Court considered a plaintiff's constitutional challenge to a Georgia statute that prohibited physicians from performing abortions unless the mother's life was endangered, or the pregnancy resulted from rape, or the fetus

---

[52] Plaintiffs' Memorandum in Support of Standing (doc. no. 93), at 9.

was likely to be born with a serious defect.  The plaintiff there failed to meet any of these criteria, and sued when she was denied an abortion.  Under the same rationale relied on in *Roe*, the *Doe* Court determined that the plaintiff had standing to challenge the statute's constitutionality, although the criminal provisions of the statute were directed at providers of abortions (distributors), rather than those who sought the services of the providers (consumers).  410 U.S. at 187, 93 S. Ct. at 745.

Once again, in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, consumers of prescription drugs were permitted to bring a constitutional challenge to a Virginia criminal statute that prohibited pharmacists from advertising drug prices.  The consumers were held to possess standing to challenge the statute, although they were not targeted for criminal prosecution by the legislative language, because they were able to demonstrate that they would benefit from the drug pricing information, and that the statute thus infringed First Amendment free speech guarantees.  425 U.S. at 755, 757, 96 S. Ct. at 1822, 1823.

Finally, in *Washington v. Glucksberg*, the Court permitted terminally-ill patients who desired to commit suicide while assisted by a physician to challenge the constitutionality of a Washington criminal statute that prohibited a physician from aiding a person to commit suicide.  521 U.S. at 707, 96 S. Ct. at 2261.

Given these decisions, and their factual similarity to the present case, in which *consumer* plaintiffs challenge a state criminal statute targeting *distributors* of sexual devices, the court concludes that the user plaintiffs have demonstrated independent standing to challenge the contested statute.  Further, the decisions reviewed above implicitly recognized those plaintiffs' standing, although none was prosecuted or threatened with prosecution under the state criminal statute at issue.  Consequently, the user plaintiffs' contention that enforcement of Alabama Code § 13A-12-

-21-

200.2(a)(1) unconstitutionally burdens their access to sexual devices is sufficient to satisfy Article III standing requirements.

## B.     Standing of the Vendor Plaintiffs

The Attorney General contends that vendor plaintiffs Sherri Williams and B.J. Bailey do not have standing to sue, because they cannot demonstrate that they have suffered injury, pursuant to *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136. The Attorney General asserts that this is because "any vendor who sells a sexual device to the user plaintiffs has a statutory affirmative defense that shields them from a successful prosecution . . . ."[53] Plaintiffs respond that the vendor plaintiffs have independent standing to bring suit. Additionally, they assert that there is a fundamental "problem" with defendant's affirmative defense argument, because

> enforcement of the statute is left to the discretion of local law enforcement officials who can close a business down, seize the stock and place the owner and employees in jail pending trial. Moreover, there is no assurance that this defense will be successful. It ultimately lies with the trier of fact in a criminal proceeding. The Defendant has offered nothing to show that prosecutors across the state would uniformly interpret the statute to allow the sale of sexual devices under the circumstances involving the plaintiffs in this case. Nor can [the Attorney General] demonstrate[] that jurors would uniformly come to the same conclusion. It is this very uncertainty over how the law will be enforced that makes it impossible for the vendors to continue to operate their business. The record shows that retailers would shut down rather than risk prosecution and jail time.[54]

A search of reported cases failed to uncover any decision applying the affirmative defense embodied in Alabama Code § 13A-12-200.4.

Plaintiffs assert further that the vendor plaintiffs also possess standing to sue on behalf of those "individuals who use sexual devices and are not before this court,"[55] because

---

[53] Defendant's Memorandum in Support (doc. no. 78), at 4 (heading).

[54] Plaintiffs' Memorandum in Opposition (doc. no. 88), at 14-15.

[55] *Id.* at 13.

-22-

[p]laintiffs Sherri Williams and B.J. Bailey[] each sell the type of products that come within the coverage of the statute.  They allege third party standing to bring the challenge on behalf of the past, present and future customers whose privacy rights would be burdened by the enforcement of the statute.[56]

This court concludes that the vendor plaintiffs have standing to pursue this action in their own right, and, on behalf of their potential customers.  *See Carey v. Population Services International*, 431 U.S. 678, 683, 97 S. Ct. 2010, 2015, 52 L. Ed. 2d 675 (1977) (holding that corporation engaging in mail-order retail sale of non-medical contraceptive devices had standing to challenge New York statute prohibiting distribution of contraceptives in its own right and on behalf of its customers).  The vendor plaintiffs satisfy Article III standing requirements because Alabama Code § 13A-12-200.2(a)(1) operates to inflict an injury on these vendor plaintiffs "sufficient to guarantee [their] 'concrete adverseness.'"  *Craig v. Boren*, 429 U.S. 190, 194, 97 S. Ct. 451, 455, 50 L. Ed. 2d 397 (1976) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663 (1962)).

In *Craig*, the Supreme Court considered a constitutional challenge by a licensed beer vendor to an Oklahoma statute that prohibited the sale of 3.2% beer to males under the age of twenty-one, and to females under the age of eighteen.  429 U.S. at 194, 97 S. Ct. at 455.  The Court concluded that the vendor there had standing, both to challenge the statute independently and to bring an equal protection challenge on behalf of males between the ages of eighteen and twenty, because:

> The legal duties created by the statutory sections under challenge are addressed directly to vendors such as appellant.  *She is obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyer's market, or to disobey the statutory command and suffer . . . sanctions and perhaps loss of license. . . .*
>
> As a vendor with standing to challenge the lawfulness of [the Oklahoma

---

[56] *Id.*

-23-

statutory provisions at issue in *Craig*], appellant is entitled to assert those concomitant rights of third parties that would be "diluted or adversely affected" should her constitutional challenge fail and the statutes remain in force. *Griswold v. Connecticut*, 381 U.S. 479, 481, 85 S. Ct. 1678, 1679, 14 L. Ed. 2d 510 (1965) . . . . Otherwise, the threatened imposition of governmental sanctions might deter appellant Whitener and other similarly situated vendors from selling 3.2% beer to young males, thereby ensuring that "enforcement of the challenged restriction against the [vendor] would result indirectly in the violation of third parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510, 95 S. Ct. 2197, 2211, 45 L. Ed. 2d 343 (1975). *Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function. See, e. g., Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972); *Sullivan v. Little Hunting Park*, [396 U.S. 229, 90 S. Ct. 400, 24 L. Ed. 2d 386 (1969)]; *Barrows v. Jackson*,[346 U.S. 249, 73 S. Ct. 1031, 97 L. Ed. 1586 (1953)].

*Craig*, 429 U.S. at 195, 97 S. Ct. at 455-56 (emphasis supplied) (some citations and internal quotation marks omitted).

The *Craig* Court relied on *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972), in arriving at this conclusion. In both *Craig* and *Eisenstadt*, "a state statute . . . imposed legal duties and disabilities upon the claimant." *Craig*, 429 U.S. at 196, 97 S. Ct. at 456. While the claimant in *Eisenstadt* actually had been convicted of distributing contraceptive foam, in the case before this court — as in the case confronting the *Craig* Court — there has been no arrest, prosecution, or conviction under Alabama Code § 13A-12-200.2(a)(1). The *Craig* Court nevertheless made it plain that the rationale of *Eisenstadt* applied when finding that the vendor plaintiff there had standing to bring a constitutional challenge:

Since the statute was directed at Baird and penalized his conduct, the [*Eisenstadt*] Court did not hesitate . . . to conclude that the "case or controversy" requirement of Art. III was satisfied. *In considering Baird's constitutional objections, the [Eisenstadt] Court fully recognized his standing to defend the privacy interests of*

-24-

> third parties. *Deemed crucial to the decision to permit* jus tertii[57] *standing was the recognition of "the impact of the litigation on third-party interests."* Just as the defeat of Baird's suit and the "[e]nforcement of the Massachusetts statute will materially impair the ability of single persons to obtain contraceptives," . . . so too the failure of Whitener [the vendor plaintiff in *Craig*] to prevail in this suit and the continued enforcement of [the Oklahoma 3.2% beer statute] will "materially impair the ability of" males 18-20 years of age to purchase 3.2% beer despite their classification by an overt gender-based criterion.

*Craig*, 429 U.S. at 196, 97 S. Ct. at 456 (emphasis supplied) (citations and footnote omitted). In the

omitted footnote, the *Craig* Court added these helpful observations:

> The fact that Baird chose to disobey the legal duty imposed upon him by the Massachusetts anticontraception statute, *resulting in his criminal conviction, does not distinguish the standing inquiry from that pertaining to the anticipatory attack in this case. In both* Eisenstadt *and here, the challenged statutes compel* jus tertii [read "third party"] *claimants either to cease their proscribed activities or to suffer appropriate sanctions. The existence of Art. III "injury in fact" and the structure of the claimant's relationship to third parties are not altered by the litigative posture of the suit. And, certainly, no suggestion will be heard that Whitener's* [the vendor plaintiff's] *anticipatory challenge offends the normal requirements governing such actions.* . . .

*Id.* at 196 n.5, 97 S. Ct. at 456 n.5 (emphasis supplied) (citations omitted).

In like manner, the vendor plaintiffs before this court are "obliged either to heed the statutory

discrimination, thereby incurring a direct economic injury through the constriction of [their] buyer's

market, or to disobey the statutory command and suffer . . . sanctions." *Craig*, 429 U.S. at 194, 97

S. Ct. at 455-56. Indeed, the vendor plaintiffs complain that they have lost business since the

challenged statutory provision was adopted.[58] These vendor plaintiffs also have standing to "resist

---

[57] *Jus tertii* is a Latin phrase meaning "the right of a third party." *See Black's Law Dictionary* 868 (7th ed. 1999). As Bryan Garner has elsewhere observed, however, the phrase "generally is not a useful enough LATINISM to justify its presence in legal prose." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 493 (2d ed. 1995). Indeed, it obfuscates, rather than clarifies, the author's meaning.

[58] Plaintiffs' Memorandum in Opposition (doc. no. 88), at 15.

efforts at restricting their operations by acting as advocates of the rights of third parties who seek

access to their market or function." *Id.* Accordingly, vendor plaintiffs Sherri Williams and B.J.

Bailey have demonstrated that they have standing to pursue their constitutional challenge against

defendant — both independently and on behalf of third party purchasers of sexual devices.

### V. FUNDAMENTAL RIGHTS ANALYSIS AND PLAINTIFFS' AS-APPLIED CHALLENGES

Plaintiffs initially brought facial and as-applied challenges to the 1998 amendments to

Alabama Code § 13A-12-200.2(a)(1). This court rejected plaintiffs' facial challenge to the statute

in the memorandum opinion entered on March 29, 1999, a holding that was affirmed by the Eleventh

Circuit on appeal. *See Williams*, 240 F.3d at 953. Even so, the appellate court remanded the case

for further consideration of plaintiffs' as-applied challenges. *See id.* at 955. Specifically, the

Eleventh Circuit instructed:

> *Although the statute is not facially unconstitutional* because . . . it may
> constitutionally be applied to those who sell to minors sexual devices which are
> deemed harmful to minors, *the as-applied challenges raised by the plaintiffs, married
> or unmarried, implicate different and important interests in sexual privacy. See
> Griswold*, 381 U.S. at 485-86, 85 S. Ct. at 1682 ("Would we allow the police to
> search the sacred precincts of marital bedrooms? The very idea is repulsive to the
> notions of privacy surrounding the marriage relationship."); *Glucksberg*, 521 U.S.
> at 720, 117 S. Ct. at 2267 (citing *Griswold* as holding the Constitution protects a
> fundamental right "to marital privacy"); *see also Casey*, 505 U.S. at 898, 112 S. Ct.
> at 2831 (invalidating provision requiring notification of married woman's spouse
> before abortion could be performed because "[w]omen do not lose their
> constitutionally protected liberty when they marry. The Constitution protects all
> individuals, male or female, married or unmarried, from the abuse of governmental
> power, even where that power is employed for the supposed benefit of a member of
> the individual's family"); *Eisenstadt*, 405 U.S. at 453, 92 S. Ct. at 1033 ("[T]he
> rights of the individual to [have] access to contraceptives . . . must be the same for
> the unmarried and married alike."); *Bowers v. Hardwick*, 478 U.S. 186, 209 n. 4, 106
> S. Ct. 2841, 2853 n. 1, 92 L. Ed. 2d 140 (1986) (Blackmun, J., dissenting)
> (questioning validity of categorizations of sexual activity depending on marital
> status); *id.* at 216, 106 S. Ct. at 2857 (Stevens, J., dissenting) (citing *Eisenstadt* and
> *Carey* as holding that fundamental rights protection in sexual matters "extends to

-26-

intimate choices by unmarried as well as married persons").

> *We remand the as-applied challenges for due consideration by the district court because the record and stipulations in this case simply are too narrow to permit us to decide whether or to what extent the Alabama statute infringes a fundamental right to sexual privacy of the specific plaintiffs in this case.* In *Glucksberg*, its most recent case in which an argument for recognition of a new fundamental right was presented, the Supreme Court instructed that a fundamental right must be "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [the right] were sacrificed." 521 U.S. at 720-21, 117 S. Ct. at 2268 (citations and quotations omitted). In concluding the Constitution did not include such a fundamental right of physician-assisted suicide, the Court discussed at length not only the long history of the proscription of suicide and assisting suicide but also the considerable contemporary nationwide legislative action to preserve such laws. *See id.* at 710-19, 117 S. Ct. at 2262-67. By contrast, in this case the district court considered in two paragraphs only whether the "use of sexual devices" is a deeply rooted and central liberty. *See* 41 F. Supp. 2d at 1283-84 & n. 33. *The court analyzed neither whether our nation has a deeply rooted history of state interference, or state non-interference, in the private sexual activity of married or unmarried persons nor whether contemporary practice bolsters or undermines any such history.* The record is bare of evidence on these important questions. *Absent the kind of careful consideration the Supreme Court performed in Glucksberg,* we are unwilling to decide the as-applied fundamental rights analysis and accordingly remand those claims to the district court.

*Williams*, 240 F.3d at 955-56 (emphasis supplied). Accordingly, plaintiffs' as-applied challenges

are the subject of the parties' cross-motions for summary judgment.

As the excerpted language from the *Williams* opinion evidences, the Eleventh Circuit relied

in significant part on *Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772

(1997), to arrive at its holding. In *Glucksberg*, the Supreme Court considered a due process

challenge to the State of Washington's ban on assisted suicide by a group of practicing physicians,

three gravely ill patients considering physician-assisted suicide, and a nonprofit organization. The

Supreme Court emphasized its long-standing reluctance to expand the "concept of substantive due

process because guideposts for responsible decisionmaking in this unchartered area are scarce and

open-ended." *Id.* at 720, 117 S. Ct. at 2267 (internal quotation marks omitted) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992)).

In the interest of exercising "utmost care" to avoid unprincipled decisionmaking, federal courts employ a two-part substantive due process analysis to determine whether constitutional protection should be extended to an asserted right. *Id.* at 720, 117 S. Ct. at 2268. The first feature of this test requires a plaintiff to demonstrate that the fundamental right alleged is,

> objectively, "deeply rooted in this Nation's history and tradition," [*Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S. Ct. 1932, 1938, 52 L. Ed. 2d 531 (1977) (plurality opinion)]; *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S. Ct. 330, 332, 78 L.Ed 674 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 152, 82 L. Ed. 288 (1937).

*Glucksberg*, 521 U.S. at 720-21, 117 S. Ct. at 2268. The second part of the substantive due process test requires that this court carefully describe the fundamental liberty interest at issue. *See id.* at 720, 117 S. Ct. at 2268 (collecting cases).

This court now turns to the first part of the substantive due process test — namely, whether the fundamental right alleged is deeply rooted in this Nation's history and tradition. The *Glucksberg* Court began its analysis, as the Supreme Court "do[es] in all due process cases, by examining our Nation's history, legal traditions, and practices." *Id.* at 710, 117 S. Ct. at 2262. To that end, the Court looked to more than 700 years of Anglo-American common-law tradition, including the legislation of the American colonies. Significantly, *Glucksberg* extended this analysis to include a review of the contemporary practices and attitudes regarding assisted suicide: specifically, the Court looked to current statutes and those of "recent years," "public concern," "democratic action," and twentieth century model legislation and its effect on state legislation. *Glucksberg*, 521 U.S. at

-28-

715-16, 117 S. Ct. at 2265-66; *see also Williams*, 240 F.3d at 955 (instructing this court to conduct a review of "contemporary practice" in light of *Glucksberg*'s similar analysis).   The Court accordingly considered current statutes, legislative debates, voter initiatives, and the positions of contemporary task forces and commissions on the issue of assisted suicide.  The *Glucksberg* Court ultimately held that the Washington ban on assisted suicide did not violate the Fourteenth Amendment, either facially or as-applied, because there was no history, tradition, or contemporary practice of permitting persons to commit, or assist in the commission of, suicide.  *See* 521 U.S. at 719, 734, 117 S. Ct. at 2267, 2275; *see also Williams*, 240 F.3d at 955 (citing *Glucksberg*'s discussion of the "long history of the proscription of suicide and assisting suicide" and the "considerable contemporary nationwide legislative action to preserve such laws").

Applying that mode of analysis here, plaintiffs contend that this country's history and legal tradition reflect that states have intentionally refrained from interfering in the private, consensual, sexual relations of married persons.  According to plaintiffs, "[a] survey of the regulation of adult consensual sexual activity in the United States from Colonial times to present does not support state interference with lawful, private sexual conduct when engaged in by individuals married to each other."[59]   Historically, "most legislation in this area is directed at sexual conduct which occurs *outside the marital chamber* (i.e. fornication and adultery)."[60]  This historical, legislative focus on extra-marital sexual relationships has changed in the modern era, according to plaintiffs, because the "sexual revolution" that occurred in the United States during the nineteenth and twentieth centuries "resulted in changing attitudes about state interference with adult consensual activity —

---

[59] Plaintiffs' Memorandum in Support (doc. no. 58), at 16.

[60] *Id.* (emphasis supplied). Fornication is defined as "[v]oluntary sexual intercourse between two unmarried persons." *Black's Law Dictionary* 664 (7th ed. 1999); *see also The Merriam-Webster Dictionary* 301 (1997) (defining the same term as "consensual sexual intercourse between two persons not married to each other.").

regardless of marital status."[61]  These facts lead plaintiffs to declare that there is a deeply rooted history of state non-interference in the private, consensual, sexual activity of married persons, and, that contemporary practice has extended that state non-interference to include the private, consensual, sexual activity of unmarried adults.  This history, legal tradition, and contemporary practice will be examined in greater detail, below.

The Attorney General concedes that "there is no genuine dispute as to the historical chronology set forth by the plaintiffs' experts," to the effect that there is a "history or tradition of state non-interference in persons sex lives."[62]  The Attorney General further admits that, "[t]aken as a whole, it is incontestable that society's attitudes about sex in general have become increasingly liberal, especially across the last several decades."[63]  General Pryor argues, nevertheless, that "section 13A-12-200.2's general prohibition on the sale of sexual devices [is] misdefined as a bullish invasion of the marital bedroom. . . . The statute itself makes no direct demands on what couples (or individuals) may or may not do when secreted in their bedrooms."[64]

The second part of the substantive due process test requires that this court carefully describe the fundamental liberty interest at issue.  *See Glucksberg*, 521 U.S. at 720, 117 S. Ct. at 2268 (collecting cases).  The Attorney General would have this court cast the fundamental right alleged herein as one to "purchase dildos and vibrators."[65]  In fact, however, the Eleventh Circuit in *Williams v. Pryor* properly and more broadly characterized the liberty interest at issue as "a fundamental right

---

[61] Plaintiffs' Memorandum in Support (doc. no. 58), at 17.

[62] Defendant's Memorandum in Support (doc. no. 78), at 12 (internal quotation marks omitted).

[63] *Id.*

[64] *Id.* at 10.

[65] *Id.*

to *sexual privacy* of the specific plaintiffs in this case." 240 F.3d at 955 (emphasis supplied).[66]
While the conflict in this case does concern plaintiffs' right to use sexual devices when engaging
in lawful, private, consensual, sexual activity, plaintiffs correctly observe that the "major problem
with the Defendant's formulation of the issue is the misplaced emphasis on the sale or purchase of
sexual devices, rather than the important constitutional interests at stake . . . ."[67]

In light of *Glucksberg* and the two-part substantive due process test outlined above, plaintiffs
must demonstrate that the fundamental right to privacy recognized by the Supreme Court
incorporates a fundamental right to *sexual privacy* between married persons and between unmarried
persons which, in turn, "encompasses a right to use sexual devices." *Williams*, 240 F.3d at 954
(emphasis supplied). This court will recognize a fundamental right to *sexual privacy* if plaintiffs'
evidence of our national history, legal traditions, and contemporary practices establishes that such
right is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 710, 720-21,
117 S. Ct. at 2262, 2268. What follows, then, is an exploration, based on the evidence submitted
by the parties, of American history, legal tradition, and contemporary practices regarding the
"private sexual activity of married or unmarried persons." *Williams*, 240 F.3d at 955-56.

Before engaging in that exploration, however, the court notes that it is extremely significant,
if not dispositive, that the Attorney General concedes that "there is little evidence to show that
sexual devices, or consensual sexual activities in general, have historically been subject to

---

[66] The Attorney General demands that this court ignore the binding decision of the Eleventh Circuit in *Williams v. Pryor*, because he disagrees with the extent to which the appellate court applied *Glucksberg* to the case at bar. *See* Defendant's Memorandum in Support (doc. no. 78), at 11-12. The Attorney General objects specifically to the breadth of the analysis ordered by the appellate court of plaintiffs' as-applied challenges, calling the analysis "somewhat of an unwarranted amplification of *Glucksberg*." *Id.* at 11. Even were this court in a position to evade the instructions of the appellate court — which it is not — this court agrees with the Eleventh Circuit's interpretation of *Glucksberg*, and its application to plaintiffs' constitutional challenges. *See Williams*, 240 F.3d at 955-56.

[67] Plaintiffs' Memorandum in Opposition (doc. no. 88), at 15.

governmental regulation,"[68] and that "it is evident that states have historically exerted little effort in interfering with persons' private, consensual sexual activities."[69] The Attorney General's concession seems to answer the Rule 56 inquiry, and signify that there is no genuine issue of material fact for this court to consider on the question of whether this Nation's history, legal tradition, and contemporary practice evinces a fundamental right to sexual privacy between married or unmarried persons, grounded in state non-interference in the sexual relationships of married and unmarried people. This court nevertheless examines the evidence put forth by the parties, in the manner of *Glucksberg*, in further consideration of plaintiffs' claim that they have a fundamental constitutional right to sexual privacy, which encompasses a right to use sexual devices, and that such right is impermissibly infringed by Alabama Code § 13A-12-200.2(a)(1).

## A.   History and Legal Tradition Regarding Sexual Privacy Between Married Persons

As stated above, plaintiffs cannot claim that Alabama Code § 13A-12-200.2(a)(1) impermissibly infringes their fundamental right to *sexual privacy* unless the evidence submitted by the parties substantiates that such right is "deeply rooted in the Nation's history and tradition." *Glucksberg*, 521 U.S. at 720-21, 117 S. Ct. at 2268 (internal quotation marks omitted). The court may also consider evidence of contemporary practices in determining the existence of that right. *See id.* at 710, 117 S. Ct. at 2262. Plaintiffs have offered the following undisputed evidence in that vein, in order to authenticate the existence of a fundamental right of sexual privacy that encompasses plaintiffs' right to use sexual devices.

---

[68] Defendant's Memorandum in Support (doc. no. 78), at 16 (heading) (boldface emphasis deleted).

[69] *Id.*

1.     **Seventeenth Century — The Colonial Period**

This court's review of plaintiffs' undisputed evidence begins with colonial America. Historian and philosopher Michel Foucault writes that the beginning of the seventeenth century was typified by a "certain frankness."[70]

> Sexual practices had little need of secrecy; words were said without undue reticence, and things were done without too much concealment; one had a tolerant familiarity with the illicit. . . . It was a time of direct gestures, shameless discourse, and open transgressions, when anatomies were shown and intermingled at will, and knowing children hung about amid the laughter of adults: it was a period when bodies "made a display of themselves."[71]

Foucault states, however, that the "advent of the age of repression" occurred in the seventeenth century, "after hundreds of years of open spaces and free expression . . . ."[72] Plaintiffs offer evidence to show that church and state law became largely synonymous during this repressive period.[73] Protestantism predominated in the governments of the American colonies, which led to increased secular control over sexual conduct.[74] A "strict puritanical code governed society in many of the states that drew no distinction between secular and sectarian laws. Strict laws were adopted prohibiting premarital, extramarital and 'deviant' sexual behavior."[75] Even so, and despite popular opinion, seventeenth and eighteenth century Puritan clergy and congregations typically did not frown on marriage, but instead believed that "sexual intercourse was a human necessity and

---

[70] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 15 (I Michel Foucault, *The History of Sexuality* (1990)), at 3 (hereinafter *The History of Sexuality*).

[71] *Id.*

[72] *Id.* at 5.

[73] *See, e.g., id.*, Ex. 36 (William E. Nelson, *Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society, 1760-1830* (1975)), at 4 (hereinafter *Americanization of the Common Law*).

[74] *See* Plaintiff's original motion for summary judgment (doc. no. 56), Ex. J (Declaration of Vern L. Bullough), ¶ 15.

[75] *Id.* ¶ 27.

marriage the only proper supply for it."[76]  Further, "[m]arriage and childbearing . . . were

encouraged."[77]

Sexual intercourse *outside* a marital relationship was deemed forbidden by God, however,

and, consequently, also was proscribed by many colonial communities.[78]  "In almost all the colonies

a rather strict code was in place that severely punished sexual transgressions occurring outside the

marital chamber."[79]  One legal historian writes that "the primary objective of criminal law in the pre-

revolutionary period was to give legal effect to the community's sense of sin and to punish those

who breached the community's taboos."[80]  To that end, colonial America "scrupulously enforced"

laws banning adultery, sodomy (both punished as capital crimes), and fornication (violators were

whipped and forced to marry).[81]  These crimes were deemed to "threaten[] the centrality of marital,

reproductive sexuality."[82]  Plaintiffs' evidence reflects that in Massachusetts, for example,

seventeenth century criminal statutes prohibited adultery, bestiality, sodomy, and rape, and punished

or made each punishable by death.[83]  More than thirty-eight percent of all criminal prosecutions in

Massachusetts between 1760 and 1774 were for sexual offenses, and more than ninety-five percent

of those were for fornication.[84]  Connecticut's colonial laws also prohibited sodomy, bestiality,

---

[76] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 34 (Edmund Morgan, *The Puritans and Sex*, 15 New. Eng. Q. 591 (1942)), at 593 (hereinafter *The Puritans and Sex*).  Morgan cites one case, for example, in which a male plaintiff complained of slander after it was reported that he had broken his deceased wife's heart with grief because he had refused to approach her physically for a period of about three weeks.

[77] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 27.

[78] *See* Plaintiffs' appendix of authorities (doc. no. 57), Ex. 34 (*The Puritans and Sex*), at 607.

[79] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 3 (Second Bullough Declaration), ¶ 3.

[80] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 36 (*Americanization of the Common Law*), at 37.

[81] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 27.

[82] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 12 (John D'Emilio & Estelle B. Freedman, *Intimate Matters:  A History of Sexuality in America* (1988)), at 32 (hereinafter *Intimate Matters:  A History of Sexuality in America*).

[83] *See id.*, Ex. 9 (*The Colonial Laws of Massachusetts* (Wm. H. Whitmore ed., 1887)), at 14-15.

[84] *See id.*, Ex. 36 (*Americanization of the Common Law*), at 37.

adultery, and rape (punishing each as capital crimes), and printed the biblical passage that provided justification for these proscriptions alongside the law itself.[85]   Connecticut colonialists were punished for acts of fornication by being compelled to marry or suffer other court-ordered penalties.[86]

Plaintiffs contend, without dispute from the Attorney General, that, "even in those places where [deviate, extra-marital] sexual relations were closely regulated by the church/state apparatus, the state did not interfere in private, marital sexual relations."[87]   Instead, "Protestantism distinguished more clearly between proper sexual expression — that which led to reproduction — and sexual transgression — acts that occurred outside of marriage and for purposes other than reproduction."[88]   Plaintiffs also state that a review of statistics reported by historian William E. Nelson "do[es] not indicate a single prosecution of married people for sexual activity within the marital relationship."[89]   Plaintiffs emphasize, for example, that so reluctant was the state to intrude upon the sexual relationship of married people, that both the English common law and American

---

[85] *See id.*, Ex. 6 (*The Blue Laws of New Haven Colony* (1838)), at 103, 124.

[86] *Id.*  Plaintiffs state that the church's influence over state law appears to have been less significant in those areas in which demographics did not readily permit marriage.  Plaintiffs offer as an example the Chesapeake region, in which the ratio of men to women was four to one.  Even so,

> [i]n the Chesapeake, as in New England, church and court prosecuted sinners, levying fines on or whipping those who fornicated, committed adultery, sodomy, or rape, or bore bastards.  But New Englanders monitored sexual crimes more extensively and more systematically than did residents of the southern colonies.  A racially and socially homogenous population, common religious values, and the geographical proximity of the New England towns facilitated the social control of personal behavior.

Plaintiffs' appendix of authorities (doc. no. 57), Ex. 12 (*Intimate Matters:  A History of Sexuality in America*), at 11.

[87] Plaintiffs' Memorandum in Support (doc. no. 58), at 20.

[88] *Id.* at 21 (citing Plaintiffs' appendix of authorities (doc. no. 57), Ex. 12 (*Intimate Matters:  A History of Sexuality in America*), at 4-5).

[89] Plaintiffs' Memorandum in Support (doc. no. 58), at 22 (citing Plaintiffs' appendix of authorities (doc. no. 57), Ex. 36 (*Americanization of the Common Law*), at 31, 110).

colonial laws regarded marriage as a complete defense to rape.[90] As historian, author, and university professor Dr. Vern L. Bullough states:

> While there have always been laws against sodomy and rape, if such activities took place in the marital bedroom prosecutions were almost non-existent. Virtually every state throughout the history of this country had a marital rape exception. Even today, when marital rape can be subject to prosecution in some states, so strong is the tradition and value of privacy in the marital chamber, that prosecutors have been extremely reluctant to bring charges of such conduct. Cases involving marital rape exceptions today typically involve estranged couples.[91]

### 2.    Eighteenth Century — The Revolutionary Period

Plaintiffs' undisputed historical evidence also shows that the previously unified seventeenth century attitudes of church and state were followed in the eighteenth century by a decline in the enforcement of laws proscribing consensual sexual acts. Dr. Bullough states that,

> [b]y the beginning of the eighteenth century, . . . the influence of the Church was in decline. At the time of the American Revolution, and certainly by the end of the century, the enforcement of laws prohibiting private, adult consensual behavior[] was rapidly disappearing — and penalties were being reduced to misdemeanors.[92]

Seventh Circuit Judge Richard A. Posner writes, similarly, of the "dismantling of many Puritan sex laws in . . . the American states," and the "gradual although irregular decline in sexual repression" that occurred during the eighteenth century.[93] For example, in 1786, Massachusetts reduced its penalties for fornication from whippings and forced marriage to imprisonment, fines, and/or confessions of guilt.[94] Historian William E. Nelson contends that this "breakdown of ethical unity"

---

[90] *See* Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 26.

[91] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 3 (Second Bullough Declaration), ¶ 6.

[92] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 27.

[93] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (Richard A. Posner, *Sex and Reason* (1992)), at 16 (hereinafter *Sex and Reason*).

[94] *See id.*, Ex. 14 (*First Laws of the Commonwealth of Massachusetts* (M. Glazier, ed. 1981)), at 245-46.

is evidenced by the fact that prosecution for sex crimes like fornication came to a virtual standstill in Massachusetts beginning in the 1780s.[95]

> During the fifteen years before the Revolution, . . . there had been an average of seventy-two prosecutions per year for sexual offenses, nearly all for fornication. The first ten years after independence produced only a slight decline to fifty-eight cases each year.  However, in 1786 the General Court enacted a new statute for the punishment of fornication, permitting a woman guilty of the crime to confess her guilt before a justice of the peace, pay an appropriate fine, and thereby avoid prosecution by way of indictment in the court of sessions.  The number of prosecutions for sexual offenses immediately declined to an average of eleven per year during 1786-1790 and to less than five per year during the four decades thereafter.  It appears that after 1790 women simply stopped confessing their guilt of fornication, apparently aware that even though they did not confess it was most unlikely that they would be indicted.  Indeed, only four indictments were returned in the entire Commonwealth after 1790; most sexual prosecutions after that date were for more serious offenses such as adultery, public lewdness, or the publication of obscene matter . . . .[96]

Nelson offers an explanation for this decline:

> To many contemporaries the deemphasis of prosecution for sin appeared to be a decline in morals.  President Timothy Dwight of Yale traced the decline to the French and Indian War and especially to the [American] Revolution, which, he said, had added "to the depravation still remaining [from the French War] . . . a long train of immoral doctrines and practices, which spread into every corner of the country.  The profanation of the Sabbath, before unusual, profaneness of language, drunkenness, gambling, and lewdness were exceedingly increased. . . ." . . .

> Notwithstanding these complaints, it does not appear that there was any deep-seated coarseness or general immorality during the closing years of the eighteenth century.  *What was beginning to occur after the Revolution was not significantly more immorality but an abandonment of the prerevolutionary notion that government should act to enforce morality.*  Over time, . . . the abandonment by government of its enforcement role would impair the notion that there was any one set of ethical standards that all men ought to obey.[97]

---

[95] *Id.*, Ex. 36 (*Americanization of the Common Law*), at 110.

[96] *Id.*

[97] *Id.* at 111 (emphasis supplied) (footnotes omitted).

Author Cornelia Hughes Dayton has documented similar changes in eighteenth century colonial Connecticut. For example, penalties for sexual offenses like adultery and fornication were reduced, and the number of prosecutions for consensual sex offenses declined.[98] At its pinnacle, the New Haven County Court entertained 107 prosecutions of married persons for fornication from 1730-1739, but that number dropped to zero between 1780 and 1789.[99] In the 1790s, in what Dayton calls the "final act in the privatization and decriminalization of fornication," Connecticut county court judges, "without any statutory prompting, ceased to include fornication cases as a matter of the criminal record, allowing individual justices of the peace to receive pregnant single women, *not as criminals and confessors*, but as *complainants* in threatened paternity suits."[100] Dayton explains this legal shift as mirroring broader societal changes, stating that "by midcentury, new attitudes on the part of legal officers and the middling men of property — who as complainants, jurors, and witnesses were the backbone of the legal system — had pushed aside the Puritan obsession with pressuring all sinners to acknowledge immoral behavior in the most public setting possible."[101] The result was that, "*[g]radually, the regulation of moral behavior was withdrawn from the purview of the community-embodied-in-the-court and lodged in the more informal and amorphous setting of family and neighborhood.*"[102]

### 3. Nineteenth Century — The Dawn of Urbanism and Secularism

Plaintiffs' undisputed evidence suggests that American attitudes toward adult, consensual

---

[98] Plaintiffs' Memorandum in Support (doc. no. 58), at 25.

[99] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 11 (Cornelia Hughes Dayton, *Women Before the Bar: Gender, Law and Society in Connecticut, 1639-1789* (1995)), at 182, Table 7.

[100] *Id.* at 161 (emphasis supplied).

[101] *Id.* at 159.

[102] *Id.* at 160 (emphasis supplied).

sexuality shifted once again at the dawn of the nineteenth century.  As Judge Posner notes, "[t]he situation changed dramatically in the nineteenth century."[103]  Nineteenth century America witnessed the advent of the Victorian era of "prudery, which came to dominate middle-class thinking in the United States . . . [and] was encouraged, systematized, and defended in a growing literature that pronounced sex dangerous on scientific, specifically medical and eugenic, grounds, as distinguished from the older theological grounds."[104]  Historian and philosopher Michel Foucault writes that, for the Victorian American middle class,

> [s]exuality was carefully confined; it moved into the home.  The conjugal family took custody of it and absorbed it into the serious function of reproduction.  On the subject of sex, silence became the rule.  The legitimate and procreative couple laid down the law.  The couple imposed itself as model, enforced the norm, safeguarded the truth, and reserved the right to speak while retaining the principle of secrecy.  A single locus of sexuality was acknowledged in social space as well as at the heart of every household, but it was a utilitarian and fertile one:  the parents' bedroom.[105]

Foucault contrasts this period with the comparatively "lax," seventeenth century "[c]odes regulating the coarse, the obscene, and the indecent . . . ."[106]  As evidence of this shift in attitude, Judge Posner points to Victorian treatment of "that most characteristic expression of child sexuality, masturbation":  while that practice previously had been largely ignored outside theological discourse, Victorian-era scientists seized upon masturbation in children as a cause of

> feeble-mindedness, insanity, criminality, impotence, homosexuality, early death, sterility, and (when not sterility) deformed offspring.  The disapproval of masturbation was not new.  For orthodox Catholics it has always been a mortal sin because it is a form of nonmarital, nonprocreative, and therefore "disordered" sex. . . . Victorian sexology was not primarily interested in sin.  Its objection to

---

[103] *Id.*, Ex. 39 (*Sex and Reason*), at 16.

[104] *Id.*

[105] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 15 (*The History of Sexuality*), at 3.

[106] *Id.*

-39-

masturbation was medical in the first instance and moral only insofar as a practice that could debilitate the entire race necessarily raised broader concerns than the health of the individual child.[107]

Plaintiffs offer another, related example of changing attitudes toward sexuality in "anti-onanism," the theory that masturbation and auto-ejaculation are harmful to the health, a cause of physical and mental disease.[108]  This theory "had a powerful effect on Western society for the next two centuries."[109]   Even so, plaintiffs' undisputed evidence reflects that sexual devices, contraceptives, and abortion became widely available in the nineteenth century, the emergence of which suggests a growing liberalism regarding sexual relationships and sexuality in America.  For

---

[107] *Id.*, Ex. 39 (*Sex and Reason*), at 16-17.

[108] *See* Plaintiffs' Memorandum in Support (doc. no. 58), at 26.  The theoretical underpinnings of onanism actually were laid out in the early eighteenth century, with the publication of an anonymous pamphlet entitled *Onania: or, The Heinous Sin of Self-Pollution, And all its Frightful Consequences, in Both Sexes consider'd, &c.* (London, 16th ed., 1737).  *See* Plaintiffs' appendix of authorities (doc. no. 57), Ex. 24 (Robert H. MacDonald, *The Frightful Consequences of Onanism: Notes on the History of a Delusion*, 28 J. Hist. Ideas 423 (1967)), at 423.

> The author of *Onania* divides his work into three sections, the causes, the consequences, and the cure.  His remarks are introduced and accompanied by scriptural interpretation, by which he proves God's detestation for all unnatural practices, and in particular the "Sin of Onan."  The causes he sees as ignorance, secrecy in which the sin can be indulged, and the apparent impunity from punishment.  The consequences are many and horrible, both to body and soul.  Masturbation hinders the growth, is the cause of many a phymosis and paraphymosis — "I shall not explain these Terms any further, let it suffice that they are very painful and troublesome" — stranguries, priapisms and gonorrheas, thin and waterish seed, fainting fits and epilepsies, consumptions, loss of erection and premature ejaculation, and infertility.  From the wretches that survive, children may be expected so sick and weakly that they are "a Misery to themselves, a Dishonour to [sic] Human Race, and a Scandal to their Parents."  Women ("to imagine that Women are naturally more modest than Men, is a Mistake") have most of the troubles that afflict men, plus a few of their own.  Female masturbators suffer from imbecility, *fluour albus* [leucorrhoea], hysteric fits, barrenness and a "total Ineptitude to the Act of Generation itself."
>
> The cure is both spiritual and physical.  The author advocates true repentance, and renunciation of the practice.  He proposes marriage as soon as the youth be ripe.  Those who have confessed their sin and are prepared to reform are recommended to take cold baths and a milk diet, and to "repair to a skilful Surgeon" and "open their Case, which if he be a sagacious Man, may be done with a very few Hints. . . ."  In the later editions the bashful are advised to apply to the bookseller Mr. Crouch (afterwards Mr. Isted) who will furnish them with medicines specially prepared for their complaint. . . .

*Id.* at 425 (emphasis and alteration in original) (footnote omitted).

[109] *Id.* at 423.  Indeed, this action indicates that the theorem has not entirely dissipated.

example, according to Wilson Yates, "birth control information was widely circulated in the last quarter of the nineteenth century[,] even though the Comstock Law was in effect."[110]  Significantly, and despite the anti-vice crusades of the period, Wilson writes that "[d]uring the 1830s, and certainly by 1850, the desire to practice birth control and knowledge of preventives were current in the society and widespread enough to prevent any effective censorship of the subject."[111]  Yates submits further that "it is also important in assessing the activity of this period to note that during the 1840s the first United States patent for a contraceptive device was issued."[112]

### a.   The appearance of electromechanical vibrators

Also suggestive of a growing nineteenth century liberalism regarding sexuality and adult sexual conduct was the invention of the electric vibrator.  The emergence and widespread acceptance of this device supports plaintiffs' argument that their right to sexual privacy incorporates the right to use sexual devices.  The vibrator "evolved from previous massage technologies in response to demand from physicians for more rapid and efficient physical therapies, particularly for hysteria."[113]  Historian and author Rachel Maines explains:

> Massage to orgasm of female patients was a staple of medical practice among some (but certainly not all) Western physicians from the time of Hippocrates until the 1920s, and mechanizing this task significantly increased the number of patients a doctor could treat in a working day. . . .
>
>      The demand for treatment had two sources:  the proscription on female

---

[110] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 43 (Wilson Yates, *Birth Control Literature and the Medical Profession in Nineteenth Century America*, 31 J. Hist. Med. 42 (1976)), at 51.  As discussed in text *infra*, the Comstock Act was an 1873 federal statute that tightened rules against mailing obscene, lewd, or lascivious books or pictures, as well as any article or thing designed for the prevention of conception or procuring abortions.

[111] *Id.* at 47.

[112] *Id.* at 50.

[113] *Id.*, Ex. 25 (Rachel Maines, *The Technology of Orgasm: "Hysteria," the Vibrator, and Women's Sexual Satisfaction* (1999)), at 3.

masturbation as unchaste and possibly unhealthful, and the failure of androcentrically defined sexuality to produce orgasm regularly in most women. Thus the symptoms defined until 1952 as hysteria, as well as some of those associated with cholorosis and neurasthenia, may have been at least in large part the normal functioning of women's sexuality in a patriarchal social context that did not recognize its essential difference from male sexuality, with its traditional emphasis on coitus. . . .

. . . .

[M]arriage did not always "cure" the "disease" represented by the ordinary and uncomfortably persistent functioning of women's sexuality outside the dominant sexual paradigm. This relegated the task of relieving the symptoms of female arousal to medical treatment, which defined female orgasm under clinical conditions as the crisis of an illness, the "hysterical paroxysm." In effect, doctors inherited the task of producing orgasm in women because it was a job nobody else wanted.

At the same time, hysterical women represented a large and lucrative market for physicians. These patients neither recovered nor died from their condition but continued to require regular treatment. Russell Thatcher Trall and John Butler, in the late nineteenth century, estimated that as many as three-quarters of the female population were "out of health," and that this group constituted America's single largest market for therapeutic services.

. . . .

The electromechanical vibrator, invented in the 1880s by a British physician, represented the last of a long series of solutions to a problem that had plagued medical practitioners since antiquity: effective therapeutic massage that neither fatigued the therapist nor demanded skills that were difficult and time-consuming to acquire. . . . Among conditions for which massage was indicated in Western medical traditions, one of the most persistent challenges to physicians' skills and patience as physical therapists was hysteria in women. This was one of the most frequently diagnosed diseases in history until the American Psychiatric Association officially removed the hysteroneurasthenic disorders from the canon of modern disease paradigms in 1952.[114]

Despite the emergence of these electromechanical devices, plaintiffs' evidence shows,

---

[114] *Id.* at 3-5, 11 (footnotes omitted).

without dispute from the Attorney General, that supporters of nineteenth century anti-vice movements did not attempt to reform the law, to proscribe their distribution or possession. "In the states surveyed, no laws were passed in the nineteenth century (or later) banning or regulating private acts of masturbation. Judge Posner writes that no such law has ever been passed in the United States."[115] Author James C. Whorton offers support and a possible explanation for this fact, one that focuses on the *moral* rather than the *legal*:

> Most hygienic ideologists have espoused Christianity, and have seen nature as good because it is designed by God, who is also the author of the laws of morality. . . .
>
>          . . . .
>
> *Health evangelists have typically eschewed coercion and prohibition in favor of education and persuasion*, confident that once the light is seen, individuals will voluntarily follow it. . . .
>
>          The quest for purity of society and the individual and the equation of physiological propriety with spiritual value have forced health reformers to present good hygiene as a *moral obligation. The obligation may be to God, to the race, the nation, nature, or simply to self.* But whatever the direction of the obligation, failure to fulfill it constitutes immorality: bad hygiene is evil, disease is a sin. . . .[116]

### b.    Comstock Laws

The Attorney General's evidence does show that the Victorian-era reform effort appeared to lead to at least some legislative action, in the form of the so-called "Comstock Laws": federal and state legislation adopted between 1873 and 1915, and prompted by the religious anti-vice

---

[115] Plaintiffs' Memorandum in Support (doc. no. 58), at 27 (citing Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason* 207)).

[116] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 42 (James C. Whorton, *Crusaders for Fitness: The History of American Health Reformers* (1982)), at 6-7 (emphasis supplied).

crusade of former Postmaster General Anthony Comstock.[117] *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 70 n.19, 103 S. Ct. 2875, 2882 n.19, 77 L. Ed. 2d 469 (1983). The federal Comstock Act of 1873 was a criminal statute designed "for the suppression of trade in and circulation of obscene literature and articles of immoral use." *Bolger*, 463 U.S. at 70, 103 S. Ct. at 2882 (quoting Act of March 3, 1873, ch. 258, § 2, 17 Stat. 599 (1873)).[118] The Attorney General points to the Comstock legislation as evidence that "trafficking in sexual devices was indeed regulated and prosecuted during the Victorian era in America."[119]

Even so, plaintiffs' evidence suggests that the Comstock Laws were aberrant to the sexual privacy traditionally afforded to married persons, and to the growing protection extended to non-married persons. The argument that plaintiffs' right of sexual privacy incorporates a right to use sexual devices like those targeted by the challenged Alabama statute is supported by evidence

---

[117] Plaintiffs' Memorandum in Support (doc. no. 58), at 29.

[118] The federal Comstock Act of 1873, Ch. 258, 17 Stat. 598, provided that:

> [e]very obscene, lewd, or lascivious book, pamphlet, picture, paper, writing, print, or other publication of an indecent character, and every article or thing designed or intended for the prevention of conception or procuring of abortion, and every article or thing intended or adapted for any indecent or immoral use, and every written or printed card, circular, book, pamphlet, advertisement, or notice of any kind, giving information, directly or indirectly, where or how or of whom or by what means any of the hereinbefore mentioned matters, articles, or things may be obtained or made, and every letters upon the envelope of which, or postal card upon which, indecent, lewd, obscene, or lascivious delineations, epithets, terms, or language may be written or printed, are hereby declared to be non-mailable matter, and shall not be conveyed in the mails nor delivered from any post-office nor by any letter carrier; and any person who shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be non-mailable matter, and any person who shall knowingly take the same, or cause the same to be taken, from the mails, for the purpose of circulating or disposing of, or of aiding in the circulation or disposition of the same, shall be deemed guilty of a misdemeanor, and shall for each and every offense be fined not less than one hundred dollars nor more than five thousand dollars, or imprisoned at hard labor not less than one year nor more than ten years, or both, at the discretion of the court.

*United States v. Chase*, 135 U.S. 255, 257-58, 10 S. Ct. 756, 756-57, 34 L. Ed. 117 (1890). The 1873 Act was amended in 1876 to include trafficking of such goods through the mails. *See* Act of July 12, 1876, 19 Stat. 90. Both the 1873 and 1876 Acts were repealed, and the 1876 Act was replaced by 18 U.S.C. § 1461.

[119] Defendant's Memorandum in Support (doc. no. 78), at 14 (heading for Part B).

-44-

indicating that such sexual devices were not the impetus for the so-called Comstock Acts. As Rachel Maines explains,

> vibrators and dildos were not significant motivations for the passage and enforcement of the Comstock Act. Vibrators were legally mailable matter throughout the Comstock era (1873-1915), and were in fact mass-marketed in household magazines such as *Modern Priscilla* and *Woman's Home Companion.* They appeared in the Sears, Roebuck catalog as well. The Comstock Act was enforced almost entirely against contraceptives, pornographic pictures, texts and other representations. . . . The "Articles of immoral use, of rubber, etc." with which the New York Society for the Suppression of Vice (NYSSV), Comstock, and the Post Office were concerned were almost all contraceptives. . . . Although a few dildos were seized in raids on vendors of rubber goods, it is clear from the NYSSV's own records that these were isolated incidents.[120]

Maines states further that, "[a]lthough Anthony Comstock himself may have seized and destroyed some dildos in his notoriously warrantless raids on retailers and manufacturers of rubber contraceptive devices, the evidence from primary sources, including cases, indicates clearly that enforcement of the Comstock laws was directed against contraceptives, abortion, and sexually[] oriented writings and pictures."[121] In fact, "[v]ibrators remained legal throughout this period, and were mailable matter under the Comstock laws of 1873-1914."[122] The popularity, legality, and ease of access to sexual devices like vibrators and dildos further demonstrate that the firm legislative respect for sexual privacy in the marital relationship extended to deliberate non-interference with adults' use of sexual devices within those relationships. For example, plaintiffs note that "a search of federal court decisions from that period uncovered no cases in which there were prosecutions for distribution of sexual devices. Similarly, there are no reported decisions for this conduct under the

---

[120] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 4 (Second Declaration of Rachel Maines), ¶ 4 (citations omitted).

[121] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. A (Declaration of Maines), at 17.

[122] *Id.*

Act as it now exists."[123]

States enacted statutes similar to the federal Comstock Act that prohibited the sale of "instruments for immoral purpose."[124]  One example was a Massachusetts law passed in 1879 that banned the sale of "instruments or other articles for self-abuse," and "for the prevention of conception or abortion."[125]  As with the federal Comstock Act, however, plaintiffs state that "a search of Massachusetts court decisions uncovered no cases involving prosecutions under the statute."[126]

Rachel Maines echoes this statement regarding the modern-day incarnation of the federal Comstock Act:  "There are no references to cases involving dildos and vibrators in either the annotations to the U.S. Code for 18 U.S.C. [§] 1461 or in *Federal Cases* . . . ."[127]  A search of relevant case law by this court yielded the same result.

Plaintiffs contend that, historically, Alabama courts have been reluctant to establish a rule that sexual activity between persons outside the bonds of matrimony was illegal *per se*.[128]  This is the case even though the State of Alabama enacted legislation criminalizing adultery and fornication during the nineteenth century (although it did not amend its penal code to include a prohibition on sexual devices until nearly 150 years later).[129]  Indeed, "[e]very southern state discouraged fornication, defined as sexual intercourse by unmarried persons or sexual intercourse by married

---

[123] Plaintiffs' Memorandum in Support (doc. no. 58), at 30.

[124] *Id.* (collecting statutes).

[125] *Id.* at 31.

[126] *Id.*

[127] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. A (Declaration of Maines), at 17 (citations omitted).

[128] *See* Plaintiffs' Memorandum in Support (doc. no. 58), at 32.

[129] *See id.* at 31-32 (citing Alabama cases and statute dating from 1852).

persons with unmarried persons."[130] Despite this legislation and concomitant attitudes toward extra-marital sexual conduct, plaintiffs' undisputed evidence suggests that the "primary reason for the prohibition was to protect the sanctity of marriage, not to prevent sexual activity as such."[131] Essentially, such legislation did not seek to monitor or invade adult sexual relationships; rather, states sought to protect, and encourage the perpetuation of, the marital union. As support for this proposition, plaintiffs point to *Quatermas v. State*, 48 Ala. 269 (1872), in which the Alabama Supreme Court held that adultery was not an indictable offense, unless was committed openly and notoriously. "The parties accused must live together in adultery or fornication, or at least the conduct of the parties must be of such a character as to become, openly, an evil example — an outrage upon decency and morality." *Id.* at 271. The Alabama Supreme Court acknowledged that, in the absence of regular and openly notorious sexual misconduct between persons not married to one another, "occasional act[s] of criminal intimacy" were "punishable only in *foro conscientiae* [*i.e.*, the tribunals or courts of conscience] — municipal justice could not reach it." *Collins v. State*, 14 Ala. 608, 610 (1848). Fornication was ultimately decriminalized in 1975, when Alabama revised its penal code.

Despite the emergence of Victorian morality and anti-sexual vice crusades, plaintiffs claim, without dispute, that state regulation of consensual adult sexual activity had declined by the end of the nineteenth century, thereby continuing to protect the marital sexual relationship, and continuing the liberalizing trend of state non-interference with private, consensual, sexual relationships between unmarried adults.[132] As John D'Emilio and Estelle B. Freedman write:

---

[130] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 4 (Mary Frances Berry, *Judging Morality: Sexual Behavior and Legal Consequences in the Late Nineteenth Century South*, 78 J. Am. Hist. 835 (1991)), at 838.

[131] *Id.*

[132] *See* Plaintiffs' Memorandum in Support (doc. no. 58), at 33.

Older means of maintaining sexual values no longer operated effectively in a mobile and industrializing society.  Parental power, and particularly fathers' control over their children through the dispensation of property, had been eroding since the mid-eighteenth century.  Nor did traditional church discipline retain its power to shame individuals into conformity to the sexual values of the congregation, although ministers continued to offer up church discipline, as it had in early America.  *The new laws formulated by the American state and federal governments took a laissez-faire attitude toward regulation of the family in general and of sexuality in particular.  In the early nineteenth century, property rather than morals offenses preoccupied legislatures and courts. . . . [T]he task of sexual regulation fell largely to the family, and especially to women.*  At the same time, increasing secularization and the rise of the medical profession began to shift authority over sexuality from clergy to doctors.  *Doctors and women agreed that individuals should internalize control over sexuality.*

. . . .

At the same time, the advice literature called attention to the importance of sexuality in personal life, often elevating it as a powerful force imbued with possibilities for heightened marital intimacy and even spiritual transcendence.[133]

As further support for this proposition, plaintiffs submit, again without dispute, that their review of the reported decisions from this period failed to produce any cases in which married persons were prosecuted for sexual activity within the marital relationship.[134]  This included prosecution for violation of state sodomy laws, which, according to the Model Penal Code, were enforced "against consenting adults only rarely and against husband and wife virtually never."[135]  Dr. Bullough similarly suggests that, despite Comstock-era legislation, there was a reluctance to enforce laws governing sexual activity for violations committed by married adults (and even by consenting adults generally).  Dr. Bullough acknowledges the restrictive attitudes of the Victorian era, agreeing with

---

[133] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 12 (*Intimate Matters:  A History of Sexuality in America*), at 66-67 (emphasis supplied).

[134] *See* Plaintiffs' Memorandum in Support (doc. no. 58), at 33.

[135] *Id.* (quoting Plaintiffs' appendix of authorities (doc. no. 57), Ex. 31 (The American Law Institute, *Model Penal Code* § 213.2 cmt. 1 (1980)).  Sodomy is defined as either "sexual intercourse with a member of the same sex or with an animal," or as "noncoital and especially anal or oral sexual intercourse with a member of the opposite sex."  *The Merriam Webster Dictionary* 691 (1997).

-48-

Foucault that "the bedroom was more or less sacrosanct in the United States,"[136] but contends that,

> [d]espite the onset of the Victorian era and the Age of Comstock (1873-1915), *there was no accompanying widespread attempt to enforce laws dealing with private, consensual, adult sexual content.* Contrary to public misconception, the Comstock laws of the era were not directed at sexual activity, but at the sale of obscene materials and birth control information and products.

> Even at the height of the Comstock era, *enforcement of laws directed at consensual adult activity was extremely rare,* except in cases involving conduct considered open and notorious. . . . *Through this entire period laws purporting to regulate adult sexual conduct continued to fall into further and further disuse.* Much of this history is documented in the published drafts of the *Model Penal Code,* which *proposed that crimes involving consensual adult sexual conduct be eliminated as criminal offenses. Many states adopted the* [Model Penal Code] *and eliminated those crimes.*[137]

In summarizing these changing nineteenth century societal attitudes toward sexuality and sexual privacy, Judge Posner notes that, despite the emergence of Comstock laws and other anti-vice crusades that attempted to suppress pornography, abortion, prostitution, contraception, and obscene books and materials, "[t]hese developments coexisted with, and *by no means smothered, the early flames of the sexual revolution.*"[138]

## B.   Twentieth Century Contemporary Practice Extends the Historical Right of Sexual Privacy to Unmarried Adults

In light of the fundamental rights analysis employed by the *Glucksberg* Court, the parties may also point to evidence of contemporary practices in this country that evince or contravene a fundamental right of sexual privacy. Plaintiffs rely on such evidence to prove that this right extends to unmarried individuals, and that it includes the right to use sexual devices like the ones targeted

---

[136] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 26.

[137] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 3 (Second Bullough Declaration), ¶¶ 4-5 (emphasis supplied).

[138] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason*), at 61 (emphasis supplied).

by Alabama Code § 13A-12-200.2(a)(1). *See Glucksberg*, 521 U.S. at 715-16, 117 S. Ct. at 2265-66. What follows is a consideration of the parties' evidence of contemporary practices.

Plaintiffs' undisputed evidence shows that the role of state and federal governments in regulating consensual, adult, sexual activity continued to change into the twentieth century, and "[b]y the end of the 1920s . . . the state withdrew almost entirely from the regulation of private, adult sexual activity."[139]   Even so, Judge Posner writes that "sex by the end of the nineteenth and beginning of the twentieth century had become, as insistently as in the early Christian era, a matter for troubled, self conscious reflection:  an issue."[140]  Dr. Bullough suggests similarly that the early part of the twentieth century was marked by a "devot[ion] to overcoming the misinformation about sexual practices promulgated during the nineteenth century."[141]  Judge Posner explains that the First World War "ushered in what is popularly but also accurately called the sexual revolution," and that convulsion coincided with "such relevant and technical changes as the widespread availability of cheap and effective contraceptives, both male and female; the decline of religious authority; and the decline in infant mortality, which, coupled with a decreasing desire for large families, liberated women from a life of continual pregnancy . . . ."[142]  He observes further that,

> between about 1920 and 1980 there were dramatic changes in sexual mores, both in the United States and in most Western countries.  Among the changes are these:
>
> > • The incidence of premarital intercourse rose steeply, especially among women.  No longer are most women virgins when they marry.  This is true even after correction is made for changes in the age of marriage.
> >
> > • Legalized abortion and sex education increased, and restrictions on the distribution of contraceptives, even to minors, dwindled.

---

[139] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 30.

[140] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason*), at 54.

[141] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 3 (Second Bullough Declaration), ¶ 31.

[142] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason*), at 54 (emphasis supplied).

• The marriage rate fell.

• The divorce rate skyrocketed, and with it cohabitation in lieu of, as well as in preparation for, marriage. *With nonmarital sex so utterly commonplace, the word fornication, with its strong pejorative connotations, has virtually passed out of the language.*

. . . .

• *Social tolerance for noncoercive deviant sexual acts, such as heterosexual sodomy between spouses and homosexual activity between consenting adults, has increased to the point where these acts have been decriminalized in many nations and in many states of the United States. Even where they remain prohibited, efforts at enforcement are perfunctory at best, and the prohibited behavior may actually be flaunted.*[143]

Plaintiffs' undisputed evidence further reflects that Americans and their legal systems became increasingly liberal regarding adult sexuality and the privacy afforded private, consensual, adult sexual relationships in the twentieth century. For example, at the advent of the twentieth century, "Comstock and his approach to sexuality increasingly lost public support."[144] During that period, controversial birth-control advocate Margaret Sanger, one of the most vocal opponents of state and federal Comstock legislation, made attempts to distribute contraceptive information through the mails.[145] Although Comstock "had her arrested and charged, before she was tried for her actions, Comstock had died, and the charges were dropped."[146] In addition, "American public discourse" became "heavily influenced" by the writings of Dr. Sigmund Freud.[147] Wealthy

---

[143] *Id.* at 55-56 (emphasis added).

[144] *Id.*

[145] *See id.*; *see also Margaret Sanger Papers Project*, http://www.nyu.edu/projects/sanger/ms-bio.htm (last visited September 23, 2002).

[146] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 32. Interestingly, Planned Parenthood Federation of America, Inc., which was founded by Sanger in 1916, reports (perhaps in hyperbolic fashion) that Sanger "brought about the reversal of federal and state 'Comstock laws' that prohibited publication and distribution of information about sex, sexuality, contraception, and human reproduction." Planned Parenthood Federation of America, Inc., *Margaret Sanger*, http://www.plannedparenthood.org/about/thisispp/sanger.html (last visited June 17, 2002).

[147] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. J (Bullough Declaration), ¶ 33.

industrialists, like John D. Rockefeller, Jr., began to lend substantial financial support to the study

of sexuality.[148]  With such funding, scientists and researchers began to publish studies of sexuality

in the United States, including the influential Kinsey studies of *Sexual Behavior in the Human Male*

(1949) and *Sexual Behavior in the Human Female* (1953), and the Masters and Johnson studies of

*Human Sexual Response* (1966) and *Human Sexual Inadequacy* (1981).[149]  The conclusion, if not

revelation, of the Kinsey studies was that

> men and women regularly and widely engaged in such activities as adultery,
> fornication, sodomy, and masturbation.  The findings of these studies served to
> demonstrate that what was once considered "deviant" is in fact quite normal and
> common.  As a result, American attitudes about sexuality changed drastically:
>
>> [S]tudies undertaken soon after publication suggested that Kinsey's work did
>> liberalize attitudes, especially among the young.  His findings publicized not
>> only the sexual diversity, but also the gap between ideals and reality in
>> America.  Such information about the prevalence of certain "questionable
>> practices" tended to alter attitudes in the direction of tolerance. . . . With
>> consummate skill he dispelled ignorance about changes in sexual mores
>> which had already taken place, *sub rosa*, since World War I.  In presenting
>> Americans with a *fait accompli*, his work demanded more realistic, more
>> humane sex mores.[150]

Adding to the specter of a twentieth century sexual liberalism that protected the sexual

privacy of both married and unmarried adults are the early- and mid-twentieth century decisions of

the Supreme Court.  As evidence of these changes, plaintiffs point, for example, to *Pierce v. Society*

---

[148] *See id.*

[149] *See* Plaintiffs' appendix of authorities (doc. no. 57), Exs. 21-22 (Alfred C. Kinsey *et al.*, *Sexual Behavior in the Human Male* (1949); Alfred C. Kinsey *et al.*, *Sexual Behavior in the Human Female* (1953)); Exs. 27-28 (William H. Masters and Virginia E. Johnson, *Human Sexual Inadequacy* (1981); William H. Masters and Virginia E. Johnson, *Human Sexual Response* (1966)); *see also id.*, Ex. 39 (*Sex and Reason*), at 19 (noting the importance of the Kinsey studies).

[150] Plaintiffs' Memorandum in Support (doc. no. 58), at 37-38 (citations to Kinsey and other, similar studies omitted) (quoting Plaintiffs' appendix of authorities (doc. no. 57), Ex. 33 (Regina Markell Morantz, *The Scientist as Sex Crusader: Alfred C. Kinsey and American Culture*, 29 Am. Q. 563 (1977)), at 583).

*of Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 573, 69 L. Ed. 1070 (1925), which recognized the "liberty of parents and guardians to direct the upbringing and education of children under their control," and *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923), which also protected parental control over education. In *Meyer*, the Court held that,

> [w]hile this court has not attempted to define with exactness the [Fourteenth Amendment] liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Meyer*, 262 U.S. at 399, 43 S. Ct. at 626-67 (overturning state law prohibiting instruction in schools of language other than English) (collecting cases). In *Skinner v. Oklahoma*, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942), the Court acknowledged procreation, "the right to have offspring," as "one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race." *Id.* at 536, 541, 62 S. Ct. at 1113 (overturning a state law that provided for sterilization of criminals). Later twentieth century decisions of the Supreme Court confirmed: a right to privacy in the body, *see Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952) (overturning state criminal conviction for violation of due process where evidence was forcibly extracted from defendant's mouth and stomach); the right to marital privacy, *see Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (overturning state law forbidding use of contraceptives as unconstitutional); the right to marry, *see Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) (overturning Virginia anti-miscegenation statute); the right to privacy as incorporating a right to use contraceptives, *see Eisenstadt v. Baird*,

405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 34 (1972) (holding unconstitutional a state law prohibiting the distribution of contraceptives to single persons, but not to married persons); and, the right to privacy as incorporating a right to reproductive choice, *see Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) (overturning state law that prohibited abortion).

Plaintiffs explain that, out of these decisions and changing societal attitudes toward adult sexuality and sexual privacy, came the American Law Institute's exhaustive evaluation of criminal law in the United States, and, the 1980 draft of the Model Penal Code ("MPC"). Designed for adoption by the states, the drafters explained that the MPC

> *makes a fundamental departure from prior law in excepting from criminal sanctions deviate sexual intercourse between consenting adults.* This policy applies to the various styles of sexual intimacy between man and wife, and to sexual relations between unmarried persons, regardless of gender. . . . [U]nder the Model Code deviate sexual intercourse is not criminal where both participants consent, where each is of sufficient age and mental capacity to render consent effective, and where they conduct their relations in private and create no public nuisance.[151]

The drafters of the MPC emphasized that state interests in criminalizing "deviate sexual intercourse" between consenting adults also stopped at the threshold to the marital chamber.

> So-called deviate sexual intercourse between spouses [like sodomy] may contravene an ethical or religious notion that there is one "right" way to achieve sexual gratification, *but there is nothing approaching societal consensus on this point. Both the popular literature and available empirical data reveal that such practices are anything but uncommon.* Moreover, current scientific thinking confirms that so-called deviate sexual intercourse may actually be part of a healthy and normal marital relationship. While it is difficult to see that non-standard sexual intimacy between spouses occasions any harm of which the state properly might take cognizance, *it is easy to identify criminal sanctions for such conduct as inconsistent with the societal goal of protecting the marital relationship against outside interference. Indeed, it seems likely that the newly enunciated constitutional right of marital privacy extends*

---

[151] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 31 (*Model Penal Code*), at 362-63 (emphasis supplied).

*to all forms of consensual sexual activity between husband and wife.*[152]

Notably, the drafters of the MPC also advocated that similar policies should apply to unmarried persons, and even questioned whether sexual intimacy out of wedlock was a "wrong."[153] Given these views, and the fact that "American penal statutes against fornication and adultery are generally unenforced,"[154] the MPC recommended that "private immorality should be beyond the reach of the penal law,"[155] and that states should punish only "non-consensual sexual acts between any two people regardless of sex."[156]

As further evidence of the growing protection for, and state non-interference with, consensual, sexual relationships between married persons and unmarried adults, plaintiffs state that, by the time of the MPC's drafting, half of the states had excluded adultery and fornication from their penal codes.[157] (Alabama, as noted above, decriminalized fornication upon revision of its criminal code in 1975, but maintained its prohibition against adultery.[158]) Moreover, while twenty-five states prohibited adultery and sixteen proscribed fornication prior to 1980, "few states still maintain [adultery and fornication] laws, and those that do rarely enforce them."[159] The Attorney General concedes this point, and states that, with some "notable" exceptions, "it is evident that states have historically exerted little effort in interfering with persons' private, consensual sexual activities. .

---

[152] *Id.* at 363-64 (emphasis supplied) (footnotes omitted) (citing cases, including *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), for the constitutional right to marital privacy).

[153] *Id.* at 365.

[154] *Id.* at 434.

[155] *Id.* at 439.

[156] Plaintiffs' Memorandum in Support (doc. no. 58), at 40.

[157] *See id.* at 41.

[158] *See* Ala. Code § 13A-13-2 (1975) (1994 Replacement Vol.) (prohibiting sexual intercourse when coupled with cohabitation between one person and another not his spouse).

[159] Plaintiffs' Memorandum in Support (doc. no. 58), at 46 & n.8.

. . Otherwise, the historical record of legislative activity or prosecutions in this area is sparse."[160]

This is the case even though, according to Judge Posner (writing in 1992),

> • The average age of first intercourse has fallen dramatically for both sexes, but particularly for women.
> • The rates of teenage pregnancy and illegitimate births have soared, but the increase in the illegitimate-birth rate has been more than offset by a decline in the legitimate birth-rate, resulting in a net decline in the over-all birth rate.
> • With most "respectable" girls and women no longer averse to premarital sex, prostitution has diminished.[161]

Judge Posner points to a series of newspaper articles as evidence for his conclusion that "prosecutions [for adultery] have become so rare as to be front-page news . . . ."[162]

Similarly, plaintiffs note that, at the time *Bowers v. Hardwick* was decided by the Supreme Court in 1986 (upholding Georgia's criminal sodomy statute), twenty-four states had criminal sodomy prohibitions.[163] 478 U.S. 186, 192, 106 S. Ct. 2841, 2844, 92 L. Ed. 2d 140 (1986). Today, just eleven states criminally proscribe sodomy, and at least four of those provide for exceptions from prosecution.[164] Indeed, in the matter of *Bowers v. Hardwick*, although respondent Hardwick was arrested for violating Georgia's sodomy statute, the district attorney assigned to the criminal case decided not to prosecute Hardwick under the law. *See id.* at 188, 106 S. Ct. at 2842. Twelve years later, the Georgia Supreme Court determined that "unforced, private, adult sexual activity" was encompassed within that State's constitutional right to privacy. *Powell v. State*, 510 S.E.2d 18, 22-

---

[160] Defendant's Memorandum in Support (doc. no. 78), at 16-17.

[161] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason*), at 56.

[162] *Id.* at 261 n.44 (citing articles). One Milwaukee County, Wisconsin, District Attorney stated that no one had been prosecuted for adultery in that jurisdiction for more than twenty-five years, and that, in his opinion, "prosecuting someone for adultery today would amount to a selective enforcement of the law, which would violate the equal protection clause of the Fourteenth Amendment." *Id.*, Ex. 20 (*Milwaukee Journal Sentinel*, Jan. 18, 2001), at 2.

[163] *See* Plaintiffs' Memorandum in Support (doc. no. 58), at 48.

[164] *See id.* at 48-49 (collecting statutory provisions).

-56-

23, 24 (Ga. 1998) (noting, however, that Georgia's right to privacy is broader than that guaranteed by the United States Constitution).  Accordingly, the *Powell* Court overturned as unconstitutional the very sodomy statute that had resulted in Hardwick's arrest.  *See id.* (overturning Ga. Code § 16-6-2(a)).

The imagery and implements of adult sexual relationships also pervade modern American society, further supporting plaintiffs' undisputed argument that state non-interference with private, consensual, adult sexual relationships continued to solidify in the twentieth century.  Judge Posner notes that "[p]ornography of the grossest sort circulates widely with little interference from the law."[165]  Dr. Bullough points to the development and widespread marketing of Viagra (including by such notable personalities as former United States Senate Majority Leader and 1996 Republican presidential candidate Robert J. Dole and popular NASCAR driver Mark Martin), an erectile dysfunction medication prescribed more than 39 million times, and to more than 10 million men, between its initial public dissemination in 1998 and the date of this opinion.[166]  Maines states that vibrators have been mass-marketed since *1899*, and continue to be advertised in the print and Internet media, as in "airline magazines, *Cosmopolitan*, and such upscale mail-order catalogs as the *Sharper Image*."[167]  Maines additionally notes that the May 2002 issue of *American Demographics* reports that "16.3 million Americans use vibrators or other sex toys," while retailers report annual sales in such sexual devices of approximately ten million dollars nationwide.[168]  Further, just two

---

[165] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason*), at 56.

[166] *See* Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 3 (Second Bullough Declaration), ¶ 9; *see also* "About Viagra," http://www.viagra.com/about/index.asp (last visited June 18, 2002).

[167] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 4 (Second Maines Declaration), ¶ 5.

[168] *Id.* (citations omitted).

States other than Alabama restrict the distribution of sexual devices.[169]

## C.    Plaintiffs' Evidence Demonstrates the Existence of a Fundamental Right to Sexual Privacy

Plaintiffs' undisputed evidence has shown that there is a historical practice and contemporary trend of legislative and societal liberalization of attitudes toward consensual, adult sexual activity, and, a concomitant avoidance of prosecutions against married and unmarried persons for violations of statutes that proscribe consensual sexual activity. The Attorney General has conceded plaintiffs' evidence in this regard. This evidence leads plaintiffs to argue that "the 'deeply rooted' respect for marital privacy shields [married and] unmarried persons from intrusions into their sexual lives and bedrooms . . . ."[170] Given the breadth, depth, volume, and weight of that evidence, and the Attorney General's concession, this court is compelled to agree. Dr. Bullough concludes that

> there is no history [] or tradition in this country of regulating the sexual practices or activities of married individuals in their own homes nor is there any precedent for regulation of marital sexual activities in the laws of our European ancestors. . . . [T]he puritanical mores that dominated the seventeenth and eighteenth century colonial America took a healthy view of sexual activity, provided it was confined to the marital bedroom. Although sexual activity was pervasively regulated during this period, it did not cross the marital boundary. *This tradition of non-interference with what people did within the privacy of their marital chamber carried down through the nineteenth and twentieth centuries and was eventually extended to establish a pattern of non-interference with virtually all consenting adult sexual behavior.*[171]

Judge Posner's interpretation of Supreme Court jurisprudence in recent decades is in accord:

> [The Supreme Court] must have been bothered by the fact that *Griswold* had been so emphatic about *marital* privacy, implying that unmarried couples had fewer rights. For the Court added [in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972)]: "The marital couple is not an independent entity with a mind and

---

[169] These are Georgia and Texas.

[170] Plaintiffs' Memorandum in Support (doc. no. 58), at 50.

[171] Plaintiffs' supplemental evidentiary submissions (doc. no. 84), Ex. 3 (Second Bullough Declaration), ¶ 6 (emphasis supplied).

heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. *If the right to privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.*" Read literally, all this hyperbolic passage says is that the government cannot force unmarried persons, any more than it can force married persons, to have children — a proposition few will quarrel with, although its provenance in the text or history of the Constitution is not easy to find. *Implied, however, is the further proposition that* notwithstanding the unchallenged misdemeanor fornication law (easily overlooked because totally unenforced), *unmarried persons have a constitutional right to engage in sexual intercourse.*[172]

In the original opinion entered in this case, this court declined to "extend the fundamental right of privacy to protect plaintiffs' interest in using devices designed or marketed as useful primarily for the stimulation of human genital organs when engaging in lawful, private, sexual activity, and thereby impose a strict scrutiny frame of analysis when reviewing the Alabama statute at issue." *Williams*, 41 F. Supp. 2d at 1284 (internal quotation marks omitted).   Given the instructions of the Eleventh Circuit on review of that opinion, however, the overwhelming evidence submitted by plaintiffs in support of their motion for summary judgment (and in refutation of the Attorney General's motion for summary judgment), and the concession to this evidence by the Attorney General, this court concludes that plaintiffs have met their burden of showing that there is a "history, legal tradition, and practice" in this country of deliberate state non-interference with private sexual relationships between married couples, and a contemporary practice of the same between unmarried persons. *Glucksberg*, 521 U.S. at 710, 117 S. Ct. at 2262.   Unlike *Bowers* and *Glucksberg*, where proponents of the offending statutes were able to demonstrate a long history, tradition, and contemporary practice, respectively, of *prohibiting* sodomy (albeit, generally in the context of homosexual relationships) and suicide, respectively, plaintiffs' evidence establishes that

---

[172] Plaintiffs' appendix of authorities (doc. no. 57), Ex. 39 (*Sex and Reason*), at 330-31 (emphasis added).

there exists a constitutionally inherent right to sexual privacy that firmly encompasses state *non-interference* with private, adult, consensual sexual relationships. *See Williams*, 240 F.3d at 954, 955 (characterizing plaintiffs' right at issue as one of "sexual privacy"); *see also Glucksberg*, 521 U.S. at 710-19, 117 S. Ct. at 2262-67; *Bowers*, 478 U.S. at 192-94, 106 S. Ct. at 2844-46.  The court notes that this right to sexual privacy cannot be limited to a mere right to "sex," when the decisions of the Supreme Court protecting abortion, contraception, and the right to privacy in our bodies are considered.

One inquiry remains, nevertheless:  Does this fundamental right of sexual privacy between married and unmarried adults in private, consensual, sexual relationships encompass a right to use sexual devices like the vibrators, dildos, anal beads, and artificial vaginas distributed by the vendor plaintiffs in this action?   Plaintiffs' substantial and unrefuted evidence demands an affirmative response to that question.  Another Alabama district court appears to agree.  *See, e.g., Cohen v. City of Daleville*, 695 F. Supp 1168, 1173 n.7 (M.D. Ala. 1988) ("[T]he mere possession of artificial vaginas, artificial penises and similar sexual aids is protected by the right to privacy.") (citations omitted).

Plaintiffs' evidence shows, first, that such sexual devices are used by individuals (including plaintiffs) to consummate the most private acts — whether they be medically, therapeutically, or sexually motivated.  The user plaintiffs all have averred that their own use of these devices is contained within the confines of their adult sexual relationships.  Further, while these devices may be used for masturbatory purposes, masturbation is not now, nor has it ever been, a crime in any state of the Union.[173]  Moreover, one of the most widely known sexual devices — the vibrator —

---

[173] *Id.* at 207.

has been legally and widely available since its invention in the mid-nineteenth century: first in doctors' offices, and later through magazine advertisements, mail-order catalogs, on the Internet, and retail outlets in the forty-seven states that do not restrict distribution of sexual devices. Just as states have deliberately avoided interference in the sexual relationships of married and unmarried adults (historically as to married adults, and contemporarily as to unmarried adults), states have deliberately, and with few exceptions, avoided the regulation of these sexual devices. The fact that history and contemporary practice demonstrate a conscious avoidance of regulation of these devices by the states, along with the fact that such devices are used in the performance of deeply private sexual acts, supports a finding that the right to use these sexual devices is encompassed by plaintiffs' right to sexual privacy.

**D.     Burden on Plaintiffs' Right to Sexual Privacy**

At this juncture, the question becomes whether Alabama Code § 13A-12-200.2(a)(1) impermissibly burdens plaintiffs' right to sexual privacy, by virtue of its prohibition of the distribution of sexual devices.   Plaintiffs' evidentiary submissions substantiate that the user plaintiffs' purchase and use of sexual devices is intrinsic to the sexual relationships they share with their spouses or other partners.  For example, plaintiffs Benny and Deborah Cooper state that their use of sexual devices during sexual intercourse "saved" their marriage, and enabled them to improve marital communications, both in and out of their bedroom.[174]  Plaintiff Jane Poe similarly states that incorporating sexual devices into her sexual relationship with her husband has removed "strain" upon their intimacy, eliminated fears of infidelity held by each spouse, and improved "every aspect" of the couple's marital communication.[175]  Plaintiff Dan Bailey asserts that the use of sexual devices

---

[174] Plaintiffs' original motion for summary judgment (doc. no. 56), Ex. B (Cooper Declaration), ¶ 6.
[175] *Id.*, Ex. C (Poe Declaration), at 2.

has encouraged intimacy in his sexual relationship with his wife, and that the use of such sexual

devices improved the quality of the couple's sexual relations during his bout with erectile

dysfunction.[176] Plaintiff Jane Roe, who is not married, uses these devices in her sexual relationships

to permit her to enjoy sexual gratification, as Ms. Roe suffers from a disability that makes sexual

intercourse extremely painful.[177] These facts support plaintiffs' contention that, "[t]aken as a whole,

these devices are designed to improve or enhance sexual relations or provide an alternative to

them."[178] Plaintiffs thus have demonstrated that their use of these sexual devices is an important part

of their sexual relationships and, consequently, is protected by their right to sexual privacy.

The Attorney General responds that the State of Alabama has not prohibited the *use* of sexual

devices, or their *purchase*, but simply their *sale*, and that Alabama Code § 13A-12-200.2(a)(1) "does

not dictate how persons may engage in intimate activity within the sanctity of their own homes."[179]

In *Griswold*, the Supreme Court seemed to validate this distinction, stating that

> the present case . . . concerns a [marriage] relationship lying within the zone of
> privacy created by several fundamental constitutional guarantees.  And it concerns
> a law which, in forbidding the *use* of contraceptives rather than regulating their
> *manufacture* or *sale*, seeks to achieve its goals by means having a maximum
> destructive impact upon that relationship.

381 U.S. at 485, 85 S. Ct. at 1682 (emphasis supplied).  A careful reading of that passage suggests,

however, that the *Griswold* Court was not intent on making a blanket statement that all statutes that

solely prohibit the *sale* or *manufacture* of a product in this context, rather than its *use*, are

constitutionally permissible.

---

[176] *See id.*, Ex. D (Bailey Declaration), ¶ 4.  Incidentally, Mr. Bailey's erectile dysfunction was successfully treated with a regular regimen of the prescription medication "Viagra."

[177] *See* Amended and Restated Complaint (doc. no. 55), ¶ 16.

[178] Plaintiffs' Memorandum in Support (doc. no. 58), at 69.

[179] Defendant's Memorandum in Support (doc. no. 78), at 11.

This court is mindful instead of the *Griswold* Court's instruction: "[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedom." *Id.* at 485, 85 S. Ct. at 1682. A statute solely prohibiting the sale of a product can nevertheless unconstitutionally infringe on the rights inherent in the "zone of privacy created by several fundamental constitutional guarantees," *id.*, because, in essence, a ban on the *sale* of these sexual devices can amount to an impermissible burden on their *use*. *See Williams*, 240 F.3d at 954 ("[T]he statute prohibiting the distribution of sexual devices would burden an individual's ability to use the devices . . . ."). In the decisions that followed *Roe v. Wade*, for example, the Supreme Court held as unconstitutional statutes that "did not prohibit abortions outright but limited in a variety of ways a woman's access to them." *Carey*, 431 U.S. at 688, 97 S. Ct. at 2017 (citing *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S. Ct. 2831, 49 L. Ed. 2d 788 (1976); *Bigelow v. Virginia*, 421 U.S. 809, 95 S. Ct. 2222, 44 L. Ed. 2d 600 (1975); *Doe v. Bolton*, 410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973)). Similarly, in *Carey*, the Supreme Court wrote that a

> *total prohibition against sale* of contraceptives, for example, *would intrude* upon individual decisions in matters of procreation and contraception *as harshly as a direct ban on their use. Indeed, in practice, a prohibition against all sales, since more easily and less offensively enforced, might have an even more devastating effect upon the freedom* to choose contraception.

*Carey*, 431 U.S. at 687-88, 97 S. Ct. at 2017 (emphasis supplied). The Supreme Court makes clear that "the same test must be applied to state regulations that burden an individual's right . . . by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely." *Id.* at 688, 97 S. Ct. at 2018 (referring to an individual's right

-63-

to device to prevent conception or terminate pregnancy). This is the case, *"not because there is an independent fundamental 'right of access to contraceptives'* [or, here, to purchase sexual devices], but because such access is essential to the exercise of the constitutionally protected right. . . ." *Id.* (emphasis supplied).

This court accordingly concludes that Alabama's prohibition of the sale of sexual devices imposes a significant burden on the right of married and unmarried persons to sexual privacy, in that it severely limits their ability to access, and thus to use, sexual devices within their sexual relationships. This is further evidenced by the Attorney General's argument that the user plaintiffs — all Alabama residents — can travel to the State of Tennessee, should they desire to purchase sexual devices.[180] As in *Carey*, Alabama's prohibition on the sale of sexual devices "renders [the devices] considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition." *Carey*, 431 U.S. at 689, 97 S. Ct. at 2018 (contemplating that limits on distribution of contraceptives imposed a "significant burden" on fundamental rights, even though those limits fell short of a total ban on distribution).

Further, while this court does not specifically or exclusively weigh the validity of the so-called "medical affirmative defense" urged by the Attorney General to exempt these plaintiffs from prosecution, *see* Alabama Code § 13A-12-200.4, it is of significance that the Supreme Court has eschewed as unjustifiably burdensome the imposition of medical restrictions on the distribution of contraceptives and the performance of abortions, where the state is unable to demonstrate that the medical restriction is substantially related to the state's interest in protecting the consumer's health. As the *Carey* Court wrote:

---

[180] *See id.* at 7.

> Of particular relevance here is *Doe v. Bolton,* [410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973)], in which the Court struck down, as unconstitutionally burdening the right of a woman to choose abortion, a statute requiring that abortions be performed only in accredited hospitals, in the absence of proof that the requirement was substantially related to the State's interest in protecting the patient's health. 410 U.S., at 193-195, 93 S. Ct., at 748-749. The same infirmity infuses the limitation in § 6811(8) [the New York statute limiting distribution of contraceptives]. "Just as in *Griswold,* where the right of married persons to use contraceptives was 'diluted or adversely affected' by permitting a conviction for giving advice as to its exercise, . . . so here, to sanction a medical restriction upon distribution of a contraceptive not proved hazardous to health would impair the exercise of the constitutional right." *Eisenstadt v. Baird*, 405 U.S., at 464, 92 S. Ct., at 1043 (White, J., concurring in result).

*Carey*, 431 U.S. at 689-90, 97 S. Ct. at 2018. The Attorney General has offered no explanation as to how the sexual devices at issue here are hazardous to the health of plaintiffs.

Despite plaintiffs' evidence that Alabama Code § 13A-12-200.2(a)(1) burdens their fundamental right to privacy, insofar as that right includes sexual privacy and the right to use sexual devices, not all infringements of a fundamental right are unconstitutional. *See Carey*, 431 U.S. at 685-86, 97 S. Ct. at 2016 ("That the constitutionally protected right of privacy extends to an individual's liberty to make choices regarding contraception does not, however, automatically invalidate every state regulation in this area.") Plaintiffs argue, nevertheless, that the

> challenged statute is a backdoor attempt to discourage or limit the use of sexual devices by removing them from the marketplace. While there may have been other motives for adoption of the statute as well, it does not alter the fact that the effect of the law will significantly diminish the availability of sexual devices in Alabama. Because the mere possession or use of sexual devices implicates important underlying interests in sexual privacy and personal liberty, the user plaintiffs have alleged from the start that the law violates their rights guaranteed under the Due Process Clause of the Fourteenth Amendment.[181]

The Attorney General does not address this issue, either in his own motion, or his response to

---

[181] Plaintiffs' Memorandum in Support (doc. no. 58), at 50.

plaintiffs' motion, for summary judgment. Accordingly, the extent of the burden on plaintiffs' right to sexual privacy, as it encompasses their right to use sexual devices, is considered below.

**E.     Standard of Review and Compelling State Interests for Alabama Code § 13A-12-200.2**

Whether a statute unconstitutionally burdens a fundamental right "is determined in large part by the level of scrutiny applied by the courts." *Williams*, 240 F.3d at 947. If a statute is found to infringe a fundamental constitutional right, it will be subject to strict scrutiny, "which requires that the statute be narrowly tailored to achieve a compelling government interest." *Id.* (citing *Adarand Constructors v. Pena*, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113, 132 L. Ed. 2d (1995); *Reno v. Flores*, 507 U.S. 292, 301-02, 113 S. Ct. 1439, 1447, 123 L. Ed. 2d 1 (1993)); *see also Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S. Ct. 673, 682, 54 L. Ed. 2d 618 (1978); *Roe*, 410 U.S. at 155, 93 S. Ct. at 728 (collecting cases). "Most statutes reviewed under the very stringent strict scrutiny standard are found to be unconstitutional." *Williams*, 240 F.3d at 948. However, "even a burdensome regulation may be validated by a sufficiently compelling state interest." *Carey*, 431 U.S. at 686, 97 S. Ct. at 2016.

As a preliminary matter, the Attorney General fails to consider the challenged statute under the lens of strict scrutiny review. Although it is the Attorney General's burden to demonstrate that the infringement of plaintiffs' right to privacy is necessary to support a compelling state interest, *see, e.g., Roe*, 410 U.S. at 156, 93 S. Ct. at 728, defendant fails to shoulder this burden, thus warranting entry of summary judgment in favor of plaintiffs. This is because the Attorney General has failed to offer even one state interest for the challenged statute, much less a compelling state interest. Further, the Attorney General has not attempted to prove that the statute is narrowly tailored to meet those phantom interests. *See also Johnson v. Board of Regents of the University of Georgia*, 263

F.3d 1234, 1244 (11th Cir. 2001) (citing *Adarand*, 515 U.S. at 227, 115 S. Ct. at 2113; *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1114 (11th Cir. 2001) (citing, in turn, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 510-11, 109 S. Ct. 706, 730-31, 102 L. Ed. 2d 854 (1989) (regarding defendant's burden in a challenge to a race-based classification subject to strict scrutiny)); *see also Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992) ("If the challenged law burdens a fundamental constitutional right, then the law can survive only if the State demonstrates that the law advances a compelling interest and is narrowly tailored to meet that interest.") (citing *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 109 S. Ct. 1013, 1019, 103 L. Ed. 2d 271 (1989); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S. Ct. 544, 550, 93 L. Ed. 2d 514 (1986); *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S. Ct. 983, 990, 59 L. Ed. 2d 230 (1979)).  The Attorney General instead restricts his argument in support of summary judgment, and in response to plaintiffs' motion for summary judgment, to the issue of plaintiffs' standing, and to his assertion that there is no fundamental constitutional right implicated by the facts of this case.[182]  Attorney General Pryor omits any contemplation of the alternatives (which are in fact the conclusions of this court):  first, that plaintiffs possess standing to bring their constitutional challenge; second, that plaintiffs enjoy a constitutionally protected right to privacy that encompasses the sexual privacy of married or unmarried persons, and a right to use sexual devices within the confines of a private, consensual, adult, sexual relationship; third, that the statute burdens plaintiffs' right to sexual privacy; and fourth, that the challenged statute is not narrowly tailored to effectuate a compelling state interest.

Even so, the importance of the rights at issue, and the significance of the relief requested,

---

[182] *See generally* Defendant's Memorandum in Support (doc. no. 78).

seem to require that this court not grant plaintiffs' motion solely on the basis of the Attorney General's omission. For that reason, the court incorporates the findings of its opinion entered March 29, 1999 on this issue. *See Williams*, 41 F. Supp. 2d at 1257.

In the original opinion, this court determined that the State had put forth "legitimate" interests supporting the passage of Alabama Code § 13A-12-200.2(a)(1). *See Williams*, 41 F. Supp. 2d at 1285-87. Despite that conclusion, this court held that the means by which the State had sought to effectuate those interests were not rationally related to those government interests. *See id.* at 1287-93. The Eleventh Circuit disagreed, and acknowledged that, under that highly deferential standard of review, the statute was not unconstitutional, because the statute "is rationally related to the State's legitimate power to protect its view of public morality." *Williams*, 240 F.3d at 952.

In contrast, this court now engages in a much stricter, exacting review of the offending statute and the interests offered for its justification, because Alabama Code § 13A-12-200.2(a)(1) burdens plaintiffs' fundamental right to privacy, as it encompasses a right to sexual privacy and plaintiffs' consequential right to purchase or use sexual devices. Under this strict scrutiny review, any burden imposed by Alabama Code § 13A-12-200.2(a)(1) on plaintiffs' right to sexual privacy "may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey*, 431 U.S. at 686, 97 S. Ct. at 2016 (citing *Roe*, 410 U.S. at 155-56, 93 S. Ct. at 727-28). The first question before the court, then, is whether this burdensome statutory provision serves a compelling state interest. *See Carey*, 431 U.S. at 686, 97 S. Ct. at 2016 ("[E]ven a burdensome regulation may be validated by a sufficiently compelling state interest.").

This court found, in the opinion entered on March 29, 1999, that the Alabama Legislature aided the court by stating a purpose for the 1998 amendments to the Alabama Anti-Obscenity

Enforcement Act; and, therefore, that the following state interests could have been implicated in the

passage of Alabama Code § 13A-12-200.2(a)(1):

> Section 1. The Legislature of Alabama finds and declares:

>> (1) That in order to protect children from exposure to
>> obscenity, prevent assaults on the sensibilities of unwilling adults by
>> the purveyor[s] of obscene material, and suppress the proliferation of
>> "adult-only video stores," "adult bookstores," "adult movie houses,"
>> and "adult-only entertainment," the sale and dissemination of
>> obscene material should be regulated without impinging on the First
>> Amendment rights of free speech by erecting barriers to the open
>> display of erotic and lascivious material.

> 1998 Ala. Acts 98-467. These findings and declarations clearly suggest that the
> purpose behind this act was to prohibit "open display[s]" of things "obscene,"
> specifically those displays accessible to "children" and "unwilling adults."

>> In addition, upon consideration of the pleadings, motions, briefs, oral
>> arguments of counsel, and independent judicial research, the court finds that the
>> state's interest in passing the Act also could have been:  (1) the belief that "[t]he
>> commerce of sexual stimulation and auto-eroticism, for its own sake, unrelated to
>> marriage, procreation or familial relationships is an evil, an obscenity . . . detrimental
>> to the health and morality of the state" (Brief of Alabama Attorney General, at 21);
>> or (2) the desire to ban commerce in all "obscene" material.

*Williams*, 41 F. Supp. 2d at 1285-86 (footnotes omitted).  The court already has determined that each

of these interests is legitimate.  *See id.* at 1286-87.  Whether they are sufficiently compelling to

withstand strict scrutiny is another matter.

States clearly have a compelling interest in protecting children from exposure to obscene

material.  *See American Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990) ("[A] state's

interest in protecting children from exposure to material obscene as to minors is a substantial and

important state interest.").  As the Supreme Court has written, "[b]ecause of the State's exigent

-69-

interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare and morals of its community by barring the distribution to children of books recognized to be suitable for adults." *Ginsberg v. State of New York*, 390 U.S. 629, 636, 88 S. Ct. 1274, 1278-79, 20 L. Ed. 2d 195 (1968) (citation and internal quotation marks omitted); *see also New York v. Ferber*, 458 U.S. 747, 756-57, 102 S. Ct. 3348, 3354, 73 L. Ed. 2d 1113 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'") (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S. Ct. 2613, 2620, 73 L. Ed. 2d 248 (1982)).

This court is not convinced, however, that even if the State has a compelling interest in regulating obscenity generally, that interest is compelling in the context of a ban on sexual devices carried out simply because the State abhors the "commerce of sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation or familial relationships [as] an evil, an obscenity." *Williams*, 41 F. Supp. 2d at 1285-86. The Attorney General, again, has offered no evidence or argument to this extent. However, the State of Alabama may not declare that all sexual devices are obscene simply because they are used in the context of sex. As Justice Brennan emphasized when writing for the Supreme Court in *Roth v. United States*,

> *sex and obscenity are not synonymous.* Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material and constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern.

354 U.S. 476, 487, 77 S. Ct. 1304, 1310, 1 L. Ed. 2d 1498 (1957) (emphasis supplied). Further, while the Supreme Court has acknowledged the "high importance of the state interest in regulating

the exposure of obscene materials to juveniles and unconsenting adults," the Court has done so

solely in the context of First Amendment claims of protected speech. *Paris Adult Theatre I v.*

*Slaton*, 413 U.S. 49, 57, 93 S. Ct. 2628, 2635, 37 L. Ed. 2d 446 (1973)*; see also, e.g., Ashcroft v.*

*The Free Speech Coalition*, __ U.S. __, 122 S. Ct. 1389, 1402, 152 L. Ed. 2d 403 (2002); *Sable*

*Communications of California*, 492 U.S. 115, 126, 109 S. Ct. 2829, 2836, 106 L. Ed. 2d 93 (1989);

*Miller v. California*, 413 U.S. 15, 23, 26, 93 S. Ct. 2607, 2614, 1616, 37 L. Ed. 2d 419 (1973);

*Ginsberg v. New York*, 390 U.S. 629, 639-40, 88 S. Ct. 1274, 1280-81, 20 L. Ed. 2d 195 (1968);

*Roth*, 354 U.S. at 476, 77 S. Ct. at 1304.  No such claims — *i.e.*, that the sexual devices regulated

by Alabama Code § 13A-12-200.2(a)(1) infringe protected speech — are present here.  Moreover,

this court was unable to locate any binding authority to suggest that these state interests might be

compelling outside the First Amendment context. *Cf. State v. Brenan*, 772 So. 2d 64, 68 (La. 2000)

(Louisiana Supreme Court acknowledged obscenity guidelines established in *Miller v. California*

were limited to the First Amendment context,[183] but used that framework to analyze the

constitutionality of a Louisiana statute banning promotion of obscene devices).

## F.    Alabama Code § 13A-12-200.2(a)(1) is Not Narrowly Tailored to Meet Compelling State Interests

Although a state may be able to demonstrate that its interests in a burdensome regulation are

compelling, "to withstand constitutional scrutiny, '[the state] must do so by narrowly drawn

---

[183] *See Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 491 (1973), where the Supreme Court held:

> The basic guidelines for the trier of fact must be:  (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S. Ct. at 2615.

-71-

regulations designed to serve those interests . . . .'" *Sable Communications of California, Inc.*, 492

U.S. at 126, 109 S. Ct. at 2836 (quoting *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S. Ct.

1755, 1760, 48 L. Ed. 2d 243 (1976), and citing other cases); *see also Zablocki v. Redhail*, 434 U.S.

374, 388, 98 S. Ct. 673, 682, 54 L. Ed. 2d 618 (1978) (stating that a burdensome statute must be

supported by compelling state interests and "closely tailored to effectuate only those interests");

*Griswold*, 381 U.S. at 485-86, 85 S. Ct. at 1682 ("Would we allow the police to search the sacred

precincts of marital bedrooms for telltale signs of the use of contraceptives?  The very idea is

repulsive to the notions of privacy surrounding the marriage relationship.").

Even if this court were to assume, first, that Alabama's interests in enacting Alabama Code

§ 13A-12-200.2(a)(1) rise to the level of "compelling," and, second, that the rationale of First

Amendment obscenity case law is applicable,[184] the challenged statute still is not narrowly tailored

to meet those objectives and, thus, is unconstitutional as applied to these plaintiffs.

As is by now well known, the challenged statute provides that it "shall be unlawful for any

person to knowingly distribute, possess with intent to distribute, or offer or agree to distribute any

obscene material or any device designed or marketed as useful primarily for the stimulation of

human genital organs for any thing of pecuniary value."  Alabama Code § 13A-12-200.2(a)(1).

Further, "[m]aterial not otherwise obscene may be obscene under this section if the distribution of

the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation

---

[184] The court is particularly reluctant to apply First Amendment obscenity decisions to this case, without acknowledging that these decisions are not "on all fours" with the Fourteenth Amendment challenge at bar.  Indeed, the Supreme Court has carved out a specific jurisprudence in the First Amendment arena with regard to obscenity, and this court is not convinced that the special considerations of that body of law are entirely transferable to the facts of this case. First Amendment obscenity case law might be applicable in light of the fact that Alabama Code § 13A-12-200.2(a)(1) was enacted as an amendment to Alabama's existing obscenity statute.  Nevertheless, this court must be guided by the authority most relevant to the case at hand, and so looks to the First Amendment obscenity decisions described in this opinion for instruction.

of erotica for the sake of prurient appeal." *Id.* The statute provides that violators of this provision "shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than one year." *Id.* Subsequent violations, following a first conviction, amount to a Class C felony, and require corporations or businesses to pay fines of "not less than ten thousand dollars ($10,000) nor more than fifty thousand dollars ($50,000)." *Id.*

The first purpose offered by the Alabama Legislature for this statutory scheme is to protect children and unwilling adults from exposure to open displays of obscene material, and to suppress the proliferation of adult-oriented entertainment, bookstores, movie houses, and video stores. Alabama's ban on the distribution of sexual devices "sweep[s] unnecessarily broadly" in an attempt to effectuate this state interest, however, *Griswold*, 381 U.S. at 485, 85 S. Ct. at 1682, because it is not narrowly tailored solely to address those interests. *See Zablocki*, 434 U.S. at 388, 98 S. Ct. at 682; *see also American Booksellers v. Webb*, 919 F.2d 1493, 1501, 1502 (11th Cir. 1990). In *Webb*, for example, the Court considered a Georgia criminal statute that prohibited the display of any material "harmful to minors" in a place accessible to minors. The *Webb* Court held that, while the State could deny access to such materials to minors, it could not impermissibly burden the access of adults to the same materials. Thus, the "crucial inquiry" was whether the "restriction on adults' access to protected speech is unnecessarily burdensome or 'significant,' or . . . whether alternate modes of adult access are unduly restricted." *Webb*, 919 F.2d at 1501, 1502.

The challenged statute appears immediately *not* to be narrowly tailored to meet this state objective, when the court considers the statute's effect on vendor plaintiff B. J. Bailey. Ms. Bailey and her Saucy Lady, Inc. enterprise are criminally restricted by the challenged statute, even though

-73-

Ms. Bailey's private "Tupperware-style" parties are held in private homes, and are advertised solely by word of mouth, rather than by any public display or advertisement.  Alabama Code § 13A-12-200.2(a)(1) thus does not narrowly effectuate only the State's interest of protecting children and unwilling adult viewers from exposure to open displays of sexual devices, because it reaches beyond those public displays to ban the distribution of sexual devices in the private forum of sales parties conducted by Saucy Lady, Inc.

Further, other, narrower, constitutionally-permissible alternatives appear available to the State to safeguard its children and unwilling adults.  The State might narrowly prevent exposure by unwilling adults and children to open displays of sexual devices by requiring vendor plaintiff Sherri Williams to alter the outward appearance of her retail stores.  *See Williams*, 41 F. Supp. 2d at 1288.  Plaintiffs also correctly observe that the State is constitutionally permitted to employ its zoning powers to restrict businesses that distribute sexual devices to locations out of reach and view of children and unwilling adults.  *See, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S. Ct. 925, 930, 89 L. Ed. 2d 29 (1986) (approving city's use of zoning to prohibit adult motion picture theaters from locating within one thousand feet of any residential zone, single or multi-family dwelling, church, park, or school); *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (acknowledging that governments have a substantial interest in combating the secondary effects of adult businesses, and that zoning is an appropriate method by which governments may protect that interest).

The second purpose offered for the challenged statute is the State's goal of regulating the "commerce of sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation or familial relationships [as] an evil, an obscenity . . . detrimental to the health and

morality of the state." Alabama Code § 13A-12-200.2(a)(1) is not narrowly tailored to effectuate solely this state interest and, in fact, has the effect of accomplishing the reverse for the user plaintiffs. Each of the user plaintiffs has stated that use of sexual devices during marital and dating relationships has enabled them to, among other things, improve the quality of their marital communications, better their sexual relationships, encourage intimacy in their marital relationships, eradicate fears of infidelity between spouses, and to combat embarrassing or painful medical conditions. The Attorney General has stipulated to these facts. Further, the parties have stipulated that "a great many" of vendor plaintiff B.J. Bailey's customers have "reported to Ms. Bailey that the products they purchased helped them to become orgasmic and greatly improved their marital and sexual relations."[185] The parties also have stipulated to the fact that vendor plaintiff Sherri Williams' customers include "[m]any" who have been "referred to the store by therapists treating them for sexual dysfunction or marital problems."[186] The parties further have stipulated to the opinions of two experts in the study of human sexuality that "sexual aids help in the revitalization of potentially failing marital relations," and that the use of sexual devices is recommended in "therapy for couples who are having sexual problems in their marriage . . . ."[187] Also compelling is the fact that the State of Alabama's own University Health System Internet site advocates applying a "powerful vibrator on the glans of the penis" to enable men who have suffered spinal cord injuries to ejaculate, for the specific purpose of "impregnat[ing] their wives and hav[ing] normal, healthy children."[188]

Given these facts, the court concludes that Alabama's total prohibition of the distribution of

---

[185] Stipulation of Facts (doc. no. 33), ¶ 26.

[186] *Id.* ¶ 14.

[187] *Id.* ¶¶ 65, 77 (statements of Drs. Alfred Jack Turner and Pepper Schwartz).

[188] University of Alabama Health System, "Spinal Cord Injury May Result in Loss of Sexual Function," http://www.health.uab.edu/show.asp?durki=8359 (last visited June 26, 2002).

sexual devices is not narrowly tailored to regulate the "commerce of sexual stimulation and auto-eroticism, for its own sake, *unrelated to marriage, procreation or familial relationships* [as] an evil, an obscenity . . . detrimental to the health and morality of the state." The challenged statute instead serves to prevent the user plaintiffs' access to devices that they, and experts in the field of human sexuality, have averred are integral to growing, preserving, and/or repairing marital and familial relationships.

Finally, while the State of Alabama may have an interest in banning "commerce in all 'obscene' material," the challenged statute sweeps too broadly in an attempt to do so. *See Griswold*, 381 U.S. at 485, 85 S. Ct. at 1682. This is because, while Alabama Code § 13A-12-200.2(a)(1) might have the effect of prohibiting the distribution of those sexual devices that meet the definition of "obscene," it has the added effect of banning the distribution of sexual devices that do not meet that definition.

The often-repeated standard for determining whether matter is obscene (albeit in the First Amendment context) comes from the Supreme Court's decision in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 491 (1973). As that Court explained,

> [t]he basic guidelines for the trier of fact must be:  (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S. Ct. at 2615 (citations and internal quotation marks omitted). In the original, March 29, 1999 memorandum opinion, this court determined that, while the sexual devices at issue here do include penis-shaped dildos and artificial vaginas, many other devices "do not represent human

-76-

genitals," and "bear absolutely no resemblance to such organs." *Williams*, 41 F. Supp. 2d at 1291. Other sexual devices include "vibrators and . . . stimulators, which may or may not be in the form of a penis, and may or may not be designed for insertion into the vagina; penis extenders; penis enlargement pumps; genital rings; anal beads; and inflatable dolls." *Id.*

The immediate question under the *Miller* guidelines, then, is whether community standards would dictate that such devices appeal to the prurient interest. *See Miller*, 413 U.S. at 24, 93 S. Ct. at 2615. This court concludes that many of these devices would not and, thus, cannot be considered "obscene." The Supreme Court considers "material appealing to the prurient interest [to be] 'material having a tendency to excite lustful thoughts,'" or "whose predominant appeal is to a shameful or morbid interest in nudity, sex, or excretion." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498, 105 S. Ct. 2794, 2799, 86 L. Ed. 2d 394 (1985) (citing the Model Penal Code definition of obscenity and *Roth v. United States*, 354 U.S. 476, 487, 77 S. Ct. 1304, 1310, 1 L. Ed. 2d 1498 (1957)). As a preliminary matter, Alabama Code § 13A-12-200.1(17) adopts the *Miller* scheme of obscenity evaluation, although neither *Miller* nor Alabama Code § 13A-12-200.2 characterizes sexual devices as generally obscene or, more specifically, enumerates which sexual devices should be considered obscene.[189] The court can imagine, as a matter of law, however, that some Alabama communities would find that sexual devices depicting human genitalia, for example, sufficiently prurient as to excite lustful thoughts. Even so, this court cannot say the same for those

---

[189] In fact, as this court noted in its March 29, 1999 memorandum opinion, Alabama Code § 13A-12-200.2(a)(1) is written in the disjunctive. Use of the connector "or" implicitly excludes sexual devices from the material identified as obscene, as follows: "It shall be unlawful for any person to knowingly distribute . . . any obscene material *or* any device designed or marketed as useful primarily for the stimulation of human genital organs . . . ." *Id.* (emphasis supplied). Although the statute then provides that "material not otherwise obscene may be obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of prurient appeal," *id.*, it appears that this provision should be construed as pertaining specifically to the aforementioned "material," which the statute itself distinguishes from devices. *See Williams*, 41 F. Supp. 2d at 1291 n.43.

devices that do not depict the human genitals, and are, instead, innocuous-looking, inanimate objects. *See Williams*, 41 F. Supp. 2d at 1292. Plaintiffs correctly observe that these latter devices may "suggest" sexual conduct, but a mere suggestion of sex will not satisfy the *Miller* obscenity test. Indeed, if the State of Alabama's ban on the distribution of sexual devices stemmed from a desire to prohibit all items that suggest sex, such a goal would directly contravene the Supreme Court's proscription of equating sex with obscenity.[190] *See Roth*, 354 U.S. at 487, 77 S. Ct. at 1310.

Given these facts, and that the Attorney General has failed to offer any evidence to the contrary, the court concludes that not all sexual devices prohibited from sale under the challenged statute can be adjudged legally "obscene." Consequently, Alabama Code § 13A-12-200.2(a)(1) has the sweeping effect of banning the sale of all sexual devices — both those that might be characterized as obscene, and those that could not under the *Miller* test. Accordingly, the court finds that the challenged statutory provision is not narrowly tailored to meet the State's interest in this regard.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is due to be granted, and defendant's motion for summary judgment is due to be denied. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this _10th_ day of October, 2002.

United States District Judge

---

[190] *See* Plaintiffs' Memorandum in Support (doc. no. 58), at 67.