FILED

2006 Feb-28  PM 04:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **SHERRI WILLIAMS, *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-98-S-1938-NE** |
| ) | |
| **TROY KING, in his official capacity** ) | |
| **as Attorney General of the State of** ) | |
| **Alabama,** ) | |
| ) | |
| **Defendant**.[1] ) | |

## MEMORANDUM OPINION

This opinion marks the third occasion on which this court has been required to

address substantive due process challenges to an Alabama statute that criminalizes

the commercial distribution of "any device designed or marketed as useful primarily

for the stimulation of human genital organs."[2]  *See Williams v. Pryor*, 41 F. Supp. 2d

---

[1] Troy King, in his official capacity as Attorney General for the State of Alabama, was substituted for the previous occupant of that position pursuant to Federal Rule of Civil Procedure 25(d)(1).

[2] Ala. Code § 13A-12-200.2(a)(1) (1975) (Supp. 2005) provides in relevant part:

> It shall be unlawful for any person to knowingly distribute, possess with intent to distribute, or offer or agree to distribute any obscene material *or any device designed or marketed as useful primarily for the stimulation of human genital organs* for any thing of pecuniary value.  Material not otherwise obscene may be obscene under this section if the distribution of the material, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica for the sake of prurient appeal.  Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than one year.  A second or

1257 (N.D. Ala. 1999) ("Williams I"), *rev'd*, 240 F.3d 944 (11th Cir. 2000) ("Williams II"); *see also Williams v. Pryor*, 220 F. Supp. 2d 1257 (N.D. Ala. 2002) ("Williams III"), *rev'd*, 378 F.3d 1232 (11th Cir. 2004) ("Williams IV").  As in prior opinions, this court will employ the term "sexual devices" as a shorthand replacement for the cumbersome statutory phrase "any device designed or marketed as useful primarily for the stimulation of human genital organs."

The plaintiffs are either vendors or users of sexual devices.  Their complaint asserts that enforcement of the subject statute will impose an undue burden upon their "fundamental rights of privacy and personal autonomy" in violation of the Fourteenth Amendment's Due Process Clause.[3]  Alternatively, plaintiffs allege that there is no rational relationship between a wholesale ban on the sale of all sexual devices and a proper legislative purpose.

## PART ONE

### *Summary of Facts*

---

subsequent violation of this subdivision is a Class C felony if the second or subsequent violation occurs after a conviction has been obtained for a previous violation.  Upon a second violation, a corporation or business entity shall be fined not less than ten thousand dollars ($10,000) nor more than fifty thousand dollars ($50,000) [emphasis supplied].

[3] *See*, *e.g.*, *Williams* I, 41 F. Supp. 2d at 1274 ("Plaintiffs claim enforcement of Alabama Code § 13A-12-200.2(a)(1) would impose an undue burden on their fundamental rights of privacy and personal autonomy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution.") (internal marks and footnote omitted).

The pertinent factual findings are based upon a stipulated evidentiary record that was spread at length in both of this court's previous opinions.[4]  Those findings establish that sexual devices have many beneficial medical and psychological therapeutic uses that are recognized by health-care professionals and the federal Food and Drug Administration,[5] including "frequent prescription in marital and non-marital sexual or relationship counseling — often as a necessary component for successful therapy."[6]

## PART TWO

### *Prefatory Issues*

The Supreme Court jurisprudence that applies to the issues of this case is extraordinarily complex and subtle.  It defies easy summation.  There simply is no easy grouping of cases that comfortably conveys a consistent concept of either the constitutional basis for or content of plaintiffs' asserted "rights of privacy and personal autonomy."   Rather, the doctrinal underpinnings of those allegedly "fundamental rights" have been cobbled together from a diverse collection of cases, resulting in a rickety structure.  Moreover, debate on the core concepts is far from being closed, either within the Supreme Court or American society.  Therefore, in

---

[4] *See id.* at 1261-73; *Williams* III, 220 F. Supp. 2d at 1261 *passim.*
[5] *See* 21 C.F.R. §§ 884.5940, 884.5960.
[6] *Williams* II, 240 F.3d at 947.

order to see more clearly how this case should now, on the third attempt, be decided, it may be helpful to trace from whence it has come.  As Oliver Wendell Holmes, Jr., remarked, the "rational study of law is still to a large extent the study of history" because, without resort to the past, "we cannot know the precise scope of rules which it is our business to know" when resolving contemporary controversies.[7]  A backward look at the evolution of particular principles and, as here, their application in a specific case, "is a part of the rational study, because it is the first step toward an enlightened scepticism, that is, toward a deliberate reconsideration of the worth of those rules."[8]  Such exercises must be undertaken with caution, however, because clarity of hindsight does not ensure an equally acute vision of the future.[9]  Holmes's description of the evolution of common law actions in tort describes *precisely*, by way of analogy, the present predicament:

> The law did not begin with a theory.  It has never worked one out.  The point from which it started and that at which . . . it has arrived, are on different planes.  In the progress from one to the other, it is to be expected that its course should not be straight and its direction not

---

[7] Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897).

[8] *Id.*

[9] *Cf. id.* at 466 ("[T]he logical method and form flatter that longing for certainty and repose which is in every human mind.  But certainty generally is illusion, and repose is not the destiny of man.  Behind the logical form lies a judgment as to the relative worth and importance of competing legislative grounds, often an inarticulate and unconscious judgment, it is true, and yet the very root and nerve of the whole proceeding.").  *See also id.* at 474 ("We must beware of the pitfall of antiquarianism, and must remember that for our purposes our only interest in the past is for the light it throws upon the present.").

always visible.  All that can be done is to point out a tendency, and to justify it.[10]

## A.   *Fundamental Rights and Liberties*

The definition of those rights and liberties deemed to be so important that they are characterized as "fundamental" — and, therefore, beyond the power of popularly-elected legislative assemblies to infringe,[11] except in only the most compelling or exigent circumstances[12] — begins with the first ten amendments to the Constitution, generally referred to as the "Bill of Rights."[13]  The first eight of those amendments

___

[10] O.W. Holmes, Jr., *The Common Law* 77-78 (1881).  *Cf.* O.W. Holmes, Jr., *Codes, and the Arrangement of the Law*, 5 Am. L. Rev. 1 (1870) ("It is the merit of the common law that it decides the case first and determines the principle afterwards.").

[11] *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.") (citations and internal quotation marks omitted).

[12] Regarding the "exigent circumstances" that *may* justify deviation from Constitutional protection of individual rights, *compare Korematsu v. United States*, 323 U.S. 214, 216 (1944) (addressing the infamous internment of American citizens of Japanese ancestry in concentration camps during the Second World War, and stating that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect.  *This is not to say that all such restrictions are unconstitutional*.  It is to say that courts must subject them to the most rigid scrutiny.  *Pressing public necessity may sometimes justify the existence of such restrictions*; racial antagonism never can.") (emphasis supplied), *with Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) (holding that "no adequate reason" had been shown for a state legislative proscription against the teaching of subjects in the German language following the end of the First World War, during a "time of peace and domestic tranquility").

[13] *See* William J. Brennan, *The Bill of Rights and the States*, 36 N.Y.U. L. Rev. 761, 776 (1961) ("The Bill of Rights is the primary source of *expressed information* as to what is meant by constitutional *liberty*.  The safeguards enshrined in it are deeply etched in the foundations of America's freedoms.") (emphasis supplied).

define a hierarchy of rights that the founding generation considered essential to the preservation of individual liberty, justice, and freedom from arbitrary governmental intrusions into, as well as purposeless restraints upon, the private lives of citizens.[14] Even so, the history of the proposal, adoption, and ratification of those amendments is perfectly clear on this point:  they were intended to provide protection against acts of only the new, national government.[15]

Beginning in 1897, however, the Supreme Court embarked on a slow course of gradually "incorporating" some of the specific rights enumerated in the first eight amendments into the Fourteenth Amendment.[16]  The unifying principle giving order

---

[14] Neither the Ninth nor Tenth Amendments specifically describe individual rights and liberty interests.  Instead, the Ninth Amendment provides that "[t]he enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people," whereas the Tenth states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people."  Even so, at least three former Justices of the Supreme Court perceived in the neglected Ninth Amendment a textual basis for protection of "those personal rights" that are "so rooted in the traditions and conscience of [the American] people as to be ranked as fundamental," even if those are "not mentioned explicitly in the Constitution" or Bill of Rights.  *Griswold v. Connecticut*, 381 U.S. 479, 486-87 (1965) (Goldberg, J., concurring, and joined by Chief Justice Warren and Justice Brennan) (citation and internal quotation marks omitted).

[15] This principle was confirmed by Chief Justice Marshall, speaking for a unanimous Court in *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243 (1833), and holding that the amendments provided "security against the apprehended encroachments of the general government — not against those of the local governments," and they "contain no expression indicating an intention to apply them to the state governments."  *Id*. at 247.  *See generally* Alpheus T. Mason, *The States' Rights Debate* 91-93 (2d ed. 1972); Robert A. Rutland, *The Birth of the Bill of Rights* 200-215 (1955).

[16] *See Chicago, Burlington & Quincy Railroad Co. v. Chicago*, 166 U.S. 226 (1897) (holding that the Fourteenth Amendment's Due Process Clause compelled state and local governments to award just compensation when it took private property for a public use, thus effectively, even though not explicitly, absorbing the Fifth Amendment's takings clause).

and coherence to a very long line of "selective incorporation" cases is this:  only those rights deemed essential to the conceptions of liberty or justice were absorbed into the Fourteenth Amendment's Due Process Clause.[17]  Through this process, the Court has determined over time that, with only a few exceptions, most of the provisions of the Bill of Rights meet the definition of "fundamental" liberties and, thus, act as restraints against oppressive and arbitrary actions by state and local governments, as well as the federal.[18]

Beyond the specific provisions of the Bill of Rights thus absorbed into and protected by the Fourteenth Amendment lies a constitutional quagmire, rife with soft and slippery doctrinal ground, jurisprudential quicksand, and subtle, semantical snares for the unwary traveler.  This is the domain of those rights that — even though lacking an explicit textual basis in the Constitution — the Supreme Court has recognized as possessing a value so essential to the preservation of individual "liberty" that they have been characterized as "fundamental."  They are freedoms deemed "implicit in the concept of ordered liberty,"[19] inherent in human nature, and

---

[17] *See*, *e.g.*, *Palko v. Connecticut*, 302 U.S. 319, 326 (1937) ("If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed.").

[18] For a discussion of the specific portions of the Bill of Rights that have been absorbed into the Fourteenth Amendment, see 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 15.6 (3d ed. 1999); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 6.3.3 (2d ed. 2002).

[19] *Palko*, 302 U.S. at 325.

consequently inalienable.

The specific liberty interests that fall under the heading of "fundamental rights" have varied over the course of the American experiment in democratic self-government.  For example, rights of "property" were of paramount importance during the ante-bellum period, and "freedom of contract" held sway for seventy years after the Civil War.  With the decline of "economic substantive due process" following the head-on collision of the Hughes Court with Franklin Roosevelt's "New Deal" programs, however, those interests lost primacy.  From then through the remainder of the Twentieth Century, personal liberty interests have assumed the position of first importance.

Thus far, the Supreme Court has characterized the following, non-textual liberty interests as "fundamental" and, as such, rights that should prevail if in conflict with governmental authority or other, less valued, liberties:[20]  (*i*) the right to marry;[21]

---

[20] *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (listing some, but not all, of those rights and liberty interests recognized by the Supreme Court as fundamental).

[21] *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Zablocki v. Redhail*, 434 U.S. 378, 384 (1978) ("Cases subsequent to *Griswold* and *Loving* have routinely categorized the decision to marry as among the personal decisions protected by the right of privacy."); *see also Turner v. Safley*, 482 U.S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right.").

(*ii*) the right to procreate;[22] (*iii*) the right to purchase and use contraceptives;[23] (*iv*) the

qualified right to an abortion;[24] (*v*) the right to custody of one's children;[25] (*vi*) the

right to keep a family together;[26] (*vii*) the right of parents to direct the education and

upbringing of their children;[27] (*viii*) the right to marital privacy;[28] (*ix*) the right to

---

[22] *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental" rights.).

[23] *Griswold v. Connecticut*, 381 U.S. 479 (1965) (invalidating a Connecticut statute banning the use of contraceptives by married couples); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (expanding the right of privacy articulated in *Griswold*, and holding that a Massachusetts law prohibiting distribution of contraceptives to unmarried individuals violated the Equal Protection Clause). "If the right of privacy means anything," Justice Brennan wrote in *Eisenstadt*, " it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 453 (emphasis in original) (majority opinion). *See also Carey v. Population Services International*, 431 U.S. 678 (1977) (declaring unconstitutional a law providing that only a licensed pharmacist could provide contraceptives to persons over the age of 16 years, and that no one could distribute them to persons under the age of 16).

[24] *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992); *Roe v. Wade*, 410 U.S. 113, 153 (1973) ("This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or ... in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.") (Blackmun, J.).

[25] *Stanley v. Illinois*, 405 U.S. 645 (1972); *see also Michael H. v. Gerald D.*, 491 U.S. 110 (1989); *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (stating that a "natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right") (citations omitted).

[26] *Moore v. City of East Cleveland*, 431 U.S. 494 (1977).

[27] *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (recognizing that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (addressing the right of parents to send their children to private and parochial schools); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (affirming the unwritten right to instruct a child in a foreign language in a private school).

[28] *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965) ("Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives?  The very idea is repulsive to the notions of privacy surrounding the marital relationship.") (Douglas, J., plurality opinion).

bodily integrity;[29] (*x*) the right to refuse unwanted, lifesaving, medical treatment;[30] (*xi*) the right to travel within the United States;[31] (*xii*) the right to vote;[32] (*xiii*) the qualified right to control the dissemination of private information;[33] (*xiv*) the right of all persons to equal access to the courts;[34] and *arguably* (*xv*) the right of adults to engage in private, consensual, non-commercial, sexual activity common to a homosexual lifestyle.[35]

---

[29] *Rochin v. California*, 342 U.S. 165 (1952).

[30] *Cruzan v. Missouri Department of Health*, 497 U.S. 261, 279 (1990) (assuming that the Constitution grants competent persons a "constitutionally protected right to refuse lifesaving hydration and nutrition").

[31] *Saenz v. Roe*, 526 U.S. 489 (1999); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (holding that residency requirements for receipt of state welfare benefits violate the right to travel protected by the Equal Protection Clause); *The Passenger Cases*, 48 U.S. (7 How.) 283 (1849) ("We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States. And a tax imposed by a State for entering its territories or harbours, is inconsistent with the rights which belong to the citizens of other States as members of the Union, and with the objects which that Union was intended to attain.").

[32] *See* U.S. Const. amends. XV (1870), XIX (1920), XXIV (1964), XXVI (1971); *see also*, *e.g.*, *Kramer v. Union Free School Dist.*, 395 U.S. 621, 626 (1969) (right to vote is a fundamental right protected by the Equal Protection Clause); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (holding that the right to vote is a "fundamental political right" because it is "preservative of all rights").

[33] *See*, *e.g.*, *Whalen v. Roe*, 429 U.S. 589 (1977).

[34] *See*, *e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 16-17 (1956) (quoting Magna Carta as the basis of the principle: "To no one will we sell, to no one will we refuse, or delay, right or justice. . . . No free man shall be taken or imprisoned, . . . but by the lawful judgment of his peers or by the law of the land.").

[35] *Lawrence v. Texas*, 539 U.S. 558 (2003). *But see infra* note 98, discussing the conclusion of the *Williams* IV majority that *Lawrence* did not "announce a new fundamental right" to sexual privacy "or, more broadly, to all forms of sexual intimacy."

**B**.    *Standards for "Substantive Due Process" Review of State Statutes*

The Fourteenth Amendment's Due Process Clause provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1 (1868).  In addition to the obvious purpose of guaranteeing fair *procedures*,[36] the clause has been construed as including a *substantive* dimension, requiring that legislation be fair and reasonable in *content*, and promote legitimate governmental objectives.[37]  "In other words, *substantive due process* looks to whether there is a sufficient justification for the government's action.  Whether there is such a justification depends very much upon the level of scrutiny used."[38]

**1**.    *Rational Basis Test*

If a statute impacts only business or economic interests, and does not implicate fundamental rights or employ "suspect criteria" to define the class of persons

---

[36] "*Procedural due process*, as the phrase implies, refers to the procedures that the government must follow before it deprives a person of life, liberty, or property.  Classic procedural due process issues concern what kind of notice and what form of hearing the government must provide when it takes a particular action."  Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 7.1, at 523 (2d ed. 2002).

[37] *See*, *e.g.*, *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992) (observing that the substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them") (citation and internal quotation marks omitted); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (observing that the substantive component of the Due Process Clause provides "heightened protection against governmental interference with certain fundamental rights and liberty interests").

[38] Chemerinsky, *supra* note 36 at 523-24 (emphasis supplied) (footnote omitted).

benefitted or burdened by the legislation,[39] then the state's justification for the law is evaluated by a standard known as the "rational basis test."  This standard requires courts to compare the content of a statute to its purported purposes, and to determine whether the law constitutes a reasonable means of accomplishing (*i.e.*, "is rationally related to") a legitimate end or purpose of state government.  The salient feature of this test is that it is "a highly deferential standard that proscribes only the very outer limits of a legislature's power."  *Williams* II, 240 F.3d at 948.[40]  Statutes tested under

---

[39] Statutes challenged under the Fourteenth Amendment's Equal Protection Clause for allegedly employing "suspect criteria" to define the class of persons benefitted or burdened by the law — *e.g.*, an individual's race or national origin — are subjected to "strict scrutiny."  *See*, *e.g.*, *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ("affirmative action" case employing strict scrutiny standard to review state and local legislation benefitting racial minorities).  *See generally* Joseph Tussman and Jacobus TenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 353 (1949) ("The assertion of human equality is closely associated with the denial that difference in color or creed, birth or status, are significant or relevant to the way in which men should be treated. . . .  To these differences in the supplicants before her bar, Justice must be blind.  Laws which classify men by color or creed or blood accordingly, are repugnant to the demand for equality, and therefore, such traits should not be made the basis for the classification of individuals in laws.").  As Professor Chemerinsky has observed,

> [t]he major difference between due process and equal protection as the basis for protecting fundamental rights is in how the constitutional arguments are phrased.  If a right is safeguarded under due process, the constitutional issue is whether the government's *interference* is justified by a sufficient purpose.  But if the right is protected under equal protection, the issue is whether the government's *discrimination as to who can exercise the right* is justified by a sufficient purpose.  Although the difference is generally just semantics and phrasing, there can be a real distinction:  If a law denies the right to everyone, then due process would be the best grounds for analysis; but if a law denies a right to some, while allowing it to others, the discrimination can be challenged as offending equal protection or the violation of the right can be objected to under due process.

Chemerinsky, *supra* note 36, § 10.1.1, at 763 (emphasis supplied) (footnote omitted).

[40] *See also* James B. Thayer, *The Origin and Scope of the American Doctrine of*

this standard are deemed constitutional if "there is *any reasonably conceivable state of facts* that could provide a rational basis for the statute." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993) (emphasis supplied).[41]

Statutes affecting only economic or business interests normally pass constitutional muster because the Supreme Court "presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985). This presumption of the self-rectifying nature of the democratic process is a theme that will be revisited in Part Four (Section B) of this opinion, in connection with the discussion of *Lawrence v. Texas*, 539 U.S. 558 (2003), and its implications for the issue on remand.

**2.** *Strict Scrutiny*

On the other hand, if the challenged statute burdens a person's exercise of

---

*Constitutional Law*, 7 Harv. L. Rev. 129, 148 (1893) ("The judicial function is merely that of fixing the outside border of reasonable legislative action, the boundary beyond which the . . . police power, and legislative power in general, cannot go without violating the prohibitions of the constitution or crossing the line of its grants.").

[41] *See also Beach Communications*, 508 U.S. at 314-15 ("On rational-basis review, . . . a statute . . . comes to us bearing a strong presumption of validity, and those attacking the rationality of the statute have the burden to negative every conceivable basis which might support it. Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason . . . actually motivated the legislature. . . . In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). In addition, state legislatures are "allowed leeway to approach a perceived problem incrementally, even if its incremental approach is significantly over-inclusive or under-inclusive." *Williams* II, 240 F.3d at 948-49 (citations and internal quotation marks omitted).

fundamental rights or employs suspect criteria to define the class of persons benefitted or burdened by the legislation,[42] then the state's justification for the law *may be* subjected to a higher standard, known as "strict scrutiny," which requires the legislation to be narrowly tailored to the achievement of a compelling governmental interest.[43]  The phrase "may be" in the preceding sentence is emphasized because strict scrutiny does not follow automatically from the mere assertion that a law infringes or burdens fundamental rights.  Instead, the court must engage in two inquiries.  The first question is whether the right implicated by the statute is "fundamental" — an inquiry that comprises two requirements: (*i*) "a careful description of the asserted fundamental liberty interest," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted); and (*ii*) a determination of whether the right as thus described is among "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id*. at 720-21.[44]  If the initial inquiry is answered

---

[42] *See supra* note 39.

[43] *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 155 (1973) ("Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake.") (citations omitted).

[44] *See Glucksberg*, 521 U.S. at 722 ("[B]y establishing a threshold requirement — that a challenged state action implicate a fundamental right — before requiring more than a reasonable relation to a legitimate state interest to justify the action, it avoids the need for complex balancing

affirmatively, then the statute is subjected to strict scrutiny, which requires that three questions be answered: (*a*) What is the governmental interest or purpose the statute seeks to promote or achieve?; (*b*) Is that interest "compelling"?; and (*c*) Is the statute narrowly tailored to the achievement of that interest?

"Most statutes reviewed under the very stringent strict scrutiny standard are found to be unconstitutional." *Williams* II, 240 F.3d at 948. Even so, the application of the strict scrutiny standard of review "is not inevitably fatal in fact" to the constitutionality of a statute. *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996).[45]

## PART THREE

### *Procedural History*

**A.**   *The First District Court Opinion — "Williams I"*

This court's original opinion rejected plaintiffs' argument that the Supreme Court's line of decisions recognizing, in certain contexts, a person's fundamental right to privacy or personal autonomy was "broad enough to encompass an

---

of competing interests in every case.").

[45] There exists a third level of scrutiny between those discussed above — hence, the term "intermediate scrutiny" — that is employed when the challenged statute involves gender or illegitimacy classifications. *See, e.g., Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, previous cases establish that classification by gender must serve important governmental objectives and must be substantially related to those objectives."). *See generally* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 18.3, at 218-26 (3d ed. 1999).

individual's decision to engage in private sexual activity *not* proscribed by law" (*i.e.*, to *use* sexual devices)[46] and, accordingly, did not subject the contested statute to "strict scrutiny."  The reasons for not doing so are addressed below.

**1**.    *Fundamental Rights Analysis*

The contested Alabama statute forbids only the *sale* of sexual devices — *not* their possession or *use*.[47]  Nevertheless, this court focused upon "use" of the devices, saying:  "[T]o resolve the issues raised by plaintiffs' assertion of a 'fundamental right,' this court must focus on the *use* of the proscribed devices, rather than their *distribution* because, if the *use* of such devices is a fundamental liberty interest, as plaintiffs contend, then the legislature's ban on *distribution* compels strict judicial scrutiny."  *Williams* I, 41 F. Supp. 2d at 1281 (emphasis supplied).[48]  *Cf. Carey v. Population Services International*, 431 U.S. 678, 687-88 (1977) ("Restrictions on the distribution of contraceptives clearly burden the freedom to make [protected childbearing] decisions.  A total prohibition against sale of contraceptives, for example, would intrude upon individual decisions in matters of procreation and

---

[46] *Williams* I, 41 F. Supp. 2d at 1274 (quoting plaintiffs' brief) (emphasis in original).

[47] *See supra* note 2 (reciting the text of Ala. Code § 13A-12-200.2(a)(1)).

[48] Moreover, statutes regulating ordinary economic and commercial activities in the distribution, sale, and purchase of consumer products are subject only to rational basis scrutiny.  *See, e.g.*, *Beach Communications*, 508 U.S. at 314 ("In areas of social and economic policy, . . . any reasonably conceivable state of facts that could provide a rational basis for the" statute is sufficient to sustain its constitutionality); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955).

contraception as harshly as a direct ban on their use.").

Therefore, taking into account the Supreme Court's observation in *Carey*, *supra* — "A total prohibition against sale of [sexual devices] would intrude upon individual decisions [concerning the use of such devices in profoundly personal activities] as harshly as a direct ban on their use" — this court framed the question for decision as: "whether the concept of a constitutionally protected 'right to privacy' protects an individual's liberty to *use* [sexual devices] when engaging in lawful, private, sexual activity"?[49]

Ultimately, however, this court did not subject the Alabama statute to a "strict scrutiny" standard of review, because "nothing presented to this court in brief or during oral argument suggest[ed] that use of sexual devices ha[d] monumental or abiding approval."[50]  That major premise of the first opinion was not well stated; it would have been better framed as follows:  even though this court recognized that a total ban on the *distribution* of sexual devices burdened the *use* of such devices as harshly as a direct ban upon their use, plaintiffs then had not presented an evidentiary basis for concluding that their asserted rights to sell, purchase, possess, and use sexual devices were among "those fundamental rights and liberties which are,

---

[49] *Williams* I, 41 F. Supp. 2d at 1275 (footnote omitted) (emphasis supplied).
[50] *Id*. at 1283 (footnote omitted).

objectively, deeply rooted in this Nation's history and tradition, . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).[51]

### 2. *Rational Basis Review*

Accordingly, this court engaged in rational basis review of the statute, and held

---

[51] This court expanded upon plaintiffs' failure to meet the *Glucksberg* standards for strict scrutiny review in the following marginal note:

Certain submissions to the court, and certain facts that were stipulated, establish that some level of *popularity* in the use of sexual devices has evolved over the past twenty years. For example, several publications and websites discuss or suggest the use of these devices in aid of achieving orgasm. The parties also have stipulated that these devices possess some therapeutic value (or at least that plaintiffs and certain experts in human sexuality believe they do).

Evidence of recent popularity notwithstanding, the most persuasive evidence supporting an argument that use of these devices can satisfy the *Glucksberg* standards is the fact that the federal Food and Drug Administration promulgated regulations concerning some of the more common sexual devices, establishing standards for their therapeutic use.

The FDA first established such regulations in 1980. *See* 45 Fed.Reg. 12684-12720 (1980); *see also Postscript Enterprises, Inc. v. Whaley*, 658 F.2d 1249, 1254 n.6 (8th Cir. 1981).

The twenty years of regulation proves to be the most persuasive evidence before the court, largely because it is the most longstanding.

In fact, aside from references to two publications, it is the only stipulation or evidentiary submission dating from an earlier decade. The court also notes that neither of the vendor plaintiffs has operated her relevant business (at least in Alabama) for more than six years.

*Williams* I, 41 F. Supp. 2d at 1283 n.33. Stated differently, plaintiffs then had presented evidence dating back only two decades or so — a period that hardly seemed sufficient to satisfy the *Glucksberg* standard of being "deeply rooted in this Nation's history and tradition."

it unconstitutional, but on the narrow ground that broadly prohibiting the sale of all sexual devices, regardless of the many beneficial uses acknowledged by the State of Alabama, was not rationally related to any legitimate state interest.[52]  In reaching that conclusion, this court considered and rejected a number of possible justifications.

The first state interest the court considered was the protection of children and unwilling adults from exposure to public displays of obscene materials.[53]  This court tied that interest to public notions of morality,[54] but found that the statutory prohibition was "absolutely arbitrary," because "[i]nnumerable measures far short of an absolute ban on the distribution of sexual devices would accomplish the State's goals."[55]  This court also held that any interest in protecting children and unwilling adults had no application to one of the vendor plaintiffs, who sells sexual devices in private homes during "Tupperware-style" parties attended only by consenting adults. Finally, this court held that storefront vendors could easily adapt their window displays (as had vendor plaintiff Sherri Williams) to accommodate the State's

---

[52] *Williams* I, 41 F. Supp. 2d at 1293. *See also id*. at 1274 ("If legislation does not burden a fundamental right, . . . then the act faces only minimal scrutiny:  that is, a 'rational basis' standard. When reviewing legislation under a rational basis test, courts ensure only that a legitimate governmental interest supports the legislation, and, that the resulting law bears a rational relation to that interest.") (citing *Glucksberg*, 117 S. Ct. at 2271; *Reno v. Flores*, 507 U.S. 292, 302-05 (1993)).

[53] *Williams* I, 41 F. Supp. 2d at 1285.

[54] *Id*. at 1286.

[55] *Id*. at 1288.

concerns for the decency of public displays.[56]  For these reasons, the Court concluded that the statute failed rational basis review if premised upon the interest in public decency, because the breadth of the ordinance was so far removed from the particular justification.[57]

The second possible objective considered — characterized as "banning commerce in sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation or familial relationships"[58] — also was tied to the State's interest in notions of social morality.[59]  Although this court accepted that as a legitimate state interest,[60] it did not find a rational relationship between the statute and the objective.[61]  Instead, the statute accomplishes just the opposite for the user plaintiffs, because it prevents them from access to devices "that they, and experts in the field of human sexuality, have averred are integral to growing, preserving, and/or repairing marital and familial relationships."[62]

---

[56] This court's second opinion, discussed *infra*, also observed that the State is constitutionally permitted to employ its zoning powers to restrict businesses to locations out of reach and view of children and unwilling adults. *Williams* III, 220 F. Supp. 2d at 1305.

[57] *Williams* I, 41 F. Supp. 2d at 1288.

[58] *Id.* at 1286.

[59] The Attorney General asserted in his brief that "[t]he commerce in sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation or familial relationships is an evil, an obscenity . . . detrimental to the health and morality of the state." *Id.* (footnote omitted).

[60] *Id.* at 1287.

[61] *See id.* at 1288-90.

[62] *Id.* at 1289.

This court also found that the statute swept too broadly with respect to another, conceivable state interest:  banning commerce in "obscene" materials.[63]  It first was noted that many of the devices at issue do not represent human genitals, and would not be considered "obscene" under the guidelines of *Miller v. California*, 413 U.S. 15 (1973).  Moreover, even though some of the devices might appeal to "prurient interests" — one definition of which is "characterized by or arousing inordinate or unusual sexual desire"[64] — this court concluded that "a majority, or at least a significant minority, of the proscribed devices, as a matter of law, are not obscene under any established definition of obscenity."[65]

Accordingly, this court granted plaintiffs' motion for summary judgment, denied the defendant's motion for summary judgment, and entered judgment enjoining the Attorney General from enforcing the statutory provision.[66]

**B**.     *The First Eleventh Circuit Opinion* — "Williams II"

The Eleventh Circuit reviewing panel held that this court erred when concluding that the Alabama statute's absolute ban on the sale of sexual devices was not rationally related to a proper governmental purpose.

---

[63] *Williams* I, 41 F. Supp. 2d at 1290-93.

[64] *Black's Law Dictionary* 1263 (8th ed. 2004).

[65] *Williams* I, 41 F. Supp. 2d at 1292-93.

[66] *Id*. at 1293.

We conclude the district court erred in determining the statute lacks a rational basis. *The State's interest in public morality is a legitimate interest rationally served by the statute.* The crafting and safeguarding of public morality has long been an established part of the States' plenary police power to legislate and indisputably is a legitimate government interest under rational basis scrutiny. *See, e.g., Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) (citing *Bowers v. Hardwick*, 478 U.S. 186, 196 (1986); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61 (1973); *Roth v. United States*, 354 U.S. 476 (1957)). *A statute banning the commercial distribution of sexual devices is rationally related to this interest.* Alabama argues "a ban on the sale of sexual devices and related orgasm stimulating paraphernalia is rationally related to a legitimate legislative interest in discouraging prurient interests in autonomous sex" and that "it is enough for a legislature to reasonably believe that commerce in the pursuit of orgasms by artificial means for their own sake is detrimental to the health and morality of the State." Appellant's Brief at 13, 16. The criminal proscription on the distribution of sexual devices certainly is a rational means for eliminating commerce in the devices, which itself is a rational means for making the acquisition and use of the devices more difficult. Moreover, incremental steps are not a defect in legislation under rational basis scrutiny, so Alabama did not act irrationally by prohibiting only the commercial distribution of sexual devices, rather than prohibiting their possession or use or by directly proscribing masturbation with or without a sexual device. Thus, we hold the Alabama sexual devices distribution criminal statute is constitutional under rational basis scrutiny because it is rationally related to at least one legitimate State interest.[67]

The panel emphasized its conclusion that Alabama's interest in public morality was a legitimate, governmental interest rationally served by the statute with this footnoted observation:

---

[67] *Williams* II, 240 F.3d at 949-50 (some citations and footnote omitted) (emphasis supplied).

In fact, the State's interest in public morality is sufficiently substantial to satisfy the government's burden under the more rigorous intermediate level of constitutional scrutiny applicable in some cases. *See*, *e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 1395-97 (2000); *Barnes*, 501 U.S. at 569.  For purposes of consistency in this case, however, we will refer to the interest as legitimate.[68]

The panel then turned its attention to plaintiffs' fundamental rights arguments, and noted that plaintiffs had "challenged the constitutionality of the statute on its face and as applied."[69]

**1.**   *Facial Challenge*

With regard to the *facial* challenge, the panel observed that it is a very high hurdle indeed, because such an attack required plaintiffs to "establish that *no* set of circumstances exists under which the Act would be valid."[70]  "Unless the statute is unconstitutional in all its applications, an as-applied challenge must be used to attack its constitutionality."[71]

The panel then addressed the question of "how to frame the nature and scope

---

[68] *Id*. at 949 n.3.

[69] *Id*. at 952-53.

[70] *Id*. at 953 (emphasis in original) (quoting *Gulf Power Co. v. United States*, 187 F.3d 1324, 1328 (11th Cir. 1999) (in turn quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  *See also*, *e.g.*, *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000) (stating that "no set of circumstances" is the general rule for evaluating facial challenges in this circuit); *Jacobs v. Florida Bar*, 50 F.3d 901, 906 n.20 (11th Cir. 1995) ("[W]hen a plaintiff attacks a law facially, the plaintiff bears the burden of proving that the law could never be constitutionally applied.") (citing *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988)).

[71] *Williams* II, 240 F.3d at 953.

-23-

of a constitutional right that would *facially* invalidate the Alabama statute,"[72] and

concluded that this court had correctly framed the fundamental rights analysis:

> The district court narrowly framed the analysis as the question "whether the concept of a constitutionally protected 'right to privacy' protects an individual's liberty to use [sexual devices] when engaging in lawful, private, sexual activity."  41 F.Supp.2d at 1275; *see also id.* at 1281 & n. 30.  *For purposes of the facial challenge*, the right is more precisely stated as whether the Constitution protects such liberty of *every individual.*
>
> In light of the Supreme Court's decision in *Carey v. Population Services International*, 431 U.S. 678 (1977), *we conclude the district court correctly framed the fundamental rights analysis in this case*. Following its decisions holding [that] a state may not criminalize every sale or distribution of contraceptives, *see Griswold v. Connecticut*, 381 U.S. 479 (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972), the Supreme Court struck down a narrower New York law criminalizing the sale of contraceptives to persons under 16 years of age and the sale of contraceptives by non-pharmacists.  *See Carey*, 431 U.S. at 681-82. The Court explained that:
>
> > [T]he Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State. Restrictions on the distribution of contraceptives clearly burden the freedom to make such decisions. . . . This is so not because there is an independent fundamental "right of access to contraceptives," but because such access is essential to exercise of the constitutionally protected right of decision in matters of childbearing that is the underlying foundation of the holdings in *Griswold*, *Eisenstadt v. Baird*, and *Roe v. Wade*.
>
> 431 U.S. at 687-89; *see also id.* at 689-91 (concluding that New York law fails strict scrutiny for lack of compelling state interest).  Similarly,

---

[72] *Id.* (emphasis supplied).

-24-

because the [Alabama] statute prohibiting the *distribution* of sexual devices would burden an individual's ability to *use* the devices, the analysis in this case must be framed *not* in terms of whether the Constitution protects a right to sell or buy sexual devices, *but rather in terms of whether there is a fundamental constitutional interest* — broad or narrow — *that encompasses a right to* use *sexual devices* and invalidates this statute on its face.[73]

The panel then concluded there was "no controlling precedent that *specifically establishes* the *facial* unconstitutionality of this statute."[74]

The fundamental constitutional rights of *privacy* recognized to date by the Supreme Court *in the area of sexual activity* each have followed from the Court's protection of *a person's right to make the decision not to procreate* without governmental interference. Specifically, the Court has repeatedly sustained *a right to prevent pregnancy through the use of contraceptives*, *see Griswold*, 381 U.S. at 479; *Eisenstadt*, 405 U.S. at 438; *Carey*, 431 U.S. at 678, as well as *a woman's qualified right to terminate a pregnancy*, *see*, *e.g.*, *Planned Parenthood v. Casey*, 505 U.S. 833 (1992); *Roe v. Wade*, 410 U.S. 113 (1973). More than half a century ago, the Court also protected *the right to procreate*, invalidating a state's provision for involuntary sterilization of habitual criminals. *See Skinner v. Oklahoma*, 316 U.S. 535 (1942). The Court also has recognized other fundamental rights, including *rights of privacy unrelated to sexual activity*, that protect personal autonomy from governmental intrusion. *See*, *e.g.*, *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261 (1990) (sustaining *right to refuse medical treatment*); *Loving v. Virginia*, 388 U.S. 1 (1967) (invalidating *ban on interracial marriage*). None of these cases, however, is decisive on the question whether the Constitution protects *every individual's right to private sexual activity and use of sexual devices from being burdened by Alabama's sexual device distribution criminal statute*.[75]

---

[73]*Id.* at 953-54 (emphasis supplied).

[74] *Id.* at 954 (emphasis supplied) (footnote omitted).

[75] *Id.* (emphasis supplied).

The panel then addressed the question of whether it might, "in this case, recognize an extension of the right to privacy, which the Supreme Court has recognized as fundamental in certain contexts, that is broad enough to facially invalidate the Alabama statute,"[76] but concluded that some binding authorities suggested the statute had possible constitutional applications and, therefore, was not *facially* unconstitutional.

> This circuit has recognized that a state may regulate materials deemed harmful to minors. *See American Booksellers v. Webb*, 919 F.2d 1493, 1500-01 (11th Cir. 1990); *see also Ginsberg v. New York*, 390 U.S. 629 (1968) (state may constitutionally regulate well-being of minors, and within this power to regulate is the power to restrict access to materials rationally deemed to be harmful to minors). Application of Alabama's statute to those who sell sexual devices to minors, to such extent that those devices are deemed harmful to minors, would not violate any fundamental right. The statute has possible constitutional applications and therefore is not facially unconstitutional. The district court correctly rejected the plaintiffs' facial challenge to the statute.[77]

## 2.   *As-Applied Challenge*

The panel then considered plaintiffs' challenges to the constitutionality of the statute "as applied," and concluded this court had "failed to specifically consider the as-applied challenges raised by the four 'user' plaintiffs" — challenges the panel described as "implicat[ing] *important interests in sexual privacy*."[78]

---

[76] *Id.* (citations, internal quotation marks, and bracketed alteration omitted).

[77] *Williams* II, 240 F.3d at 954-55.

[78] *Id.* at 955 (emphasis supplied).

The district court failed to specifically consider the as-applied challenges raised by the four "user" plaintiffs. Betty Faye Haggermaker and Alice Jean Cope are married women who use sexual devices with their husbands. *See* 41 F. Supp. 2d at 1264. Sherry Taylor-Williams and Jane Doe began using sexual devices in marital intimacy but both are now single. *See id*. at 1264-65. Although the statute is not *facially* unconstitutional because, in light of *Webb* and *Ginsberg*, it may constitutionally be applied to those who sell to minors sexual devices which are deemed harmful to minors, *the as-applied challenges raised by the plaintiffs, married or unmarried, implicate different and important interests in sexual privacy. See Griswold*, 381 U.S. at 485-86 ("Would we allow the police to search the sacred precincts of marital bedrooms?  The very idea is repulsive to the notions of privacy surrounding the marriage relationship."); *Glucksberg*, 521 U.S. at 720 (citing *Griswold* as holding the Constitution protects a fundamental right "to marital privacy"); *see also Casey*, 505 U.S. at 898 (invalidating provision requiring notification of married woman's spouse before abortion could be performed because "[w]omen do not lose their constitutionally protected liberty when they marry. The Constitution protects all individuals, male or female, married or unmarried, from the abuse of governmental power, even where that power is employed for the supposed benefit of a member of the individual's family"); *Eisenstadt*, 405 U.S. at 453 ("[T]he rights of the individual to [have] access to contraceptives . . . must be the same for the unmarried and married alike."); *Bowers v. Hardwick*, 478 U.S. 186, 209 n. 4 (1986) (Blackmun, J., dissenting) (questioning validity of categorizations of sexual activity depending on marital status); *id*. at 216 (Stevens, J., dissenting) (citing *Eisenstadt* and *Carey* as holding that *fundamental rights protection in sexual matters* "extends to intimate choices by unmarried as well as married persons").[79]

The panel accordingly remanded the case for reconsideration, and gave these instructions:

---

[79] *Id.* (emphasis supplied).

We remand the as-applied challenges for due consideration by the district court because the record and stipulations in this case simply are too narrow to permit us to decide whether or to what extent the Alabama statute infringes *a fundamental right to sexual privacy of the specific plaintiffs in this case*. In *Glucksberg*, its most recent case in which an argument for recognition of a new fundamental right was presented, the Supreme Court instructed that a fundamental right must be "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [the right] were sacrificed." 521 U.S. at 720-21 (citations and quotations omitted). In concluding the Constitution did not include such a fundamental right of physician-assisted suicide, *the Court discussed at length not only the long history* of the proscription of suicide and assisting suicide *but also the considerable contemporary nationwide legislative action to preserve such laws. See id.* at 710-19. By contrast, in this case the district court considered in two paragraphs only whether the "use of sexual devices" is a deeply rooted and central liberty. *See* 41 F.Supp.2d at 1283-84 & n. 33. The court analyzed neither whether our nation has a deeply rooted history of *state interference*, or *state non-interference*, *in the private sexual activity of married or unmarried persons* nor whether *contemporary practice* bolsters or undermines any such history. The record is bare of evidence on these important questions. Absent the kind of careful consideration the Supreme Court performed in *Glucksberg*, we are unwilling to decide the as-applied fundamental rights analysis and accordingly remand those claims to the district court.[80]

**C.**   *The Second District Court Opinion* — "Williams III"

Following receipt of the Eleventh Circuit's mandate and resumption of proceedings in this court, plaintiffs amended their complaint to add five persons who used sexual devices,[81] and who alleged that Alabama's ban on distribution of such

---

[80] *Id.* at 955-56 (emphasis supplied).

[81] The five persons added as "user plaintiffs" were:  Deborah and Benny Cooper, a married

items

> intruded into the most intimate of places — the bedrooms of its citizens
> — and the lawful sexual conduct that occurs therein.  While the statute's
> reach does not directly proscribe the sexual conduct in question, it
> places — without justification — a substantial and undue burden on the
> ability of the plaintiffs to obtain devices regulated by the statute.  By
> restricting sales of these devices to plaintiffs, Alabama has acted in
> violation of the fundamental rights of privacy and personal autonomy
> that protect an individual's lawful sexual practices guaranteed by the
> First, Fourth, Fifth, Ninth, and Fourteenth Amendments of the United
> States Constitution.[82]

The parties also supplemented the lengthy stipulation of facts filed in connection with

the original proceedings in this court[83] with an extensive evidentiary record bearing

upon the plaintiffs' as-applied challenge.[84]

After considering the parties' cross-motions for summary judgment and the

evidence presented, this court held that plaintiffs possess a fundamental right to

sexual privacy:

---

couple who began using sexual devices in an attempt to repair their deteriorating sexual relationship and marriage; Dan Bailey (a 61-year-old male who suffered from a respiratory condition that caused erectile dysfunction); Jane Poe (a 24-year-old married woman who had difficulty achieving orgasm); and Jane Roe (a 38-year-old single woman who suffered from a chronic disability that made sexual intercourse extremely painful).  *See Williams* II, 220 F. Supp. 2d at 1260, 1265-66.  Further, the claims of two of the four "user plaintiffs" before this court and the Eleventh Circuit during the original round of proceedings (see the quoted text accompanying note 79 *supra*) were dismissed.  *Id*. at 1261.  Thus, a net total of seven user plaintiffs were before this court on remand.

[82] *Williams* III, 220 F. Supp. 2d at 1261 (quoting plaintiffs' amended complaint).

[83] *See Williams* I, 41 F. Supp. 2d at 1261-73.

[84] *See Williams* III, 220 F. Supp. 2d at 1261 *passim* (the evidentiary materials submitted following remand are discussed throughout the remainder of the opinion).

[P]laintiffs have met their burden of showing that there is a "history, legal tradition, and practice" in this country of deliberate state non-interference with private sexual relationships between married couples, and a contemporary practice of the same between unmarried persons. *Glucksberg,* 521 U.S. at 710, 117 S. Ct. at 2262.  Unlike *Bowers* and *Glucksberg,* where proponents of the offending statutes were able to demonstrate a long history, tradition, and contemporary practice, respectively, of *prohibiting* sodomy (albeit, generally in the context of homosexual relationships) and suicide, respectively, plaintiffs' evidence establishes that there exists a constitutionally inherent right to sexual privacy that firmly encompasses state *non-interference* with private, adult, consensual relationships.  *See Williams* [*II*], 240 F.3d at 954, 955 (characterizing plaintiffs' right at issue as one of "sexual privacy"); *see also Glucksberg,* 521 U.S. at 710-19, 117 S. Ct. at 2262-67; *Bowers,* 478 U.S. at 192-94, 106 S. Ct. at 2844-46.  The court notes that this right to sexual privacy cannot be limited to a mere right to "sex," when the decisions of the Supreme Court protecting abortion, contraception, and the right to privacy in our bodies are considered.

*Williams v. Pryor*, 220 F. Supp. 2d 1257, 1295-96 (N.D. Ala. 2002) ("Williams III") (emphasis supplied).  This court further held that plaintiffs' right to sexual privacy encompasses the right to use sexual devices, based on "[t]he fact that history and contemporary practice demonstrate a conscious avoidance of regulation of these devices by the states, along with the fact that such devices are used in the performance of deeply private sexual acts . . . ."[85]

This court also concluded that the Alabama law prohibiting the sale of sexual devices infringes plaintiffs' fundamental right to sexual privacy because it "imposes

---

[85] *Id.* at 1296.

a significant burden on the right of married and unmarried persons to sexual privacy, in that it severely limits their ability to access, and thus to use, sexual devices within their sexual relationships."[86]   Finally, this court held that violation of plaintiffs' fundamental right of privacy was not justified by a compelling governmental interest which the statute was narrowly tailored to achieve.[87]   Accordingly, this court again ruled in favor of plaintiffs, finding the statute unconstitutional and entering a second order enjoining its enforcement.[88]

**D**.   *Lawrence v. Texas*

Eight months after this court's opinion in *Williams* III, and thirteen months before the second Eleventh Circuit reviewing panel's majority decision in *Williams* IV, the Supreme Court announced its decision in *Lawrence v. Texas*, 539 U.S. 558 (2003).  The facts of the case bore some similarities to those of *Bowers v. Hardwick*, 478 U.S. 186 (1986),[89] a precedent that *Lawrence* expressly overruled.[90]   Police

---

[86] *Id.* at 1298.

[87] *Id.* at 1299-1307.

[88] *Id.* at 1307.

[89] Justice Kennedy explicated the factual similarities and statutory distinction between *Bowers* and *Lawrence* in his majority opinion:

> The facts in *Bowers* had some similarities to the instant case.  A police officer, whose right to enter seems not to have been in question, observed Hardwick, in his own bedroom, engaging in intimate sexual conduct with another adult male. The conduct was in violation of a Georgia statute making it a criminal offense to engage in sodomy.  *One difference between the two cases is that the Georgia statute prohibited the conduct whether or not the participants were of the same sex, while*

officers in Houston, Texas, were dispatched to a private residence in response to a reported weapons disturbance. They entered an apartment occupied by John Geddes Lawrence. On entering, they did not see any weapons, but they did see Lawrence engaging in a sexual act with Tyron Garner. Lawrence and Garner were arrested, held in custody over night, charged, and convicted of "deviate sexual intercourse, namely anal sex, with a member of the same sex (man)." Each man was fined $200 and assessed court costs. *Lawrence*, 539 U.S. at 562-63. Both men appealed and, in the majority opinion authored by Justice Kennedy,[91] the Supreme Court held that petitioners' convictions for "adult consensual sexual intimacy in the home," and the Texas statute on which those convictions were based, violated the petitioners' "vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth

---

*the Texas statute* . . . applies only to participants of the same sex. Hardwick was not prosecuted, but he brought an action in federal court to declare the state statute invalid. He alleged he was a practicing homosexual and that the criminal prohibition violated rights guaranteed to him by the Constitution. The Court, in an opinion by Justice White, sustained the Georgia law. Chief Justice Burger and Justice Powell joined the opinion of the Court and filed separate, concurring opinions. Four Justices dissented.

*Lawrence*, 539 U.S. at 566 (emphasis supplied) (citations omitted).

[90] *See* 539 U.S. at 578 ("*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers v. Hardwick* should be and now is overruled.").

[91] Justice Kennedy's opinion for the Court was joined by Justices Stevens, Souter, Ginsburg, and Breyer. *See Lawrence*, 539 U.S. at 561-62. Justice O'Connor filed an opinion concurring in the judgment. *Id.* at 579. Justice Scalia filed a dissenting opinion, in which Chief Justice Rehnquist and Justice Thomas joined. *Id.* at 586. Justice Thomas also filed a separate dissenting opinion. *Id.* at 605.

Amendment." *Id*. at 564 (describing questions on which certiorari was granted).

Specifically, *Lawrence* held that state governments have no legitimate interests justifying criminal statutes that intrude upon non-commercial, sexual practices common to a homosexual lifestyle when the acts are performed in private by two consenting adults, neither of whom is a person who might be injured or coerced, or is situated in a relationship in which consent might not easily be refused (*e.g.*, neither of the participants is mentally or physically incompetent, nor related to the other within a degree of consanguinity that would constitute incest).

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

*Lawrence*, 539 U.S. at 578 (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847 (1992)).

Justice Kennedy's majority opinion is written in prose that is "easy to read, but difficult to pin down."[92]  *Lawrence* may well prove to be an important case,[93] with "broad consequences for regulation of sexual relationships, in a way that vindicates a quite general interest in sexual autonomy."[94]  On the other hand, it may just be "a sport, a decision with no descendants, one in which the Court struck down a law that shocked its conscience but that proved unable to generate further doctrine."[95]

_____

[92] Nan D. Hunter, *Living With Lawrence*, 88 Minn. L. Rev. 1103 (2004).  *See also* Lawrence H. Tribe, Lawrence v. Texas: *The "Fundamental Right" That Dare Not Speak Its Name*, 117 Harv. L. Rev. 1893 (2004).

[93] *See, e.g.,* Lawrence H. Tribe, Lawrence v. Texas: *The "Fundamental Right" That Dare Not Speak Its Name*, 117 Harv. L. Rev. 1893, 1895 (2004) (comparing *Lawrence* to *Brown v. Board of Education* and *Roe v. Wade*, "the only two decisions since 1937 that seem remotely comparable to *Lawrence* in their cultural significance."); Erwin Chemerinsky, *October Term 2002*, 6 Green Bag 367, 370 (2003) ("*Lawrence*, more than any other case in American History, recognizes that sexual activity is a fundamental aspect of personhood and that it is entitled to constitutional protection. . . . *Lawrence* is the most important decision to date recognizing the rights of gays and lesbians to equal dignity and equal treatment under the Constitution.").

[94] Cass R. Sunstein, *What Did Lawrence Hold?  Of Autonomy, Desuetude, Sexuality, and Marriage*, 2003 Sup. Ct. Rev. 27, 60.

[95] *Id.*  The difficulties in deciphering *Lawrence* were summarized by Eleventh Circuit Judge Stanley Birch in his majority opinion in *Williams* IV, 378 F.3d at 1235-38 (concluding that *Lawrence* "clearly established the unconstitutionality of criminal prohibitions on consensual adult sodomy," but did not "announce a new fundamental right" to sexual privacy "or, more broadly, to all forms of sexual intimacy"), and his opinion for the Court in *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 815-17 (11th Cir. 2004) (affirming the constitutionality of a Florida statute prohibiting adoption by homosexual persons "who are known to engage in current, voluntary homosexual activity" against both due process and equal protection challenges, and holding that *Lawrence* did not recognize a "new fundamental right to private sexual intimacy").  Essentially, Judge Birch noted that the "language and reasoning" of *Lawrence* is "inconsistent with standard fundamental-rights analysis," and lacks the "two primary features" of fundamental-rights analysis under the Due Process Clause:

First, the *Lawrence* opinion contains virtually no inquiry into the question of whether the petitioners' asserted right is one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in

**E.**   *The Second Eleventh Circuit Opinion* — "Williams IV"

On appeal to the Eleventh Circuit, this court's second opinion was assigned to an entirely different panel.[96]  Two members of that panel reversed and remanded the case.  *See Williams v. Pryor*, 378 F.3d 1232 (11th Cir. 2004) ("Williams IV"), *cert. denied*, 125 S. Ct. 1335 (2005).[97]  The majority first held that the Supreme Court's intervening decision in *Lawrence v. Texas* did not recognize a fundamental right to sexual privacy:

> [W]e decline to extrapolate from *Lawrence* and its *dicta* a right to sexual privacy triggering strict scrutiny.  To do so would be to impose a fundamental-rights interpretation on a decision that rested on rational-basis grounds, that never engaged in *Glucksberg* analysis, and that never invoked strict scrutiny.[98]

------

the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Second, the opinion notably never provides the "'careful description' of the asserted fundamental liberty interest" that is to accompany fundamental-rights analysis.  Rather, the constitutional liberty interests on which the Court relied were invoked, not with "careful description," but with sweeping generality.  Most significant, however, is the fact that the *Lawrence* Court never applied strict scrutiny, the proper standard when fundamental rights are implicated, but instead invalidated the Texas statute on rational-basis grounds, holding that it "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual."

*Williams* IV, 378 F.3d at 1236 n.6 (quoting *Lofton*, 358 F.3d at 816).

[96] The initial reviewing panel was comprised of then Chief Judge R. Lanier Anderson, and Circuit Judges Susan H. Black and Cynthia Holcomb Hall (U.S. Circuit Judge for the Ninth Circuit, sitting by designation).  The second reviewing panel was comprised of Circuit Judges Stanley F. Birch, Jr., and Rosemary Barkett, and Senior Circuit Judge James C. Hill.

[97] Judges Birch and Hill joined in the majority opinion, authored by Judge Birch.

[98] *Williams* IV, 378 F.3d at 1238.  The majority opinion also cited the decision in *Lofton v. Sec. of Dept. of Children and Family Services,* 358 F.3d 804 (11th Cir. 2004), to support the

The majority also criticized this court for defining plaintiffs' alleged fundamental right too broadly.  The majority agreed that this court had correctly framed the issue in *Williams* I as being "'whether the concept of a constitutionally protected right to privacy protects an individual's liberty to use sexual devices when engaging in lawful, private, sexual activity.'"[99]  However, the majority sharply criticized this court's *Williams* III opinion for "abandon[ing]" its prior formulation of the issue to instead "characterize[] the asserted right more broadly as a generalized 'right to sexual privacy.'"[100]  According to the majority, this court's opinion in *Williams* III "did little to define [the] scope and bounds" of the right in question, such that the right "would theoretically encompass such activities as prostitution,

---

proposition that *Lawrence* did not recognize a fundamental right to sexual privacy.

> The Supreme Court's most recent opportunity to recognize a fundamental right to sexual privacy came in *Lawrence v. Texas,* where petitioners and *amici* expressly invited the court to do so.  That the *Lawrence* Court had declined the invitation was this court's conclusion in our recent decision in *Lofton v. Sec. of Dept. of Children and Family Servs.,* 358 F.3d 804, 815-16 (11th Cir. 2004).  In *Lofton,* we addressed in some detail the "question of whether *Lawrence* identified a new fundamental right to private sexual intimacy."  *Id.* at 815.  We concluded that, although *Lawrence* clearly established the unconstitutionality of criminal prohibitions on consensual adult sodomy, "it is a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right" — whether to homosexual sodomy specifically, or, more broadly, to all forms of sexual intimacy.  *Id.* at 817.  We noted in particular that the *Lawrence* opinion did not employ fundamental-rights analysis and that it ultimately applied rational-basis review, rather than strict scrutiny, to the challenged statute.  *Id.* at 816-17.

*Williams* IV*,* 378 F.3d at 1236 (footnotes omitted).

[99] *Williams* IV, 378 F.3d at 1239 (quoting *Williams* II, 240 F.3d at 953).

[100] *Id.*

-36-

obscenity, and adult incest — even if we were to limit the right to consenting adults."[101]  The *Williams* IV majority refused to accept this characterization of the issue, and held instead that the right in question was the "right to use [sexual] devices."[102]

---

[101] *Id.* at 1241.

[102] *Id.* at 1242.  The dissenting opinion described the majority's analysis as "demeaning and dismissive."  *Id.* at 1250 (Barkett, J., dissenting).  This court does not enjoy a similar privilege of characterization.  Nevertheless, it does seem somewhat unfair to be chastised for attempting to comply with what this court perceived to be the instructions of the first Eleventh Circuit reviewing panel.

For example, the *Williams* IV panel said that this court "failed to exercise . . . 'utmost care'" in defining the scope of the fundamental right at issue.  *Williams* IV, 378 F.3d at 1239.  However, this court *did* exercise "utmost care" to follow the directive of the first appellate reviewing panel. Although the first panel agreed with this court's narrow framing of the alleged right in *Williams* I, it also referred to the right in question as the "right to private sexual activity and use of sexual devices," *Williams* II, 240 F.3d at 954, a right involving "important interests in sexual privacy," *id.* at 955, and the "fundamental right to sexual privacy," *id.* at 955.  The last characterization listed can be found within the Eleventh Circuit's instructions for this court on remand.

> We remand the as-applied challenges for due consideration by the district court because the record and stipulations in this case simply are too narrow to permit us to decide whether or to what extent the Alabama statute infringes *a fundamental right to sexual privacy* of the specific plaintiffs in this case.

*Id.* (emphasis supplied).

The second Eleventh Circuit panel recognized that following the first panel's instructions may have taken this court down a path with which the second panel later disagreed.

> Although our *Williams* II opinion indicated from the outset that the district court's initial narrow framing of the right was the proper approach, 240 F.3d at 953, we note that it created a degree of ambiguity by making a subsequent shorthand reference to this right as a "fundamental right to sexual privacy," *id.* at 955.  It appears that this imprecision in our language was, at least in part, the source of the district court's over-broad framing of the right on remand.

*Williams* IV, 378 F.3d at 1232.  Despite this recognition, the *Williams* IV panel's criticism was no less harsh.  This lowly court can only hope that it has not again so woefully misconstrued the Eleventh Circuit's directives.

The panel also castigated this court for concluding the alleged fundamental

right was "objectively, deeply rooted in this Nation's history and tradition."

> We find that the district court, in reaching this conclusion, erred
> on four levels.  The first error relates back to the district court's over-
> broad framing of the asserted right in question.  Having framed the
> relevant right as a generalized "right to sexual privacy," the district
> court's history and tradition analysis consisted largely of an irrelevant
> exploration of the history of sex in America.  Second, we find that this
> analysis placed too much weight on contemporary practice and attitudes
> with respect to sexual conduct and sexual devices.  Third, rather than
> look for a history and tradition of *protection* of the asserted right, the
> district court asked whether there was a history and tradition of state
> *non-interference* with the right.  Finally, we find that the district court's
> uncritical reliance on certain expert declarations in interpreting the
> historical record was flawed and that its reliance on certain putative
> "concessions" was unfounded.[103]

The Eleventh Circuit accordingly refused to recognize any fundamental right

applicable to the plaintiffs.  It reversed this court's decision to strike down the

Alabama statute, and remanded the case to this court for further proceedings

consistent with its opinion.[104]

## PART FOUR

**A.** *Discussion of the Issue on Remand*

The *Williams* IV panel unanimously agreed that, following remand, this court

"may examine 'whether our holding in *Williams* II that Alabama's law has a rational

---

[103] *Williams* IV, 378 F.3d at 1242 (emphasis supplied).

[104] *Id.* at 1250.

-38-

basis (*e.g.*, public morality) remains good law now that *Bowers* has been overruled.'"
*Williams* IV, 378 F.3d at 1238 n.9 (Birch, J., majority opinion) (quoting *id*. at 1259
n.25) (Barkett, J., dissenting)).  Several passages from Justice Kennedy's opinion for
the *Lawrence* majority bear upon that question.  The first is found at the beginning
of Justice Kennedy's discussion of *Bowers v. Hardwick*, where he said this:

> The Court began its substantive discussion in *Bowers* as follows:
> "The issue presented is whether the Federal Constitution confers a
> fundamental right upon homosexuals to engage in sodomy and hence
> invalidates the laws of the many States that still make such conduct
> illegal and have done so for a very long time." [478 U.S.] at 190.  That
> statement, we now conclude, discloses the Court's own failure to
> appreciate the extent of the liberty at stake.  To say that the issue in
> *Bowers* was simply the right to engage in certain sexual conduct
> demeans the claim the individual put forward, just as it would demean
> a married couple were it to be said marriage is simply about the right to
> have sexual intercourse.  The laws involved in *Bowers* and here are, to
> be sure, statutes that purport to do no more than prohibit a particular
> sexual act.   Their penalties and purposes, though, have more
> far-reaching consequences, touching upon the most private human
> conduct, sexual behavior, and in the most private of places, the home.
> The statutes do seek to control a personal relationship that, whether or
> not entitled to formal recognition in the law, is within the liberty of
> persons to choose without being punished as criminals.
>
> *This*, *as a general rule*, *should counsel against attempts by the*
> *State*, *or a court*, *to define the meaning of the relationship or to set its*
> *boundaries absent injury to a person or abuse of an institution the law*
> *protects*.  It suffices for us to acknowledge that adults may choose to
> enter upon this relationship in the confines of their homes and their own
> private lives and still retain their dignity as free persons.   When
> sexuality finds overt expression in intimate conduct with another person,
> the conduct can be but one element in a personal bond that is more

enduring.  The liberty protected by the Constitution allows homosexual
persons the right to make this choice.

*Lawrence*, 539 U.S. at 566-67 (emphasis supplied).  In other words, if the sexual

practices common to a homosexual lifestyle proscribed by a state criminal statute are

*not* purchased from a prostitute (*i.e.*, are not "commercial"), and are *not* performed

in public places, but instead take place "in the confines of . . . homes" between two

consenting adults, neither of whom is a person who might be injured or coerced, or

who is situated in a relationship in which consent might not easily be refused (*e.g.*,

is not mentally or physically incompetent, nor related to the other participant within

a degree of consanguinity that would constitute incest), then the moral views of a

governing majority may not be used "to define the meaning of the relationship or to

set its boundaries."

Several pages later, and while still discussing *Bowers*, Justice Kennedy framed

"the question before" the Court in *Lawrence* as being "whether the majority may use

the power of the State to enforce [its moral principles] on the whole society through

operation of the criminal law."  The context in which that statement appears was as

follows:

> It must be acknowledged, of course, that the Court in *Bowers* was
> making the broader point that *for centuries there have been powerful
> voices to condemn homosexual conduct as immoral.*  The condemnation
> has been shaped by religious beliefs, conceptions of right and acceptable

behavior, and respect for the traditional family.  For many persons these
are not trivial concerns *but profound and deep convictions accepted as
ethical and moral principles* to which they aspire and which thus
determine the course of their lives.  *These considerations do not answer
the question before us*, however.  *The issue is whether the majority may
use the power of the State to enforce these views on the whole society
through operation of the criminal law*.  "Our obligation is to define the
liberty of all, not to mandate our own moral code."

*Lawrence*, 539 U.S. at 571 (quoting *Casey*, 505 U.S. at 850) (emphasis supplied).

As Justice Kennedy's discussion of *Bowers* neared its denouement, he quoted

approvingly from Justice Stevens's dissenting opinion in *Bowers*, and stated that

Justice Stevens's "analysis . . . should have been controlling in *Bowers* and should

control here."  *Id*. at 578.  Of particular note is the fact that the quoted passage

includes this assertion:  "[T]he fact that the governing majority in a State has

traditionally viewed a particular practice as immoral is not a sufficient reason for

upholding a law prohibiting the practice."  The specific context of that statement was

as follows:

The rationale of *Bowers* does not withstand careful analysis.  In his
dissenting opinion in *Bowers* Justice STEVENS came to these
conclusions:

"Our prior cases make two propositions abundantly clear.  First,
*the fact that the governing majority in a State has traditionally
viewed a particular practice as immoral is not a sufficient reason
for upholding a law prohibiting the practice*; neither history nor
tradition could save a law prohibiting miscegenation from
constitutional attack.  Second, individual decisions by married

-41-

persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment.   Moreover, this protection extends to intimate choices by unmarried as well as married persons."  478 U.S., at 216 (footnotes and citations omitted).

Justice STEVENS' analysis, in our view, should have been controlling in *Bowers* and should control here.

*Lawrence*, 539 U.S. at 577-78 (emphasis supplied).

Finally, near the end of the majority opinion, Justice Kennedy said that the Texas criminal statute at issue in *Lawrence* "further[ed] no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Id*. at 578.

In his dissenting opinion in *Lawrence*, Justice Scalia read the foregoing passages as "effectively decree[ing] the end of all morals legislation":

I turn now to the ground on which the Court squarely rests its holding:  the contention that there is no rational basis for the law here under attack.   This proposition is so out of accord with our juris-prudence — indeed, with the jurisprudence of *any* society we know — that it requires little discussion.

The Texas statute undeniably seeks to further the belief of its citizens that certain forms of sexual behavior are "immoral and unacceptable," *Bowers*, [478 U.S.] at 196 — the same interest furthered by criminal laws against fornication, bigamy, adultery, adult incest, bestiality, and obscenity.  *Bowers* held that this *was* a legitimate state interest.  The Court today reaches the opposite conclusion.  The Texas statute, it says, "furthers *no legitimate state interest* which can justify its

-42-

intrusion into the personal and private life of the individual," [539 U.S. at ] (emphasis added).  The Court embraces instead Justice STEVENS' declaration in his *Bowers* dissent, that "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice," [539 U.S. at ].  This effectively decrees the end of all morals legislation.  If, as the Court asserts, the promotion of majoritarian sexual morality is not even a *legitimate* state interest, none of the above-mentioned laws can survive rational-basis review.

*Lawrence*, 539 U.S. at 599 (Scalia, J., dissenting) (emphasis in original).

With all due respect, Justice Scalia engaged in hyperbole when arguing that *Lawrence* decreed the end of "all" morals legislation.  So also did Justice Stevens in his *Bowers* dissent (and, by adoption, the *Lawrence* majority), when unequivocally asserting that "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice."  *Lawrence*, 539 U.S. at 577 (quoting *Bowers*, 478 U.S. at 216 (Stevens, J., dissenting)).  Laws often are based upon the moral standards of society.  Indeed, if the effects of *Lawrence* are to be construed as broadly as Justice Scalia suggests, virtually our entire criminal code would be invalidated, because it is based on social conceptions of "right" and "wrong" behavior.

Perhaps anticipating this result, the Eleventh Circuit has commented upon (but not yet squarely addressed) the issue of the post-*Lawrence* viability of public morality as a rational basis for legislation.  In an opinion involving the constitutionality of a

-43-

Florida law preventing homosexual couples from adopting children, the Eleventh

Circuit emphasized that public morality remains a constitutionally rational basis for

legislation.

> Florida also asserts that the statute is rationally related to its
> interest in promoting public morality both in the context of child rearing
> and in the context of determining which types of households should be
> accorded legal recognition as families. *Appellants respond that public
> morality cannot serve as a legitimate state interest.* Because of our
> conclusion that Florida's interest in promoting married-couple adoption
> provides a rational basis, *it is unnecessary for us to resolve the question.*
> We do note, however, the Supreme Court's conclusion that there is not
> only a legitimate interest, but "a substantial government interest in
> protecting order and morality," *Barnes v. Glen Theatre, Inc.,* 501 U.S.
> 560, 569, 111 S. Ct. 2456, 2462, 115 L. Ed. 2d 504 (1991), and its
> observation that "[i]n a democratic society legislatures, not courts, are
> constituted to respond to the will and consequently the moral values of
> the people." *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S. Ct. 2909, 2926,
> 49 L. Ed. 2d 859 (1976) (plurality opinion) (citation omitted).
>
> We also note that our own recent precedent has unequivocally
> affirmed the furtherance of public morality as a legitimate state interest.
> *See, e.g., Williams v. Pryor,* 240 F.3d 944, 949 (11th Cir. 2001) ("The
> crafting and safeguarding of public morality has long been an
> established part of the States' plenary police power to legislate and
> indisputably is a legitimate government interest under rational basis
> scrutiny."); *see also id.* at 949 n.3 ("In fact, the State's interest in public
> morality is sufficiently substantial to satisfy the government's burden
> under the more rigorous intermediate level of constitutional scrutiny
> applicable in some cases.").

*Lofton v. Secretary of Dept. of Children and Family,* 358 F.3d 804, 819 n.17 (11th

Cir. 2004) (Birch, J.) (emphasis supplied) (bracketed alterations in original). The

*Williams* IV majority opinion, also authored by Judge Birch, accordingly addressed

the issue in much the same way:

> [T]he Supreme Court has noted on repeated occasions that laws can be based on moral judgments. *See Barnes v. Glen Theatre,* 501 U.S. 560, 569, 111 S. Ct. 2456, 2462, 115 L. Ed. 2d 504 (1991) (upholding a public indecency statute, stating, "This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation"); *id.* (noting that "a legislature could legitimately act ... to protect 'the social interest in order and morality'") (citation omission); *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S. Ct. 2909, 2930, 49 L. Ed. 2d 859 (1976) (plurality opinion) (upholding the death penalty, noting that "capital punishment is an expression of society's moral outrage at particularly offensive conduct"); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61, 93 S. Ct. 2628, 2637, 37 L. Ed. 2d 446 (1973) (holding that Georgia had a legitimate interest in regulating obscene material because the legislature "could legitimately act ... to protect 'the social interest in order and morality'") (quoting *Roth v. United States,* 354 U.S. 476, 485, 77 S. Ct. 1304, 1309, 1 L. Ed. 2d 1498 (1957)); *United States v. Bass,* 404 U.S. 336, 348, 92 S. Ct. 515, 522, 30 L. Ed. 2d 488 (1971) (noting that "criminal punishment usually represents the moral condemnation of the community"). In addition, our own recent precedent has unequivocally affirmed the furtherance of public morality as a legitimate state interest. *See, e.g., Williams v. Pryor,* 240 F.3d 944, 949 (11th Cir. 2001) ("The crafting and safeguarding of public morality has long been an established part of the States' plenary police power to legislate and indisputably is a legitimate government interest under rational basis scrutiny."); *see also id.* at 949 n.3 ("In fact, the State's interest in public morality is sufficiently substantial to satisfy the government's burden under the more rigorous intermediate level of constitutional scrutiny applicable in some cases."). One would expect the Supreme Court to be manifestly more specific and articulate than it was in *Lawrence* if now such a traditional and significant jurisprudential principal has been jettisoned wholesale (with

all due respect to Justice Scalia's ominous dissent notwithstanding).

*Williams* IV, 378 F.3d at 1238 n.8.[105]

This court agrees with the reasoning behind the foregoing passages.  To hold that public morality can *never* serve as a rational basis for legislation after *Lawrence* would cause a "massive disruption of the current social order," one this court is not willing to set into motion.  *Lawrence,* 539 U.S. at 591 (Scalia, J., dissenting); *see also id.* at 590 ("'The law . . . is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed.'") (Scalia, J., dissenting) (quoting *Bowers,* 478 U.S. at 196).  Thus, the court will not invalidate the Alabama law in question here simply because it is founded on concerns over public morality.

The more difficult question, though, is whether this case fits squarely within the mold of *Lawrence,* such that *Lawrence's* holding — that public morality was not a sufficiently rational basis to support *the Texas statute at issue there* — applies to strike down the Alabama law here.  Answering this question requires the court to attempt to unlock the enigma of the *Lawrence* decision.

---

[105] Another district court within this circuit has interpreted this footnote as supporting the proposition that public morality still may serve as a rational basis for legislation. *See Wilson v. Ake,* 354 F. Supp. 2d 1298, 1309 (M.D. Fla. 2005) ("[D]espite Justice Scalia's fears in *Lawrence,* the Eleventh Circuit has recently reiterated that the 'furtherance of public morality [is] a legitimate state interest.'") (quoting *Williams* IV, 378 F.3d at 1238 n.8) (bracketed alterations in original).

**B**.    *An Interpretation of the Holding in* Lawrence v. Texas

The majority opinion in *Lawrence* is susceptible of many readings, but the

interpretation that makes most sense to this court is the following one:

> *Lawrence* is a multilayered story.  Only on its surface is it a story about removing the sanction of criminal punishment from those who commit sodomy.   Given that the criminal laws in this field have notoriously been honored in the breach and, almost from the start, have languished without enforcement, *Lawrence* quickly becomes a story about how *the very fact of criminalization*, even unaccompanied by any appreciable number of prosecutions, *can cast already misunderstood or despised individuals into grossly stereotyped roles, which become the source and justification for treating those individuals less well than others*.  The outlawed acts — visualized in ways that obscure their similarity to what most sexually active adults themselves routinely do — come to represent human identities, and this reductionist conflation of ostracized identity with outlawed act in turn reinforces the vicious cycle of distancing and stigma that preserves the equilibrium of oppression in one of the several distinct dynamics at play in the legal construction of social hierarchy.  *Lawrence* is a story, too, of shifting societal attitudes toward homosexuality, sex, and gender — a story of cultural upheaval that is related to law roughly as the chicken is to the proverbial egg.  But, perhaps more than anything else, *Lawrence* is a story of what "substantive due process," that stubborn old oxymoron, has meant in American life and law.

Lawrence H. Tribe, Lawrence v. Texas:  *The "Fundamental Right" That Dare Not

Speak Its Name*, 117 Harv. L. Rev. 1893, 1896-97 (2004) (footnotes omitted)

(emphasis supplied).

That does not tell the whole story, however, because the majority opinion in

*Lawrence* intertwines language typically associated with "substantive due process"

analysis with the "class" focus of equal protection analysis;  that is, the opinion "is a narrative in which due process and equal protection, far from having separate missions and entailing different inquiries, are profoundly interlocked in a legal double helix," and "advance[ ] an explicitly equality-based and relationally situated theory of substantive liberty." *Id*. at 1898.  *See also* Case Comment, *Eleventh Circuit Upholds Alabama Statute Banning Sale of Sex Toys*:  Williams v. Attorney General, 118 Harv. L. Rev. 802, 806-07 (2004) ("*Lawrence* clearly employed a substantive due process analysis in overturning the Texas statute criminalizing homosexual sodomy. But the Eleventh Circuit failed to recognize that the decision was also heavily driven by equal protection principles.  Indeed, *Lawrence* was groundbreaking not so much because it defended liberty for its own sake, but rather because it boldly confronted the manner in which liberty and equality intersect in society.  The prominent role of equal protection in *Lawrence* helps to explain Justice Kennedy's striking focus on human dignity and the stigma imposed by antisodomy laws. . . .") (footnotes omitted).

        In that respect, *Lawrence* echoes the themes of a precedent cited nowhere in the majority opinion, but which are implicit in its conclusions.  In *United States v. Carolene Products Co*., 304 U.S. 144 (1938), a post-*Lochner*, post-New-Deal, post-court-packing-fight decision, the Supreme Court sustained the constitutionality of a federal statute prohibiting the interstate shipment of "filled milk" on the basis of the

rational basis test — *i.e.*, *presuming* the existence of facts rationally supporting legislative judgments as to the appropriate means for regulating the distribution of an important consumer product.  Specifically, Justice Harlan Fiske Stone's opinion for the Court stated that "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional *unless* in the light of the facts made known or generally assumed it is of such a character as to preclude the *assumption* that it rests upon some rational basis within the knowledge and experience of the legislators." *Id*. at 152 (footnote omitted) (emphasis supplied).  The omitted footnote has become known to history as "*Carolene Products*' footnote four," and it warned that a rational relationship between a governmental interest and the legislative means for accomplishing that purpose might not always be sufficient to sustain the constitutionality of some statutes:

> There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth. . . .
>
> It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation. . . .
>
> Nor need we enquire whether similar considerations enter into the

review of statutes directed at particular religious . . . or national . . . or racial minorities . . . [or] *whether prejudice against discrete and insular minorities may be a special condition*, *which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.* . . .

*Carolene Products*, 304 U.S. at 152-53 n.4 (citations omitted) (emphasis supplied).

*See also Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring) (observing that the Court had "consistently held . . . that some objectives, such as 'a bare . . . desire to harm a politically unpopular group,' are not legitimate state interests," and that "[w]hen a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.") (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)).

In his study of the competing theories of judicial review that dominate contemporary discussion, John Hart Ely argued that the second and third paragraphs of *Carolene Products*' footnote four addressed the following purposes:

Paragraph two suggests that it is an appropriate function of the Court to keep the machinery of democratic government running as it should, to make sure the channels of political participation and communication are kept open. *Paragraph three suggests that the Court should also concern itself with what majorities do to minorities*, *particularly mentioning laws "directed at" religious, national, and racial minorities and those infected by prejudice against them.*

-50-

John Hart Ely, *Democracy and Distrust* 76 (1980) (emphasis supplied). Stated somewhat differently, Ely elaborates *Carolene Products'* fourth footnote as suggesting that, when one of the specifically worded textual provisions of the Constitution is not implicated, courts may overrule legislative judgments only when

> (1) the ins are choking off the channels of political change to ensure that they will stay in and the outs will stay out, *or* (2) though no one is actually denied a voice or a vote, *representatives beholden to an effective majority are systematically disadvantaging some minority out of simple hostility* or a prejudiced refusal to recognize commonalities of interest, *and thereby denying that minority the protection afforded other groups by a representative system*.

*Id*. at 103 (emphasis supplied) (footnote omitted).

In the opinion of this court, the concern reflected in *Carolene Products'* famous footnote four — that majorities may, if unchecked by a non-majoritarian institutional balance, ride booted and spurred on the backs of despised or feared minorities — is *precisely* the concern addressed by the *Lawrence* majority. The theme that reverberates throughout the majority's opinion is that the class of persons who engage in "sexual practices common to a homosexual lifestyle" constitute a "discrete and insular minority" that not only is denied the dignity and protection afforded other groups by a representative system, but also is systematically disadvantaged as a result of the majority's "animosity toward the class of persons affected." *Lawrence*, 539 U.S. at 574 (quoting *Romer v. Evans*, 517 U.S. 620, 634

(1996)).  That helps to explain why the majority opinion in *Lawrence* lacks all the indicia of a substantive due process "fundamental rights" analysis — the absence of which was noted by both Justice Scalia in his dissenting opinion in *Lawrence*,[106] and by Judge Birch in the opinions he authored for the *Williams* IV majority and the *Lofton* Court.

Justice Scalia was correct, but only in part, when asserting that the *Lawrence* majority had applied "an unheard-of form of rational-basis review."  539 U.S. at 586. The rational-basis review applied in *Lawrence is* rare, but it is not "unheard-of." Instead, it is the form of review contemplated in the third paragraph of *Carolene Products*' footnote 4, to correct institutional imbalances when the presumption of the self-rectifying nature of the democratic process does not operate as it should.[107]  As John Hart Ely put it, even though "no one is actually denied a voice or a vote, representatives beholden to an effective majority are systematically disadvantaging some minority out of simple hostility or a prejudiced refusal to recognize commonalities of interest, and thereby denying that minority the protection afforded other groups by a representative system."  Ely, *supra* at 103.

---

[106] *See*, *e.g.*, *Lawrence*, 539 U.S. at 586 ("Though there is discussion of 'fundamental proposition[s],' and 'fundamental decisions,' nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause; nor does it subject the Texas law to the standard of review that would be appropriate (strict scrutiny) if homosexual sodomy were a 'fundamental right.'") (Scalia, J., dissenting) (citations omitted).

[107] See the discussion at the end of Part Two (Section B(1)), *supra*.

If this is a correct interpretation of the majority's decision in *Lawrence*, it does not benefit plaintiffs in the present case.  As the stipulated facts show, Alabama's ban on the sale of sexual devices affects diffuse categories of people:  men and women; married as well as unmarried.  None have been identified in the stipulated facts as "gays," "lesbians," or any other "discrete and insular" class of individuals.  Moreover, none of the devices have been characterized as implements that are common to a homosexual lifestyle.  Consequently, it cannot plausibly be argued that the law has targeted a specific class of individuals for discrimination or harm out of simple hostility.  Stated somewhat differently, the Alabama statute, unlike the Texas anti-same-sex-sodomy statute at issue in *Lawrence*, neither directly nor indirectly burdens *an identifiable group* in such a way that a class of stigmatized individuals emerges.

In addition, this case simply is *different* from *Lawrence*.  The *Lawrence* majority was careful to define the scope of its holding, stating:

> The present case does not involve minors.  It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.  It does not involve public conduct or prostitution.  It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.  The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.  The petitioners are entitled to respect for their private lives.  The State cannot demean their existence or control their destiny by making their private sexual conduct a crime.  Their right to liberty under the Due Process Clause gives them

the full right to engage in their conduct without intervention of the government.  "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."  The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

*Lawrence*, 539 U.S. at 578 (quoting *Casey*, 505 U.S. at 847).

In contrast, the activities prohibited by the Alabama law at issue here are not limited to private sexual conduct, or to any other activities occurring solely within the private lives of consenting adults.  Instead, the activities prohibited by the law could very well be exposed to the public in general, including to minors.  As the *Williams IV* majority recognized, the differences between this case and *Lawrence* are significant.

> The dissent . . . flatly states that the *Lawrence* Court rejected public morality as a legitimate state interest that can justify criminalizing private consensual sexual conduct, but this conclusion ignores the obvious difference in what this statute forbids and the prohibitions of the Texas statute [at issue in *Lawrence*].  There is nothing "private" or "consensual" about the advertising and sale of a dildo.  And such advertising and sale is just as likely to be exhibited to children as to "consenting adults."

*Williams IV*, 378 F.3d 1238 n.8.  This case does *not* fit squarely within the mold of *Lawrence*.  Thus, *Lawrence's* holding — that public morality was not a sufficiently rational basis to support the Texas legislation in question there — does not apply to strike down the Alabama law here.

## PART FIVE

### *Conclusions*

In direct answer to the issue on remand, this court finds that the holding in *Williams* II — that the subject Alabama statute has a rational basis (*e.g.*, public morality) — remains "good law," even though *Bowers v. Harwick* has been overruled. In so finding, this court's holding illustrates that Justice Scalia's ominous prediction — that the majority's opinion in *Lawrence* "effectively decrees the end of all morals legislation" — will not be realized.[108]   Further, this case is distinguishable from *Lawrence,* such that public morality still may constitutionally serve as a rational basis for the law in question here.   For the reasons discussed above, the Alabama statute does not offend the human dignity of a stigmatized class of individuals, nor implicate equal protection concerns about targeting a "discrete and insular minority" for discrimination or harm out of simple hostility, in a way that requires the court to find the law unconstitutional under *Lawrence*.   Accordingly, plaintiffs' motion for summary judgment should be denied, and defendant's cross-motion for summary judgment granted.   An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

[108]*Cf.*, *e.g.*, Benjamin N. Cardozo, *The Paradoxes of Legal Science* 17 (1928) ("The moral code of each generation . . . supplies a norm or standard of behavior which struggles to make itself articulate in law.").

DONE this 28th day of February, 2006.

United States District Judge